Robert Loigman
Scott C. Shelley
Lindsay M. Weber
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Kingate Global Fund, Ltd., | Case No. 19-12853 |
| Debtor in a Foreign Proceeding. | |
| In re: | Chapter 15 |
| Kingate Euro Fund, Ltd., | Case No. 19-12852 |
| Debtor in a Foreign Proceeding. | |

**<u>DECLARATION OF PAUL PRETLOVE</u>**

I, Paul Pretlove, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1.     I make this declaration (the "<u>Declaration</u>") in support of the verified petitions (the "<u>Petitions</u>") filed by Tammy Fu and me (together, the "<u>Joint Liquidators</u>") pursuant to chapter 15 ("<u>Chapter 15</u>") of title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>"), seeking recognition of the proceedings commenced in the Commercial Division of the High Court of Justice, British Virgin Islands (the "<u>BVI Court</u>") as Case Nos. BVINCV2009/163 and

BVIHCV2009/164 (the "BVI Proceedings") in respect of Kingate Euro Fund, Ltd. ("Kingate Euro") and Kingate Global Fund, Ltd. ("Kingate Global" and, together with Kingate Euro, the "Kingate Funds" or the "Debtors").

2.      I am a resident of the British Virgin Islands ("BVI") and a licensed insolvency practitioner in both the BVI and the United Kingdom.  I am a Managing Director of Kalo (BVI) Limited ("Kalo"), an advisory firm engaged in providing restructuring and insolvency-related services in the BVI.  Prior to April 2017, Kalo operated under the name AlixPartners (BVI) Limited and prior to December 2016, Kalo operated under the name Zolfo Cooper (BVI) Limited. I have been employed at the firm since February 2012.

3.      Ms. Fu is a Managing Director of Kalo (Cayman) Limited, working in the Cayman Islands.  Ms. Fu has been employed at the firm since January 2007.

4.      Pursuant to the Verified Petition, the Joint Liquidators seek, among other things, recognition of the BVI Proceedings as foreign main proceedings under section 1517 of the Bankruptcy Code.  As discussed in more detail below, the Joint Liquidators seek chapter 15 relief at this time to protect their recent settlement (the "Madoff Settlement") with Irving Picard, the trustee (the "Madoff Trustee") for the bankruptcy estate of Bernard L. Madoff Investment Securities LLC ("BLMIS").

5.      I am advised by counsel that Chapter 15 recognition requires that a petition be brought by a "foreign representative" of a "foreign proceeding" as those terms are defined in sections 101(24) and 101(23) of the Bankruptcy Code.  I am further advised that in order to be recognized under Chapter 15 as a foreign main proceeding or a foreign nonmain proceeding, sufficient evidence must be shown to establish that the foreign proceeding is either pending in the debtor's "center of main interests ('COMI') or where the debtor has an establishment."

Accordingly, Part I of this Declaration sets forth the evidence in support of the characterization of the Joint Liquidators as foreign representatives and of the BVI Proceedings as foreign proceedings. Part II provides evidence regarding the Debtors pre-administration operations. Part III discusses the Debtors' collapse and the Madoff Settlement. Part IV provides an explanation of the Debtors' need for Chapter 15 recognition. Part V sets forth the evidence relating to the administration of the Debtors' interests in the BVI.

6.     Except as otherwise indicated, all facts set forth in this Declaration in support of the Petitions are based upon my personal knowledge or learned from my review of relevant documents, or upon my opinion based upon my experience and knowledge.

**I.     The Joint Liquidators Are "Foreign Representatives" and the BVI Proceedings Are "Foreign Proceedings" Under the Bankruptcy Code**

7.     On May 6, 2009, pursuant to the Insolvency Act, 2003 of the British Virgin Islands (the "BVI Act"), each of the Kingate Funds applied to the BVI Court for an order appointing William Tacon and Richard Fogerty, insolvency practitioners with Zolfo Cooper (BVI) Limited and Zolfo Cooper (Cayman) Limited as Kalo (BVI) Limited and Kalo (Cayman) Limited were then known, as Joint Provisional Liquidators. The BVI Court appointed Messrs. Tacon and Fogerty as provisional liquidators on May 8, 2009. On June 4, 2009, the BVI Court entered orders appointing William Tacon and Richard Fogerty as Joint Liquidators and directing the winding up of the Kingate Funds. Copies of the orders are attached to the Petitions as Exhibits B and C.

8.     Shortly after their appointment, Mr. Tacon and Mr. Fogerty sought and obtained authorization from the BVI Court to commence additional ancillary liquidation proceedings for the Kingate Funds in Bermuda, to aid and assist the principal liquidation proceeding in BVI (the "Bermuda Proceedings"). By orders dated September 4, 2009 (the "Bermuda Orders"), the

Supreme Court of Bermuda (the "Bermuda Court") (i) ordered that the Kingate Funds be wound up in accordance with the procedures of the Bermuda Companies Act 1981, and (ii) appointed Mr. Tacon, Mr. Fogerty, and John McKenna as joint provisional liquidators in the Bermuda Proceedings.  Copies of the Bermuda Orders are attached to the Petitions as Exhibits F and G. By orders dated October 5, 2009, Mr. Tacon, Mr. Fogerty, and John McKenna were appointed as joint liquidators in the Bermuda Proceedings.

9.      Even though ancillary liquidation proceedings are pending in the Bermuda Court, the liquidation of the Kingate Funds has always been centered in the BVI as main proceedings.

10.      In addition, on October 4, 2010, the Joint Liquidators sought recognition of the BVI Proceedings as foreign main proceedings from the English High Court of Justice (the "English Court") pursuant to article 15 of the UNCITRAL Model Law on Cross-Border Insolvency Regulations 2006.  The English Court entered orders on December 9, 2010 granting recognition of the BVI Proceedings as foreign main proceedings as of December 2, 2010. Copies of the English Court orders granting recognition are attached to the Petitions as Exhibits H and I.

11.      I was appointed Joint Liquidator of the Debtors in the BVI on April 29, 2016 and in Bermuda on June 1, 2016.  Ms. Fu was appointed as Joint Liquidator of the Debtors in the BVI on March 9, 2018 and in Bermuda on May 11, 2018.  Copies of the BVI orders appointing me and Ms. Fu are attached to the Petitions as Exhibits D and E.

12.      On September 4, 2019, the Joint Liquidators received authorization from the BVI Court to seek recognition of the BVI Proceedings by this Court.  Pursuant to the Appointment Orders, Ms. Fu and I are duly authorized to act as foreign representatives of the Debtors in these chapter 15 cases and are responsible for all aspects of the Debtors' business.

## II.     The Debtors' Pre-Administration Operations

13.     As set forth in the Kingate Funds' Information Memoranda, the Kingate Funds were "open-ended investment funds organized as an international business company in the British Virgin Islands ('BVI')."  *See* representative examples of Kingate Global's Information Memoranda attached to this Declaration as Exhibit 1 at i, and Kingate Euro's Information Memoranda attached to this Declaration as Exhibit 2 at ii.

14.     The Kingate Funds' registered offices have at all times been located in the BVI. Kingate Global was established on February 11, 1994, with its registered office as Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.  Exhibit 1 at i, ix.  Kingate Global filed an amended and restated memorandum of Association and Articles of Association on April 27, 2009, again listing its registered office as Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

15.     Kingate Euro was created in January 1996 as a sub-fund of Kingate Global to handle investments made in Deutsche Marks.  In April 2000, Kingate Euro became a separate legal entity to handle investments denominated in Euros, with its registered office  at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.  Exhibit 2 at ii, x.  Kingate Euro filed an amended and restated memorandum of Association and Articles of Association on April 27, 2009, again listing its registered office as Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

16.     Throughout their existence, until mid-December 2008 when Madoff was arrested, the Kingate Funds raised money through subscriptions for their shares, which they invested by paying their surplus cash into accounts managed by BLMIS.  *See, e.g.*, Exhibit 1 at ii; Exhibit 2 at iii. Each of Kingate Global and Kingate Euro supposedly reaped profits on the investments purportedly made by BLMIS, which their shareholders could realize by redeeming their shares at

a price proportionate to the net asset values of the Kingate Funds from time to time.  *See* Exhibit 1 at 22-24; Exhibit 2 at 22-25.

17.     Originally, Kingate Global was managed under "Co-Manager" agreements by Tremont (Bermuda) Limited ("Tremont") and Kingate Management Limited ("KML") in Bermuda.  In 2006, Kingate Global terminated the co-manager agreement with Tremont, leaving KML as its sole manager.  Exhibit 1 at ii.  In May 2000, Kingate Euro entered into a management agreement with KML.  Exhibit 2 at iii.

### III.    The Debtors' Collapse and the Madoff Settlement

18.     As of December 2008, almost all of the assets of the Kingate Funds were invested with BLMIS.  As a result, the arrest of Madoff and the subsequent bankruptcy of BLMIS forced the Kingate Funds into liquidation in the BVI.

19.     On April 17, 2009, the Madoff Trustee filed a complaint commencing proceedings against the Kingate Funds under various sections of the Bankruptcy Code and the New York debtor and creditor law, asserting claims to avoid and claw back $398,797,047 from Kingate Global and $527,554,858 from Kingate Euro (the "Clawback Proceeding").  *See* Doc. No. 100 in *Picard v. Ceretti, et al.*, Case No. 09-01161 (SMB) (SDNY Bankr.).

20.     The Madoff Trustee also sought to equitably subordinate the claims (the "Customer Claims") filed by the Kingate Funds in the liquidation of the BLMIS estate for their approximately $800 million net loss (i.e., the amount they had invested with BLMIS and never received back).  *See id*.

21.     After years of litigation, the Joint Liquidators achieved settlement of the Clawback Proceeding in June 2019.  The settlement followed a mediation in New York which took place over several days and which was followed by several weeks of extensive negotiations.

22.     The terms of the Madoff Settlement are set out in a settlement agreement dated June 26, 2019. *See* Exhibit A to Doc. No. 413 in Case No. 09-01161 (SMB).

23.     The Settlement Agreement is subject to a number of conditions precedent before it becomes final and binding. One condition is that the Madoff Trustee obtains approval of the Settlement Agreement from this Court, which is presiding over the SIPA Proceeding. *Id*. at 9. This Court entered an order approving the Settlement Agreement on August 6, 2019. Doc. No. 417 in Case No. 09-01161 (SMB).

24.     The Settlement is also conditional upon the Joint Liquidators obtaining sanction from both the BVI and Bermuda Courts to enter into the Settlement Agreement. Exhibit A to Doc. No. 413 in Case No. 09-01161 (SMB) at 9. The Joint Liquidators have filed applications to both the BVI and Bermuda Courts for sanction, and are now awaiting hearings.

25.     Under the Settlement Agreement, Kingate Global will receive an allowed claim in the BLMIS proceeding in the amounts of $950,401,414.27 and Kingate Euro will receive an allowed claim in the BLMIS proceeding in the amount of $709,346,680.25. After providing for the offset of the "Catch-up Payment" due to the Madoff Trustee on the avoidance claims, Kingate Global will receive a remainder payment of $262,315,130.70 from the BLMIS estate on the Closing Date (as defined in the Settlement Agreement). Both Kingate Global and Kingate Euro will be entitled to participate in collecting future distributions from the Madoff Trustee. Future distribution amounts are uncertain, of course, but could, based on current market projections, be in the range of an additional $79,500,000 to Kingate Global and $59,350,000 to Kingate Euro.

## IV.    The Debtors' Need For Recognition

26.     News of the Madoff Settlement has prompted certain purported creditors of the Kingate Funds to assert entitlement to funds received by the Kingate Funds on account of their

soon-to-be allowed Customer Claims.  In particular, Deutsche Bank ("DB"), with whom the

Joint Liquidators engaged in negotiations to sell their claims back in July 2011, has indicated that

it intends to seek to enforce an abandoned short form trade confirmation which the Joint

Liquidators signed on August 24, 2011 (the "Trade Confirmation").

27.    As set forth in the Trade Confirmation, the sale transaction was subject to the

execution of a Purchase and Sale Agreement ("PSA").  However, no PSA was ever signed

because DB refused to discuss the final drafting points required to complete the PSA and the deal

foundered in late 2011.

28.    In December 2011, the Joint Liquidators, with the sanction of the BVI Court,

commenced an action in the Southern District of New York to try to enforce DB's commitment to

purchase the Kingate Funds' Customer Claims.  *See Kingate Global et al. v. Deutsche Bank

Securities Inc.*, Case No. 11-cv-09364-DAB (S.D.N.Y. 2011).

29.    In answering the complaint, DB asserted that (among other things) the Trade

Confirmation was a preliminary agreement without all material terms, and that DB had satisfied

the obligation of good faith by negotiating for several months during 2011.  DB sought a

declaration that it had no continuing obligations under the Trade Confirmation, as the underlying

deal between the Joint Liquidators and the Madoff Trustee was not acceptable to DB.

30.    DB's Answer and Counterclaim concluded with the following affirmative

defenses (among others):

> • The Confirmation Letter, standing alone, is not a binding agreement obligating
> DBSI to purchase the claims referenced therein.

> • DBSI had met all of its obligations, if any, that existed under the Confirmation
> Letter.

> • There was no meeting of the minds as to the nature of the claim to be conveyed
> by the Funds.

*See id*. Doc. No. 10.

31.    Further negotiations ensued, but proved unfruitful, and the lawsuit was dismissed,

without prejudice, by a stipulation of dismissal entered on January 2, 2014.  *See id*. at Doc. No.

18.  The Joint Liquidators have had limited contact with DB during the ensuing six years.

32.    After learning of the Kingate Funds' mediation efforts, DB's attorneys sent a

letter to the Joint Liquidators in May 2019 asserting that the Trade Confirmation remained

binding on the Kingate Funds and that DB was "ready and willing to provide support to Kingate

in the mediation or otherwise in an effort to facilitate the resolution of the dispute between

BLMIS and Kingate, and in turn permit the transactions contemplated by the Trade Confirm to

be consummated."  The Joint Liquidators responded in a letter dated May 16, 2019, stating that

the Trade Confirmation was not binding and observing that, at that point, almost eight years had

elapsed without DB making any payment or finalizing the required documentation.

33.    Despite DB's repudiation of the earlier proposed transaction, and the passage of

many years' time, the Joint Liquidators understand that DB may now attempt to resurrect the

Trade Confirmation, based on the increase in value of the Kingate Funds' Customer Claims.  The

Joint Liquidators are concerned that DB may initiate litigation against the Kingate Funds in the

United States, in an effort to misappropriate value that should be distributed to stakeholders in the

Kingate Funds' liquidations.

34.    In order to protect the interests of stakeholders of the Kingate Funds from

purported creditors like DB seeking entitlement to the Kingate Funds' now-significant U.S.

assets, the Joint Liquidators seek recognition of the BVI Proceedings and protection under

Chapter 15.

## V.    The Debtors' Center of Main Interests is in the BVI

35.    As stated above, I am advised by counsel that to obtain recognition of the BVI

Proceedings as "foreign main proceedings" under section 1502(4) of the Bankruptcy Code, it

must be shown that the BVI is the "center of main interests" of the Debtors.  The only business

of the Debtors is their winding up and liquidation, which activities are primarily based in the

BVI and include administration of the Debtors' assets by the Joint Liquidators.  All of these

activities are overseen by the BVI Court.

36.    Moreover, below I set forth the relevant facts that support the conclusion that the

Debtors' center of main interest is in the BVI.

   a. The Kingate Funds' only headquarters is the BVI, from which location the Joint
      Liquidators direct the administration and management of the interests of the
      Kingate Funds.

   b. The BVI Court has overseen the administration of the Kingate Funds since June
      2009.

   c. Promotional materials, financial statements and reports and other written
      materials have identified the BVI as location of the Kingate Funds' business.

   d. Stakeholders and/or creditors of the Kingate Funds have received notice regarding
      the BVI Proceedings for the past ten years, apprising them that the management
      of the Kingate Funds' affairs is occurring in the BVI.

   e. The location of management of the Kingate Funds, i.e., the Joint Liquidators and
      their staff, is centered in the BVI.

   f. While Ms. Fu is a Cayman resident, she operates as an "overseas' practitioner in
      accordance with the BVI insolvency legislation.  I am a BVI resident and licensed
      by the BVI Financial Services Commission as an insolvency practitioner and Ms.
      Fu is permitted to operate on this basis in accordance with BVI insolvency
      legislation under my oversight.

   g. The majority of the activities in respect of winding up the Kingate Funds is
      managed by Kalo professionals located in the BVI.

   h. Creditors and other stakeholders of the Kingate Funds are located in many
      jurisdictions around the world, including in many European countries.

   i. The only material tangible assets of the Kingate Funds are cash funds held on
      account.  The Kingate Funds maintain bank accounts in BVI, the Cayman Islands
      and Bermuda, each of which holds cash that is subject to the control of the
      Foreign Representatives.

j.   The Kingate Funds' liquidation records are maintained primarily in the BVI.

k.   The primary, and most valuable assets of the Kingate Funds are their Customer Claims in the SIPA Proceeding.  Although the Customer Claims are pending in this District, once allowed, the proceeds of the distribution on account of those claims will be distributed to stakeholders in accordance with BVI law and will likely require determinations and/or sanction from the BVI Court.

l.   The Kingate Funds currently contract for ongoing services from several providers that are organized under the laws of the BVI, have offices in the BVI and employ residents of the BVI, including the liquidators' own staff, and Mourant, the Kingate Funds' BVI legal counsel.

m.   Correspondence sent to the Kingate Funds' stakeholders following the commencement of the BVI Proceedings advised such parties to direct communications concerning the Kingate Funds to the BVI offices of the Foreign Representatives in the BVI.

37.   I am also advised by counsel that, to obtain recognition of the BVI Proceedings as "foreign nonmain proceedings" under section 1502(5), it must be shown that such proceedings are pending in a country where the debtor has an "establishment."  I am further advised that an "establishment" is any place of operations where the debtor carries out "nontransitory economic activity."  In the event the Court does not recognize the BVI Proceedings as foreign main proceedings, I refer the Court to the facts above as demonstrating that the Debtors carry out nontransitory economic activity in the BVI.

*[signature page follows]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  September 5, 2019
        Tortola, BVI

_____
Paul Pretlove

# EXHIBIT 1

**THE SECURITIES DESCRIBED IN THIS CONFIDENTIAL INFORMATION MEMORANDUM AS THE SAME MAY BE AMENDED, SUPPLEMENTED AND RESTATED FROM TIME TO TIME (THE "MEMORANDUM") HAVE NOT BEEN REGISTERED OR QUALIFIED FOR OFFER OR SALE TO THE PUBLIC UNDER THE SECURITIES LAWS OF ANY COUNTRY OR JURISDICTION.**

**THE SHARES ISSUED BY KINGATE GLOBAL FUND, LTD. (THE "FUND") ARE NOT FOR SALE TO U.S. PERSONS OR TO ANY MEMBER OF THE PUBLIC IN THE BRITISH VIRGIN ISLANDS OR IN ANY OTHER PLACE WHERE SUCH SALE IS UNAUTHORIZED.  NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN AS CONTAINED IN THIS MEMORANDUM. PLEASE DIRECT ANY INQUIRIES TO THE ADMINISTRATOR.**

---

# KINGATE GLOBAL FUND, LTD

*A British Virgin Islands Company*

**Private Offering of USD Participating Common Shares
(herein "USD Shares")**

---

**AMENDED AND RESTATED
INFORMATION MEMORANDUM**

**22 September, 2008**

Price per Share: Net Asset Value
Minimum Initial Subscription: U.S. $250,000

| | |
|---|---|
| Manager: | Kingate Management Limited |
| Consultant: | FIM Advisers LLP |
| Administrator: | Citi Hedge Fund Services, Ltd |

---

INVESTMENT IN THE FUND INVOLVES RISK.
YOUR ATTENTION IS DRAWN TO THE RISK FACTORS
AND CONFLICTS OF INTEREST DETAILED HEREIN.

Recipient: _____

Memorandum no. _____

THIS CONFIDENTIAL INFORMATION MEMORANDUM IS BEING GIVEN TO THE RECIPIENT SOLELY FOR THE PURPOSE OF EVALUATING AN INVESTMENT IN THE SHARES DESCRIBED HEREIN.  IT MAY NOT BE REPRODUCED OR DISTRIBUTED TO ANYONE ELSE (OTHER THAN TO THE IDENTIFIED RECIPIENT'S PROFESSIONAL ADVISORS FOR THE PURPOSES OF EVALUATING THE INVESTMENT IN SHARES.)  THE RECIPIENT, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN IT AND ALL RELATED DOCUMENTS TO THE FUND IF THE RECIPIENT DETERMINES NOT TO SUBSCRIBE FOR SHARES.

# IMPORTANT NOTICES

Neither Kingate Global Fund, Ltd. (the "Fund") nor the USD Participating Common Shares of the Fund (the "USD Shares") described in this Amended and Restated Information Memorandum dated as of 22 September, 2008, as may be further amended and restated (this "Memorandum"), have been or will be registered or qualified under the securities laws of the United States ("U.S.") or any other jurisdiction.  This Memorandum does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of USD Shares in any jurisdiction in which such offer, solicitation or sale is not authorized or to any person to whom it is unlawful to make such offer, solicitation or sale.  The direct or indirect ownership of USD Shares by "Restricted Persons" as defined in this Memorandum, is prohibited except to a limited number of tax exempt investors in the Fund's discretion and then only after supplementary offering materials have been distributed to such potential investors. No person has been authorized to make any representations concerning the Fund or the USD Shares which are inconsistent with those contained in this Memorandum, and any such representations should accordingly be treated as unauthorized and may not be relied upon by the recipient.

Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice.  All prospective investors should consult their own professional advisors as to the legal, tax, financial or other matters relevant to the suitability of an investment in the USD Shares for such investor.

The purchase of USD Shares is speculative and involves a high degree of risk.  There is no assurance that the Fund will continue to be profitable and past performance is no assurance of continued future success. Moreover, since the Fund's Net Asset Value and the Net Asset Value of the USD Shares are calculated in U.S. Dollars, each investor, and not the Fund or any other person, bears the risk of any foreign currency exposure resulting from differences, if any, in the value of the U.S. Dollar relative to the currency of the country in which such investor resides.  See section entitled "CERTAIN RISK FACTORS" within this Memorandum for a more detailed description of the risks involved in the purchase of USD Shares.

This Memorandum is intended solely for the use of the person to whom it has been delivered by the Fund for the purpose of evaluating a possible investment in the USD  Shares described herein, and it is not to be reproduced or distributed to any other persons (other than professional advisors of the prospective investor receiving this document from the Fund).  Kingate Global Fund, Ltd. may offer other classes of shares pursuant to separate offering materials and may issue and offer other such classes without notice to or obtaining consent from the investors.  At present there are no other shares on offer.

Investors (and each employee, representative or other agent of investors) may disclose to any and all persons, without limitations of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including options or other tax analysis) that are provided to investors relating to such tax treatment and tax structure.  This authorization of tax disclosure is retroactively effective to the commencement of the first discussions between such investor and the Fund regarding the transactions contemplated herein.

Discussions in this Memorandum below as they relate to certain United Stated Federal Income Tax Consequences are not intended or written to be used, and cannot be used, for the purpose of avoiding United States Federal tax penalties.  Such discussions were written to support the promotion or marketing of the transactions or matters addressed in this Memorandum, and any taxpayer to whom the transactions or matters are being promoted, marketed or recommended should seek advice based on its particular circumstances from an independent tax advisor.

Any questions relating to the purchase of USD Shares in the Fund or this Memorandum should be directed to the Fund's Manager, Kingate Management Limited ("Manager").

This Memorandum supersedes the Fund's Amended and Restated Information Memorandum dated August 1, 2007.

All monetary amounts set forth herein are expressed in U.S. Dollars.

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

# KINGATE GLOBAL FUND, LTD.

## SUMMARY

The information set out below should be read in conjunction with, and is qualified in its entirety by, the full text of this Amended and Restated Information Memorandum, as may be further amended and restated (the "Memorandum"), the memorandum and articles of association (the "Memorandum and Articles of Association") of Kingate Global Fund, Ltd. and the documents and agreements referred to herein, all of which are available from the Administrator upon request.

**THE FUND**

*Generally.* Kingate Global Fund, Ltd. (the "Fund") is an open-end investment company organized as an international business company in the British Virgin Islands ("BVI") on February 11, 1994. The Fund is registered in the Territory of the British Virgin Islands as a "Professional Fund" as that term is defined in the British Virgin Islands Mutual Funds Act (1996), as amended by the Mutual Fund Amendment Act (1997).

*Offering.* The Fund is offering USD Class Participating Common Shares (the "USD Shares") at a net price per USD Share equal to the Net Asset Value (as defined herein) of the USD Shares.

The Fund is now offering, through this Memorandum, USD Participating Common Shares (the "USD Shares") at a net price per USD Share equal to the Net Asset Value (as defined herein) of the USD Shares. As of December 31, 2007, the audited Net Asset Value per Share of the USD Shares was U.S.$421.37 and there were 6,429,431 Shares outstanding. See "SHARES OF THE FUND" and "DETERMINATION OF NET ASSET VALUE." The Fund may discontinue this offering at any time for any reason or no reason. Investors are referred to herein as "Shareholders."

*Board of Directors.* The Fund has three (3) Directors on its Board of Directors (the "Board") who exercise ultimate authority over the Fund. The Directors meet quarterly, either in person or by telephone, to review the investment and administrative affairs of the Fund. See "MANAGEMENT - The Fund's Board of Directors."

*Other Classes.* The Fund is authorized to issue other classes of shares subject to terms and conditions that may differ from the terms and conditions applicable to the Shares discussed herein at any time without notice to or obtaining consent from the Shareholders. No offering of any other class is made by this Memorandum. There are no other classes on offer at the present time.

**INVESTMENT OBJECTIVE
AND PROCESS**

*Objective:* The Fund's investment objective is long-term capital appreciation.

*Stock/Options Trading.* The Fund seeks to obtain capital appreciation of its assets through the utilization of a non-traditional stock/options trading strategy. The Fund is designed for long term investment. See "THE FUND – The Fund's Investment Objective and Investment Process."

*Leverage.* The Fund may employ leverage for investment purposes or to fund redemptions.

**INVESTMENT ADVISOR**

The Fund's assets are managed by a New York based NASD[*] registered broker-dealer employing approximately 350 people and acting primarily as a market-maker in listed and unlisted stocks and convertible securities (the "Investment Advisor"). The Investment Advisor utilizes a "split strike conversion" options strategy consistent with that of the Fund, as set forth under "THE FUND – The Fund's Investment Objective and Investment Process." The Investment Advisor has managed the assets of the Fund since its inception and it is anticipated that the retention of such Investment Advisor will continue. In addition, from time to time, a portion of the Funds' assets may be managed by the Manager (as defined herein). See "MANAGEMENT - The Investment Advisor."

**PAST PERFORMANCE**

There can be no assurance that the Manager or the Investment Advisor will continue to be successful in pursuing the Fund's investment objective or that their strategy will continue to be profitable. Past results of the Manager, the Investment Advisor, or their respective principals and affiliates, are not necessarily indicative of the future favorable performance of the Fund.

**MANAGER**

Kingate Management Limited, a company duly incorporated under the laws of Bermuda on February 24, 1994 (the "Manager") is the Manager of the Fund. The Manager acts pursuant to a Manager Agreement effective January 1, 2006, by and between the Fund and the Manager (herein the "Manager Agreement"). Pursuant to the Manager Agreement, the Manager evaluates and monitors the Investment Advisor and, in general, provides all necessary management services to the Fund. The Manager may also manage directly the investment of a portion of the Fund's assets. See "MANAGEMENT - The Manager."

**CONSULTANT**

FIM Advisers LLP, located in London, United Kingdom (herein the "Consultant"), has been appointed as consultant to the Manager in relation to the investments of the Fund pursuant to a Consulting Services Agreement by and among the Fund, the

---

[*] The term NASD" refers to the U.S. National Association of Securities Dealers, Inc.

Manager and the Consultant dated August 1, 2005 (the "FIM Consulting Services Agreement"). Pursuant to the FIM Consulting Services Agreement, the Consultant renders consulting advice to the Manager with respect to certain aspects of the Fund's operational, administrative, marketing, accounting and legal matters. See "MANAGEMENT - The Consultant."

**ADMINISTRATOR**

Citi Hedge Fund Services, Ltd., (formerly BISYS Hedge Fund Services, Limited) , located in Bermuda (herein the "Administrator") is the Fund's Administrator pursuant to an Administration Agreement, as amended and restated effective June 1, 2007, by and among the Fund, the Manager and the Administrator (herein the "Administration Agreement"). Pursuant to the Administration Agreement, the Administrator administers the day-to-day activities of the Fund's operations, which include, without limitation, receiving subscriptions and processing redemption requests, calculating the Net Asset Value, responding to shareholder inquiries and similar matters. In addition to its administrative duties, an affiliate of the Administrator has been appointed as Registrar and Transfer Agent of the USD Shares pursuant to a Registrar Agreement, as amended and restated effective January 1, 2002, by and among the Fund, the Manager and the Administrator (herein the "Registrar Agreement"). See "MANAGEMENT - Administrator."

**BANKING AND CUSTODY**

The Bank of Bermuda Limited (the "Bank"), based in Hamilton, Bermuda, has been appointed as the Fund's banker for purposes of receiving subscription funds, disbursing redemption payments and processing cash transactions not directly related to the Fund's investment portfolio. Additionally, the assets of the Fund represented by the USD Shares (the "USD assets") are held in the custody of the Bank pursuant to a Custodian Agreement, dated as of May 1, 2000 by and among the Fund, the Manager and the Bank (herein the Custodian Agreement). The Bank does not provide custodian services for assets held with sub-custodians or with regard to assets maintained at the Investment Advisor. See "MANAGEMENT - Banking and Custody."

**SUBSCRIPTIONS**

*Price of Subscription.* The USD Shares may be purchased by Eligible Investors (as defined herein) as of the first Business Day (as defined below) of the month (herein the "Subscription Date") at a price equal to the Net Asset Value per USD Share as of the last Business Day of the immediately preceding calendar month (the "Valuation Date) plus any applicable subscription charges. "Business Day" refers to any day when the central banking systems of the U.S. and Bermuda are open and operating. See "Subscription Charge" below.

*Minimum Subscription.* The minimum initial investment per subscriber is U.S.$250,000. The minimum subsequent investment per subscriber is U.S.$100,000. Such amounts may be waived or reduced at the discretion of the Directors.

*Procedure.* Completed Subscription Forms must be received by the Administrator by the Business Day prior to the first Business Day of the month in which prospective investors wish to subscribe for Shares and cleared funds must be received by the Bank at the latest by the Subscription Date. All subscriptions are required to be made in U.S. Dollars. Fractional Shares are not issued and refunds of subscription funds are made only if the surplus amount (corresponding to non-issued fractional Shares) is in excess of U.S.$450. The Fund reserves the right to accept or reject any subscription in its absolute discretion. The Manager, in its sole discretion, may permit subscriptions on other than the first Business Day of a month.

*Subscription Charge.* A sales charge of up to five percent (5%) of the amount invested is payable on subscription of the USD Shares, but such charge may be waived in whole or in part at the sole discretion of the Manager. The Manager may grant all or part of such charge to dealers and independent third parties in connection with the solicitation of subscriptions.

*U.S. Tax Exempt Investors.* U.S. tax exempt investors wishing to subscribe should request a U.S. Supplemental Disclosure Statement and follow the additional procedures set forth therein.

**ELIGIBLE INVESTORS**

The Shares may be purchased only by "Eligible Investors," as described herein, except in a limited number of cases and then only after supplementary offering materials have been distributed to such potential investors (such as, without limitation, U.S. tax-exempt investors). Persons interested in purchasing Shares should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange restrictions with which they must comply. A limited number of Shares may be sold to U.S. investors and then only in a limited number of cases. See "SUBSCRIPTIONS AND REDEMPTIONS-Eligible Investors."

**NET ASSET VALUE**

*Generally.*   The Net Asset Value of the Fund is equal to the Fund's assets less the Fund's liabilities and any accrued but unpaid expenses and reasonable reserves that have not yet been charged.   Each Class of Shares and, with respect to the USD Shares, each Series thereof has its respective Net Asset Value determined in accordance with the foregoing and based upon the assets and liabilities attributable to the particular Class or Series, as the case may be.   Expenses, fees and other liabilities are determined in accordance with U.S. Generally Accepted Accounting Principles.   The Net Asset Values are calculated as of the close of business in New York on the last Business Day of each month or on such other date when such computation is necessary or appropriate (each a "Valuation Date").   See "DETERMINATION OF NET ASSET VALUE."

**CERTAIN US REGULATORY MATTERS**

The Fund is not registered as an investment company and therefore is not required to adhere to certain investment policies under the U.S. Investment Company Act of 1940, as amended (the "Company Act").   In addition, neither the Manager nor the Investment Advisor is registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"). This Memorandum may be amended by the Fund without further notice to the Shareholders so as to comply with any rule, regulation or statute.

**REDEMPTIONS**

*Generally.* Redemptions may be made as of the last Business Day of each calendar month (herein the "Redemption Date") upon thirty-five (35) days' prior notice, at the Net Asset Value as of the Redemption Date.   Settlements are generally made within thirty (30) days after the Redemption Date.   In circumstances where the Fund is unable to liquidate securities positions in an orderly manner in order to fund redemptions or where the value of the assets of the Fund cannot reasonably be determined, the Fund may take longer than thirty (30) days to effect settlements of redemptions or may even suspend redemptions.   The notice requirement may be waived by the Fund in its discretion. The redemption request is irrevocable unless the Fund consents to its withdrawal.  See "SUBSCRIPTIONS AND REDEMPTIONS."

*Redemption Charge*.   Generally, no redemption charge is imposed.   However, a redemption charge not to exceed one percent (1.0%) of the proceeds (waivable in whole or in part at the sole discretion of the Manager in exceptional circumstances) may be imposed on the redemption of Shares which are held for less than twelve (12) months from the Subscription Date.

**TRANSFERS**

No transfer of Shares may be made other than with the consent of the Directors, which consent may be withheld at the discretion of the Directors without the need for assigning any reason therefor. For the avoidance of doubt, transfers will not be approved unless the proposed transfer includes all legal, economic and beneficial rights to the Shares.  As part of the transfer process, the proposed transferee is required to complete the subscription documents and make the representations required of all other investors.  Shareholders requesting transfer of their Shares must submit a completed Transfer Request Form (available from the Administrator on request) to the Fund and the Administrator.  Note that in the event that the Shareholder is an entity or acts as nominee for others, certain additional information will be required.  No transfer will be valid without a completed Transfer Request Form and the express consent of the Directors.

**DISTRIBUTIONS**

It is the present intention of the Directors not to distribute net income by way of dividends.  Accordingly, net income effectively will be represented in the value of the Shares.  The Directors reserve the right to change such policy.

**FEES AND EXPENSES**

*Manager.* The Manager receives a monthly fee from the Fund at an aggregate annual rate equal to approximately one and one-half percent (1.50%) of the Fund's month-end Net Asset Value attributable to the USD Shares (the "Management Fee"), payable pursuant to the Manager Agreement. Appropriate adjustments are made to account for subscriptions and redemptions which may occur during the month.

*Investment Advisor*.  The Investment Advisor does not charge any fees for managing the assets of the USD Shares.  Its source of compensation is derived from the market making activity of its affiliated broker-dealer.

*Administrator.*  For its administrative duties, the Administrator receives fees as negotiated from time to time consistent with its customary charges for providing administrative services to the Fund.

*Consultant.*  The Consultant is paid by the Manager for its services at no additional cost to the Fund.

*Custodian.* Pursuant to the Custodian Agreement, the Bank receives a custodian services fee comprised of (i) an annual safekeeping charge equal to ten basis points (.10%) of the gross asset value of the Fund, subject to a maximum annual custodian fee of $25,000; and (ii) the right to recover all sub-custodian charges which are charged directly to the Fund.  The Bank is entitled to reimbursement of actual out-of-pocket expenses.

*Operations.* The Fund bears all other costs of its investment program (including brokerage and custody charges, interest and taxes) as well as professional fees of its auditors and attorneys. Expenses relating to the offering of the USD Shares are borne by the USD shareholders and paid out of the proceeds of this offering.  The USD Shares' organizational costs are being amortized and are not considered material.

*Directors' Fees.*  Each Director who is not an officer or employee of the Manager, the Administrator or related companies, receives a flat annual fee for serving in such capacity.  The fee may vary from time to time but will be in accordance with reasonable and customary directors' fees.  The Directors shall be entitled for reimbursement from the Fund for reasonable out-of-pocket expenses incurred by them on behalf of the Fund.

**RISK FACTORS**

Investment in the Fund is speculative and involves a high degree of risk. Past performance of the Manager or of the Investment Advisor is no guarantee of future performance.  There is no assurance that the Fund will be profitable.  The risks of an investment in the Fund include, but are not limited to, the speculative nature of the Fund's strategies and the charges that the Fund will incur regardless of whether any profits are earned. Moreover, each USD Shareholder, and not the Fund, bears the risk of any foreign currency exposure resulting from differences, if any, in the value of the U.S. Dollar relative to the currency of the country in which such Shareholder resides. See "CERTAIN RISK FACTORS."

**CONFLICTS OF INTEREST**

The Fund is also subject to certain conflicts of interest.  The Investment Advisor or the Manager may directly or indirectly manage the assets of funds that in some respects compete with the Fund for certain investments.  See "POTENTIAL CONFLICTS OF INTEREST."

**LISTING**

The Fund may seek to list the Shares on the Irish Stock Exchange or a similar securities exchange, at the sole discretion of the Board and without the consent of the Shareholders.

**REPORTING**

Shareholders will receive from the Fund annual audited financial statements within a reasonable time after the Fund's fiscal year-end.  In addition, Shareholders will receive from the Administrator monthly reports relating to the Fund's performance. Net Asset Value quotations are also published weekly (estimated to the extent required) in the *International Herald Tribune*, *Financial Times*, *Bloomberg* and *Telekurs*.

**FISCAL YEAR**

The Fund's fiscal year-end is December 31st.

**TAX STATUS**

The Fund should not be subject to any BVI or U.S. income taxes (other than U.S. withholding taxes on dividend or certain interest income, if any, derived from U.S. sources.)  Shareholders of the Fund who are not otherwise subject to BVI or U.S. taxation by reason of their residence, nationality or other particular circumstances should not become subject to any such taxation by reason of the ownership or redemption of the USD Shares. Prospective investors should inform themselves as to the tax consequences, if any, in their own countries, which might be relevant to the purchase, holding, repurchase, redemption or transfer of the USD Shares.

**CERTAIN ERISA CONSIDERATIONS**

Investment in the Fund generally will be open to employee benefit plans and other funds subject to ERISA and/or Section 4975 of the Code.  Except as described below under "CERTAIN RISK FACTORS – Compliance with ERISA Transfer Restrictions," the Fund intends to use commercially reasonable efforts to cause "benefit plan investors" not to own a significant portion of any class of shares in the Fund, so that the assets of the Fund should not be considered to be "plan assets" for purposes of ERISA and Section 4975 of the Code, although there can be no assurance that non "plan asset" status will be obtained or maintained.  Prospective purchases and subsequent transferees of Shares in the Fund may be required to make certain representations regarding the compliance with ERISA and Section 4975 of the Code.   See "CERTAIN ERISA CONSIDERATIONS."

**FUNCTIONAL CURRENCY**

The Fund's functional currency, *i.e.*, the currency in which it maintains its books and records, its financial statements and invests its assets, is the U.S. Dollar.

**PRIVACY NOTICE**

Any and all nonpublic personal information received by the Fund, the Manager and/or the Investment Advisor with respect to the Shareholders who are natural persons, including the information provided to the Fund by the Shareholder in the subscription documents, will not be shared with nonaffiliated third parties which are not service providers to the Fund, the Manager and/or the Investment Advisor without prior notice to such Shareholders.  Service providers that may receive such nonpublic information include but are not limited to the Administrator, the auditors and the legal advisors of the Fund. Additionally, the Fund, the Manager and/or the Investment Advisor may disclose such nonpublic personal information as required by law or regulation, including without limitation, any disclosure that may be required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 and any relevant British Virgin Islands anti-money laundering laws and

regulations.    See the exhibit to the Subscription Agreement entitled "Privacy Notice."

# DIRECTORY

| | | |
|---|---|---|
| **Fund's Registered Office** | Kingate Global Fund, Ltd.<br>c/o Bison Financial Services Limited<br>Bison Court<br>P.O. Box 3460<br>Road Town, Tortola<br>British Virgin Islands | Telephone:  (+ 1-284) 494-5239<br>Telecopier:  (+ 1-284) 494-6728 |
| **Fund's Directors** | Mr. Christopher Wetherhill<br>Mr. John E. Epps<br>Mr. Graham H. Cook | |
| **Manager** | Kingate Management Limited<br>99 Front Street<br>Hamilton HM11, Bermuda<br>Attn.:  Mr. Christopher Wetherhill<br>        Ms. Patra Philipps | Telephone:  (+ 1-441) 296-2888<br>Telecopier:  (+ 1-441) 296-6775<br>E-mail:       admin@kingate.bm |
| **Administrator** | Citi Hedge Fund Services, Ltd<br>9 Church Street<br>P.O. Box HM 951<br>Hamilton, Bermuda HM DX<br>Attn.:  Investor  Services Unit | Telephone:  (+ 1-441) 295-9166<br>Telecopier:  (+ 1-441) 296-8227 |
| **Consultant** | FIM Advisers LLP<br>20 St. James St.<br>London SW1A1ES<br>United Kingdom<br>Attn.:  Mr. Carlo Grosso<br>        Mr. Federico M. Ceretti | Telephone:  (+ 44-20) 7389-8900<br>Telecopier:  (+ 44-20) 7389-8911<br>E-mail:       main@fim-group.com |
| **Bank** | The Bank of Bermuda Limited<br>6 Front Street<br>P.O. Box HM 1020<br>Hamilton HM 11, Bermuda<br>Attn.:  Ms. Chandra Arandjelovic | Telephone:  (+ 1-441) 299-5071<br>Telecopier:  (+ 1-441) 299-6565<br>Email:chandra.arandjelovic@bob.hsbc.com |
| **Auditors** | PricewaterhouseCoopers<br>Dorchester House<br>7 Church Street<br>Hamilton HM11, Bermuda<br>Attn.:  Mr. Andrew Brook<br>Email:andrew.brook@bm.pwcglobal.com | Telephone:  (+ 1-441) 295-2000<br>Telecopier:  (+ 1-441) 295-1242 |

**Legal Advisors**

*In the British Virgin Islands:*

| | |
|---|---|
| O'Neal Webster O'Neal | Telephone:  (+ 1-284) 494-5808 |
| 30 DeCastro Street | Telecopier:  (+ 1-284) 494-5811 |
| Road Town, Tortola | Email:        boneal@owomfg.com |
| British Virgin Islands | |
| Attn:  Barbara O'Neal, Esq. | |

*In the United States*

| | |
|---|---|
| Tannenbaum, Helpern, | Telephone:  (+ 1-212) 508-6701 |
| Syracuse & Hirschtritt LLP | Telecopier:  (+ 1-212) 355-3034 |
| 900 Third Avenue | E-mail:        tannenbaum@thshlaw.com |
| New York, N.Y. 10022 | |
| U.S.A. | |
| Attn.:  Michael G. Tannenbaum, Esq. | |

# Table of Contents

Page

Summary .................................................................................................................................. i

Directory ................................................................................................................................. x

The Fund ................................................................................................................................. 1

Investment Objective and Process ......................................................................................... 2
    Investment Objective ........................................................................................................ 2
    Investment Process ........................................................................................................... 2
    Temporary Investments .................................................................................................... 3
    Investment Restrictions .................................................................................................... 3
    Borrowing and Lending ................................................................................................... 3
    Transaction Execution ..................................................................................................... 3
    Distributions and Reinvestment ...................................................................................... 3

Certain Risk Factors .............................................................................................................. 4
    Operating History ............................................................................................................. 4
    Achievement of Investment Objective ............................................................................ 4
    Illiquidity of Investment .................................................................................................. 4
    Dependence on the Manager ............................................................................................ 4
    Dependence on the Investment Advisor .......................................................................... 5
    General Economic Conditions ......................................................................................... 5
    Market Risks .................................................................................................................... 5
    Trading Strategies of the Investment Advisor ................................................................ 5
    Special Techniques Used by the Investment Advisor ...................................................... 6
    Concentration ................................................................................................................... 7
    Regulation ........................................................................................................................ 7
    No Manager Liability Beyond Fund Assets ..................................................................... 8
    Shortened Claims Period .................................................................................................. 8
    Litigation ......................................................................................................................... 8
    Early Termination ............................................................................................................ 8
    Effect of Substantial Withdrawals .................................................................................. 9
    Possibility of Fraud or Misappropriation ........................................................................ 9
    Changes in Applicable Law ............................................................................................. 9
    Reserve for Contingent Liabilities .................................................................................. 9
    Certain Conflicts of Interest ............................................................................................ 9
    Other Clients of Investment Advisor ............................................................................... 9
    Common Counsel ............................................................................................................. 10
    Lack of Independent Experts Representing Investors ...................................................... 10
    Institutional Risk ............................................................................................................. 10
    Settlements ....................................................................................................................... 10
    Pricing Information .......................................................................................................... 11
    Anti-Money Laundering .................................................................................................. 11
    Compliance with ERISA Transfer Restrictions ............................................................. 11

Management ............................................................................................................................ 12

The Fund's Board of Directors ............................................................................................. 12
The Manager .......................................................................................................................... 13
The Investment Advisor ........................................................................................................ 14
The Consultant ...................................................................................................................... 14
The Administrator .................................................................................................................. 15
Banking and Custody ............................................................................................................ 16
Voting Rights of Shareholders .............................................................................................. 16

Fees and Expenses ...................................................................................................................... 17
Organization Costs ................................................................................................................ 17
Fees of the Manager .............................................................................................................. 17
Fees of the Investment Advisor ............................................................................................ 17
Fees of the Consultant ........................................................................................................... 17
Fees of the Administrator ...................................................................................................... 17
Fees of the Bank .................................................................................................................... 17
Other Operating Expenses ..................................................................................................... 18

Subscriptions and Redemptions .................................................................................................. 18
Subscriptions ......................................................................................................................... 18
Anti Money Laundering ........................................................................................................ 19
Eligible Investors .................................................................................................................. 20
Redemptions .......................................................................................................................... 21

Determination of Net Asset Value .............................................................................................. 24

Potential Conflicts of Interest ..................................................................................................... 25

Taxation ...................................................................................................................................... 26
Introduction ........................................................................................................................... 26
The Fund ................................................................................................................................ 26
E.U. Savings Directive .......................................................................................................... 28

CERTAIN ERISA CONSIDERATIONS .................................................................................... 30

Additional Information ................................................................................................................ 33
Reports to Shareholders ........................................................................................................ 33
Available Documents ............................................................................................................. 33
Auditor's Consent .................................................................................................................. 34
Counsel .................................................................................................................................. 34
Inquiries and Communication with the Fund ........................................................................ 34

Subscription Instructions ............................................................................................................S-1
Subscription Agreement.............................................................................................................S-4
Exhibit A: Form of Incumbency Certificate ...........................................................................S-18
Exhibit B: AML Certification Form for Fund of Funds or Entities that invest on behalf of 3rd Parties ..S-20
Exhibit C: Form Letter of Reference .......................................................................................S-21
Exhibit D: Beneficial Ownership Information..........................................................................S-22
Exhibit E: Trust Ownership Information ..................................................................................S-23
Redemption Request .................................................................................................................S-24
Transfer Request Form..............................................................................................................S-27
Additional Subscription Agreement..........................................................................................S-29
Exhibit I: Sample Letter for Approved Transfers ....................................................................S-31
Exhibit J: Privacy Notice .........................................................................................................S-32

# KINGATE GLOBAL FUND, LTD.

---

## THE FUND

---

KINGATE GLOBAL FUND, LTD. (the "Fund") is an open-end investment company organized as an international business company in the British Virgin Islands ("BVI"). The Fund seeks long-term capital growth by allocating USD Share capital to a selected investment advisor to execute the Fund's Investment Objective and Process as set forth herein. See "INVESTMENT OBJECTIVE AND PROCESS."

The Fund was established and commenced operations during 1994. USD Shares were initially offered on March 1, 1995 and the Net Asset Value (as defined herein) attributable to USD Shares as of March 31, 2007 was U.S.$395.74. The same investment advisor ("Investment Advisor") has managed the Fund's assets from inception. See "MANAGEMENT." The Fund's authorized capital is US$300,000 consisting of 30,000,000 common shares, 15,000,000 of which have been designated as USD Shares. The Fund is a "Professional Fund" as that term is defined in the British Virgin Islands Mutual Funds Act (1996), as amended by the Mutual Fund Amendment Act (1997).

The USD Shares offered hereby are privately placed at Net Asset Value per Share plus any applicable subscription fee. See "SUBSCRIPTIONS AND REDEMPTIONS." The net proceeds of the offering are invested in accordance with the policies set forth under "INVESTMENT OBJECTIVE AND PROCESS." The Fund, without limitation, may hold cash or invest in cash equivalents for short-term investments. [†]

No offering other than USD Shares is made by this Amended and Restated Information Memorandum dated as of 22 September, 2008, as may be further amended and restated (the "Memorandum"). Accordingly, all references in the Memorandum shall be deemed to refer to USD Shares. The information in this Memorandum is qualified in its entirety by the Fund's memorandum and articles of association (the "Memorandum and Articles of Association") and operative agreements, all which are available on request to the Administrator.

The Fund presently has outstanding other classes of common shares which may be issued pursuant to separate offerings. The Fund has reserved the right to issue additional classes of shares from time to time, which in the Fund's discretion, may have preferences and fee arrangements which differ from those relating to the existing classes of shares, in order to meet the needs of, for example, certain institutional investors or investors facing different tax or foreign exchange requirements. Any increased administrative charges by virtue of such new classes will be borne by shareholders of such classes only. Additional classes may be issued by the Fund without consent of or notice to the Shareholders.

An investment in the Fund is subject to certain risks (see "CERTAIN RISK FACTORS") and certain conflicts of interest. See "POTENTIAL CONFLICTS OF INTEREST."

---

[†] Among the cash equivalents in which the Fund may invest are: obligations of the U.S. Government, its agencies or instrumentalities (U.S. Government Securities; U.S. Treasury Bills); commercial paper; and repurchase agreements, money market mutual funds, certificates of deposit and bankers' acceptances issued by domestic branches of U.S. banks that are members of the Federal Deposit Insurance Corporation.

## INVESTMENT OBJECTIVE AND PROCESS

### Investment Objective

The Fund's investment objective is long-term capital appreciation.  The Fund seeks to obtain capital appreciation of its assets through the utilization of a non-traditional stock/options trading strategy. In attempting to achieve its objective, the Fund has established a discretionary account with the Investment Advisor (as defined herein) who is based in the United States and who invests or trades in a wide range of equity securities, and, to a lesser extent, other securities and derivatives.  In certain instances and at certain times, the Manager (as defined herein) may directly invest certain of the Fund's assets, rather than allocating such assets to the Investment Advisor as may be consistent with, and in furtherance of, the Fund's investment objective.  All investments involve investment risk and may result in losses instead of gains, as the achievement of the Fund's investment objective cannot be assured. See "CERTAIN RISK FACTORS."

### Investment Process

The Investment Advisor invests primarily in the United States and utilizes a non-traditional investment strategy that is a variation of the traditional "option conversion" strategies (generally consisting of the purchasing of equity shares, the selling of related options representing a number of underlying shares equal to the number of shares purchased, and the buying of related put options representing the same number of underlying shares.) The strategy utilized by the Fund's Investment Advisor is called "split-strike conversion" and entails:

(i)        purchasing a basket of forty-five (45) to fifty (50) large-capitalization S&P 100 stocks (*e.g.*, General Electric, Microsoft, Pfizer, Exxon Mobil, Wal-Mart Stores, Citigroup, Intel, American International, IBM, Johnson & Johnson, etc.), which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general market;

(ii)       selling out-of-the money S&P 100 Index call options representing a dollar amount of the underlying Index equivalent to the dollar amount of the basket of shares purchased;

(iii)      purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount.

The strategy aims to limit losses when stock prices decline while still affording an upside potential that is capped to the strike price of the short call when stock prices rise.  The long put/short call position constitutes a "synthetic" short of the market, which provides a hedge against the long stock positions.  Proprietary systems continuously optimize the basket of stocks to replicate the performance of the overall market at low cost.  Put and call option positions are actively managed as strike prices and maturities are adjusted in response to relative valuations and general market movements.

**Temporary Investments**

Pending investment of capital of the Fund in accordance with the Fund's Investment Objective and Process, or to facilitate withdrawals of capital by USD Shareholders as permitted by this Memorandum, the Fund may, among other things, hold cash or invest in cash equivalents. Among the cash equivalents in which the Fund may invest are: obligations of the United States Government, its agencies or instrumentalities, commercial paper, and certificates of deposit and bankers' acceptances issued by United States banks that are members of the Federal Deposit Insurance Corporation. The Fund may also enter into repurchase agreements and may purchase shares of money market mutual funds in accordance with applicable legal restrictions.

**Investment Restrictions**

The following investment restrictions of the Fund may not be changed without the approval of the Shareholders holding at least 67% of the USD Shares: the Fund will not purchase real estate or interests in real estate, except that the Fund may purchase and sell securities that are secured by real estate or interests therein and may purchase securities issued by companies that invest or deal in real estate.

**Borrowing and Lending**

The Fund is authorized to borrow in order to fund redemption requests and to enhance its investment leverage. There are no restrictions on the Fund's borrowing capacity other than limitations imposed by lenders and any applicable credit regulations. Loans generally may be obtained from securities brokers and dealers or from other financial institutions; such loans are secured by securities or other assets of the Fund pledged to such brokers. Loans may also be made from or to other investment companies on such terms as are commercially reasonable, including without limitation, from or to investment companies similar to the Fund, or from or to finance companies with respect to which the Manager (or one or more affiliates) have an interest, either as sponsor, manager, administrator, owner or otherwise.

**Transaction Execution**

The Investment Advisor acts as a market-maker in the stocks purchased and sold by the USD portfolio, and acts as a principal in connection with its sales of securities to the USD portfolio and the purchase of securities from the USD portfolio.

The options transactions executed for the benefit of the USD portfolio are effected primarily in the over-the-counter market, not on a registered options exchange. See "POTENTIAL CONFLICTS OF INTEREST" and "CERTAIN RISK FACTORS".

**Distributions and Reinvestment**

The Fund does not expect to declare and/or pay dividends or make any other distributions to Shareholders out of the Fund's current earnings and profits. Rather, the Fund will reinvest such income. Potential investors should keep this limitation in mind when determining whether or not an investment in the Fund is suitable for their particular purposes. The Fund reserves the right to change such policy. The Manager is solely responsible for ensuring compliance by the Fund with all investment objectives, investment guidelines and investment restrictions contained in this Memorandum.

## CERTAIN RISK FACTORS

Prospective investors should give careful consideration to the following risk factors in evaluating the merits and suitability of an investment in the Fund as they relate specifically to the USD Shares or to the Fund, in general, as the context requires. The following does not purport to be an adequate summary of all the risks associated with an investment in the USD Shares of the Fund. Rather, the following are only certain particular risks to which the Fund is subject that the Manager wishes to encourage prospective investors to discuss in detail with their professional advisors.

**Operating History**

The Fund commenced operations with respect to USD Shares on March 1, 1995 and as such has an operating history with regard to such Shares since such date. There can be no assurance that future returns will be similar to returns achieved since inception to date.

**Achievement of Investment Objective**

There can be no assurance that the Fund will continue to achieve its investment objective or that the Manager or the Investment Advisor will continue to succeed in achieving the Fund's investment objective. Given the factors which are described below, and due to the fact that an investment in the Fund entails a high degree of risk, there exists a possibility that an investor could suffer a substantial loss as a result of an investment in the Fund.

**Illiquidity of Investment**

There is no market for the USD Shares of the Fund and, accordingly, investments in the USD Shares of the Fund may be disposed of only through the redemption procedures described elsewhere in this Information Memorandum.

The consent of the Manager must be obtained prior to any transfer of USD Shares. In light of the restrictions imposed on a transfer of USD Shares, and in light of the limitations imposed on a USD Shareholder's ability to withdraw all or part of his or its capital from the Fund, an investment in the Fund should be viewed as illiquid and subject to risk.

**Dependence on the Manager**

All decisions with respect to the general management of the Fund are made by the Manager, who has complete authority and discretion in the management and control of the business of the Fund, including the authority to delegate all investment management activities to the selected Investment Advisor. USD Shareholders will have no right or power to take part in the management of the Fund, nor in any decision with regard to the allocation of management of the Fund's assets to the selected Investment Advisor. As a result, the success of the Fund for the foreseeable future will depend largely upon the ability of the Manager, and no person should invest in the Fund unless willing to entrust all aspects of the management of the Fund to the Manager, having evaluated its capability to perform such functions.

The USD Shareholders have certain limited rights to consent as set forth in this Memorandum but do not have any authority or power to act for or bind the Fund.

**Dependence on the Investment Advisor**

The Manager has delegated all investment management duties with regard to USD Shares to the Investment Advisor. As a result, the success of the Fund for the foreseeable future will depend on the ability of the Investment Advisor to achieve the Fund's investment objective. Neither the Manager nor USD Shareholders have any control over the investment and trading decisions of the Investment Advisor, and no person should invest in the Fund unless willing to entrust all aspects of the investment management of the Fund to the selected Investment Advisor, having evaluated its capability to perform such functions.

**General Economic Conditions**

The success of any investment activity is influenced by general economic conditions, which may affect the level and volatility of interest rates and the extent and timing of investor participation in the markets for both equity and interest-rate-sensitive securities. Unexpected volatility or illiquidity in the markets in which the Fund directly or indirectly holds positions could impair the Fund's ability to carry out its business and could cause it to incur losses.

**Market Risks**

The success of a significant portion of the Fund's investment program depends, to a great extent, upon correctly assessing the future course of price movements of stocks, bonds and other securities. There can be no assurance that the Investment Advisor will be able to predict accurately these price movements.

**Trading Strategies of the Investment Advisor**

The Fund is a single-advisor fund and the overall success of the Fund depends upon the ability of the Investment Advisor to be successful in its own strategy. The past performance of such strategy or strategies is not necessarily indicative of its or their future profitability, and no strategy can consistently determine which security to purchase or sell at a profit. Any factor which would make it more difficult to execute more timely trades, such as, without limitation, a significant lessening of liquidity in a particular market, changes in taxation or regulation, interest rate changes, would also be detrimental to profitability. Further, the Investment Advisor may modify its strategy from time to time in an attempt to evaluate market movements more favourably. As a result of such periodic modifications, it is possible that the strategy used by such Investment Advisor in the future may be different from those presently in use. No assurance can be given that the strategy to be used by the Investment Advisor will be successful under all or any market conditions. In addition, it is not known what effect, if any, the size of the Fund's account or the increase in total funds being managed by the Investment Advisor will have on the performance of the Investment Advisor's trading methods.

**Special Techniques Used by the Investment Advisor**

The Investment Advisor uses special investment techniques that may subject the Fund's investments to certain risks. Certain, but not all, of these techniques and the risks that they entail are summarized below. The Fund, in any event, is not designed to correlate to the broad equity market, and should not be viewed as a substitute for equity investments.

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

*Risk of Lack of Independent Data.* The Investment Advisor's strategy, involving split strike conversions, is a unique investment program, and is often not well followed by the Wall Street community. Accordingly, there is very little independent data available to assist a prospective investor in his analysis of the Fund.

*Risks of Transactions Executions.* The Investment Advisor, in its role as a market-maker, trades with the USD portfolio as a principal. As a result, the portfolio is subject to credit risks (the exposure to the possibility of loss resulting from a counterparty's failure to meet its financial obligations).

*Risks of Market Illiquidity.* Despite the heavy volume of trading in securities, the markets for some securities have limited liquidity and depth. The lack of depth could be a disadvantage to the Fund, both in the realization of the prices which are quoted and in the execution of orders at desired prices.

*Risks of Arbitrage Transactions.* The success of arbitrage strategies depends often on the ability to execute two or more simultaneous transactions at desired prices. Should such transactions not be executed simultaneously at the desired prices, losses may be incurred on both sides of the transaction. Additionally, separate costs are incurred on both sides of an arbitrage transaction, and substantial favorable price moves may be required before a profit can be realized.

*Risks of Options Trading.* In seeking to enhance performance or hedge assets, the Investment Advisor may purchase and sell call and put options on stock indexes. A stock index measures the movement of a certain group of stocks by assigning relative values to the common stocks included in the index. Examples of well-known stock indexes are the Standard & Poor's Composite Index of 500 Stocks and the Standard & Poor's 100 Index. Both the purchasing and the selling of call and put options contain risks. Although an option buyer's risk is limited to the amount of the purchase price of the option, an investment in an option may be subject to greater fluctuation than an investment in the underlying securities. In theory, the exposure to loss is potentially unlimited in the case of an uncovered call writer (i.e. a call writer who does not have and maintain during the term of the call an equivalent long position in the stock or other security underlying the call), but in practice the loss is limited by the term of existence of the call. The risk for a writer of an uncovered put option (i.e., a put option written by a writer that does not have and maintain an offsetting short position in the underlying stock or other security) is that the price of the underlying security may fall below the exercise price. The effectiveness of purchasing or selling stock index options as a hedging technique will depend upon the extent to which price movements in assets that are hedged correlate with price movements of the stock index selected. Because the value of an index option depends upon movement in the level of the index rather than the price of a particular stock, whether a gain or loss will be realized from the purchase or writing of options on an index depends upon movements in the level of stock prices in the stock market generally, rather than movements in the price of a particular stock. Successful use of options on stock indexes will depend upon the ability of the Investment Advisor to predict correctly movements in the direction of the stock market generally. This ability requires skills and techniques different from those used in predicting changes in the price of individual stocks.

*Risks of Over-the-Counter Options Trading.* The Investment Advisor may execute options transactions in the over-the-counter market. Trading equity and options in the over-the-counter market is subject to counterparty risk and is without the protection afforded with respect to options transactions on regulated exchanges through the Options Clearing Corporation.

*Risks of Loss of Entire Options Investment.* An option is a wasting asset. Its value is reduced as its life shortens, and it becomes worthless upon expiry. As a consequence, an option buyer that does not

sell an option in the secondary market prior to expiry nor exercises an option prior to expiry loses his entire investment in the option.

*Risks of Assignment of Options.* In the event a short option position is assigned by its buyer, a hedged options position becomes net long or net short. Although the remaining portion of the previously hedged position may be liquidated or otherwise adjusted to limit exposure to price changes, substantial losses may result if, for instance, a trading halt occurs in the remaining options position (either in the option or the underlying security) followed by a price gap at the reopening of trading.

*Risks of Prohibition of Exercise Rights.* The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option is halted, holders and writers of that option will be locked into their position until one of the two restrictions is lifted.

**Concentration**

There is no requirement that investments of the Fund be diversified.

**Regulation**

The Manager is not registered with the U.S. Securities and Exchange Commission as a registered investment adviser under the U.S. Investment Advisers Act of 1940, as amended, and investors, therefore, are not accorded the protective measures provided by such legislation.

The Fund is not registered as an investment company under the U.S. Company Act or any similar legislation in any jurisdiction.  Investors, therefore, will not be accorded the protective measures provided by such legislation.

Registered investment companies are required, under applicable U.S. Securities Exchange Commission forms relating to the registration of their interests, to state definitive policies with respect to certain enumerated types of activities, some of which may not be changed without security holder approval.  Such policies are considered to be "fundamental" policies with respect to such securities investments (i.e., policies which the registered investment company deems to be fundamental or policies which may not be changed without the approval of a majority of the registered investment company's security holders).  The following discussion summarizes the Fund's currently anticipated policies with respect to such activities.

*Type of Securities in which the Fund May Invest*.  As set out in this Memorandum and as generally authorized by the Memorandum and Articles of Association, the Fund may invest in securities and other business interests of any and all types and descriptions, including "restricted" securities.  The Fund may buy or write put and call options.  Notwithstanding the foregoing, the Fund will not invest in real estate without the consent of USD Shareholders holding 67% of the USD Shares.

*Use of Leverage*.  The Fund may trade in securities on margin and may effect short sales.  The Fund also may borrow, pledge, mortgage, lend or hypothecate securities or other assets.

*Making of Loans*.  The Fund may make loans.

*Underwriting of Securities and Other Issuers*.  The Fund will not underwrite securities of other issuers in connection with the distribution of securities.

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

*Concentration of Investments in Particular Industries or Companies.* The Manager and the Investment Advisor may concentrate investments in particular industries and, from time to time to a lesser extent, in particular companies. The Fund will not invest more than 20% of the value of its total assets in securities of any one issuer (other than obligations of the U.S. government, certificates of deposits, time deposits, short-term commercial paper, shares of money market funds and bankers' acceptances). The Fund may not change these policies without the approval of USD Shareholders holding at least 67% of the USD Shares.

*Policy with respect to Portfolio Turnover.* The Fund has no definite policy with respect to portfolio turnover. The Fund may incur a significant turnover rate, since the Fund's investment strategies sometimes may involve short-term considerations.

**No Manager Liability Beyond Fund Assets**

The Manager shall have no personal liability to the USD Shareholders for the return of any capital contributions, it being understood that any such return shall be made solely from the Fund assets.

**Shortened Claims Period**

By subscribing for the Shares, the Shareholder is agreeing to shortening the period during which a claim may be made against the Fund, the Manager or the Consultant with regard to any matter relating to such Shareholder's investment in the Fund.

**Litigation**

The Fund and the Manager, as independent legal entities, may be subject to lawsuits or proceedings by governmental entities or private parties. Except in the event of a lawsuit or proceeding arising from a Director's or Manager's gross negligence, willful default, or fraud in the performance of its duties, expenses or liabilities of the Fund arising from any suit shall be borne by the Fund.

**Early Termination**

In the event of the early termination of the Fund, the Fund would have to distribute to the USD Shareholders their pro rata interest in the assets of the Fund. The Manager can withdraw from the Fund at any time upon 6 months' prior notice, and may thereby cause the dissolution of the Fund. The Manager may terminate the appointment of the Investment Advisor to manage the Fund's assets and henceforth withdraw assets from the Investment Advisor in the ordinary course. The Investment Advisor may terminate the authority granted to it to manage the Fund's assets at any time, and may return to the Fund all or part of the Fund's assets henceforth managed by the Investment Advisor. Certain assets held by the Fund may be highly illiquid and might have little or no marketable value. It is possible that at the time of such sale or distribution, certain securities held by the Fund would be worth less than the initial cost of such securities, resulting in a loss to the USD Shareholders.

**Effect of Substantial Withdrawals**

Substantial withdrawals by USD Shareholders within a short period of time could require the Manager to liquidate positions more rapidly than would otherwise be desirable, which could adversely affect the value of the Fund's assets. The resulting reduction in the Fund's assets could make it more difficult to generate a positive rate of return or to recoup losses due to a reduced equity base.

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

**Possibility of Fraud or Misappropriation**

Neither the Fund nor the Custodian has actual custody of the assets. Such actual custody rests with the Investment Advisor and its affiliated broker-dealer. Therefore, there is the risk that the custodian could abscond with those assets. There is always the risk that the assets with the Investment Advisor could be misappropriated. In addition, information supplied by the Investment Advisor may be inaccurate or even fraudulent. The Manager is entitled to rely on such information (provided they do so in good faith) and is not required to undertake any due diligence to confirm the accuracy thereof.

**Changes in Applicable Law**

The Fund and the Investment Advisor must comply with various legal requirements, including requirements imposed by the federal securities laws, tax laws and pension laws. Should any of those laws change over the scheduled term of the Fund, the legal requirements to which the Fund, the USD Shareholders, and the Investment Advisor may be subject could differ materially from current requirements.

**Reserve for Contingent Liabilities**

Under certain circumstances, the Manager may find it necessary upon a redemption by a USD Shareholder to set up a reserve for contingent liabilities and withhold a certain portion of the USD Shareholder's redemption proceeds.

**Certain Conflicts of Interest**

An investment in the Fund constitutes the acceptance and acknowledgement of certain conflicts of interest (See "POTENTIAL CONFLICTS OF INTEREST").

**Other Clients of Investment Advisor**

The Investment Advisor has responsibility for making trading decisions on behalf of the Fund. In addition, the Investment Advisor may also manage other accounts (including other partnerships and accounts in which the Investment Advisor may have an interest) which together with accounts already being managed could increase the level of competition for the same trades the Fund might otherwise make, including the priorities of order entry. This could make it difficult or impossible to take or liquidate a position in a particular security at a price indicated by an Investment Advisor's strategy.

**Common Counsel**

Tannenbaum Helpern Syracuse & Hirschtritt LLP ("THSH") acts as counsel to the Fund in connection with this offering of Shares; THSH also acts as counsel to the Manager. In connection with this offering of Shares and ongoing advice to the Fund, the Manager and their affiliates, THSH has not and will not be representing the Shareholders. No independent counsel has been retained to represent the Shareholders. THSH's representation of the Fund, its Manager and their affiliates is limited to those specific matters upon which it has been consulted. There may exist other matters which would have a bearing on the Fund, its Manager and their affiliates upon which THSH has not been consulted. THSH does not undertake to monitor the compliance of the Fund, its Manager and their affiliates with the investment program, valuation procedures and other guidelines set out herein, nor does it monitor compliance with applicable laws. Additionally, in all cases, including the preparation of this Amended and Restated Information Memorandum, THSH relies upon information furnished to it by the Fund, its

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

Manager and their affiliates, and does not investigate or verify the accuracy and completeness of such information.  In the course of advising the Fund, its Manager and their affiliates, there may be times when the interests of the Manager may differ from those of the Shareholders.  THSH does not represent the interests of the Shareholders in resolving such issues.

**Lack of Independent Experts Representing Investors**

The Manager has consulted with counsel, accountants and other experts regarding the formation of the Fund.  Each prospective investor should consult his own legal, tax and financial advisors regarding the desirability of an investment in the Fund.

**Institutional Risk**

The institutions, including brokerage firms and banks, with which the Fund (directly or indirectly) does business, or to which securities have been entrusted for custodial and prime brokerage purposes, may encounter financial difficulties that impair the operational capabilities or the capital position of the Fund.  Brokers may trade with an exchange as a principal on behalf of the Fund, in a "debtor-creditor" relationship, unlike other clearing broker relationships where the broker is merely a facilitator of the transaction.  Such broker could, therefore, have title to all of the assets of the Fund (for example, the transactions which the broker has entered into on behalf of the Fund as principal as well as the margin payments which the Fund provides).  In the event of such broker's insolvency, the transactions which the broker has entered into as principal could default and the Fund's assets could become part of the insolvent broker's estate, to the detriment of the Fund.  In this regard, Fund assets may be held in "street name" such that a default by the broker may cause Fund's rights to be limited to that of an unsecured creditor.

**Settlements**

The Fund is not required to distribute cash or other property to the Shareholders, and the Fund does not intend to make any such distributions.  Notwithstanding the foregoing, the Fund may, in its discretion, settle redemptions in kind in which event the Shareholders may be required to obtain advice with regard to disposing of such assets (and bear the expense thereof).  Moreover, during the period between submitting a notice of redemption and obtaining settlement, the redemption proceeds remains at risk of loss, without interest, and under certain circumstances, such proceeds may be required to be restored to the Fund.

**Pricing Information**

While pricing information is generally available for securities in which the Fund invests, reliable pricing information may at times not be available from any source.  Prices quoted by different sources are subject to material variation.  For purposes of calculating the Fund's Net Asset Value and valuing investments, valuations of investments for which pricing information cannot be obtained are made by the Administrator based upon such information as is available, including the advice of the Investment Advisor.  The Administrator may rely upon appropriate pricing services and information provided by the Investment Advisor and shall not, in the absence of gross negligence or willful default be liable for any loss suffered by the Fund or any Shareholder by reason of any error in calculation resulting from any inaccuracy in the information provided by any pricing service or the Investment Advisor.

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

10

**Anti-Money Laundering**

If the Fund, the Manager, Investment Advisor, Administrator, or any governmental agency believes that the Fund has accepted subscriptions for Shares by, or is otherwise holding assets of, any person or entity that is acting directly or indirectly, in violation of an U.S., international or other anti-money laundering laws, rules, regulations, treaties or other restrictions, or on behalf of any suspected terrorist or terrorist organization, suspected drug trafficker, or senior foreign political figure(s) suspected in engaging in foreign corruptions, the Fund, the Manager, Investment Advisor, Administrator or such governmental agency may freeze the assets of such person or entity invested in the Fund or suspend their redemption rights.  The Fund may also be required to remit or transfer those assets to a governmental agency.

**Compliance with ERISA Transfer Restrictions**

The Board intends to use commercially reasonable efforts to cause employee benefit plans subject to ERISA and/or Section 4975 of the Code and other "benefit plan investors," as defined in the Plan Asset Regulation, in the aggregate to hold less than 25% of the Shares in the Fund and of any class of shares in the Fund.  The Board shall use commercially reasonable efforts to restrict transfers of any interest in the Fund so that ownership of the Fund by benefit plan investors will remain below the 25% threshold contained in the Plan Asset Regulation.  In this event, although there can be no assurance that such will be the case, the assets of the Fund should not constitute  "plan assets" for purposes of ERISA and Section 4975 of the Code.

If the assets of the Fund were to become "plan assets" subject to ERISA and Section 4975 of the Code, certain investments made or to be made by the Fund in the normal course of its operations might result in non-exempt prohibited transactions and might have to be rescinded (see "EMPLOYEE BENEFIT CONSIDERATIONS").  If at any time the Board determines that assets of the Fund may be deemed to be "plan assets" subject to ERISA and Section 4975 of the Code, the Board may take certain actions it may determine necessary or appropriate, including requiring one or more investors to redeem or otherwise dispose of all or part of their Shares in the Fund or terminating and liquidating the Fund.  See "CERTAIN ERISA CONSIDERATIONS."

---

# MANAGEMENT

---

**The Fund's Board of Directors**

The Fund has three (3) Directors, each of whom serves in accordance with the laws of the British Virgin Islands and in accordance with the Fund's Memorandum and Articles of Association.   The Directors are:

**Mr. Christopher Wetherhill** Christopher Wetherhill, F.C.A., C.A., founded and was Chief Executive Officer of Hemisphere Management Limited, a financial services company located in Bermuda, from 1981 until 2000, when he chose to retire.  He is now a board member of, and a consultant to, a number of investment companies.  Mr. Wetherhill is a Chartered Accountant, a Fellow of the Institute of Chartered Accountants in England and Wales, a member of the Canadian and Bermudian Institutes of

Chartered Accountants, a Fellow of the Institute of Directors and a Freeman of the City of London.  Mr. Wetherhill is a resident of Bermuda.

**Graham H. Cook** is the Managing Director of TMF (BVI) Ltd., part of the TMF Group, an international organization providing trust, management and accounting services, financial services and fund administration services. Mr. Cook has worked in private practice as a solicitor in England and since 1981 has pursued a career in providing management and trust services. He has been a director of trust and management companies in the British Virgin Islands, Curacao, Gibraltar and latterly in London with TMF Management  (UK) Ltd. In 2002 he became a Director of TMF (BVI) Limited and Bison Financial Services Limited. He also has work experience in South Africa and Brazil. Mr. Cook is an Honors Law graduate from the University of Birmingham, England, completed his post graduate studies at the College of Law with a distinction, and was admitted as a Solicitor of the Supreme Court of England and Wales in 1973. Mr. Cook resides in the British Virgin Islands.

**Mr. John E. Epps**, FCA, CA, is Director, President and CEO of Consolidated Management Limited, a financial management company that he established in Bermuda in 1981, specialising in the shipping and investment industry. Prior to setting up his own company, Mr. Epps was employed in the treasury department of a major shipping company listed on the London Stock Exchange and based in Bermuda. He is active in the property, oil trading and investment markets and is a board member of numerous companies. He is currently a Trustee to a number of high profile Foundations and has served as a director of a major marine insurance company. He is a qualified chartered accountant, a Fellow of the Institute of Chartered Accountants in England and Wales as well as being a member of the Canadian and Bermuda Institutes of Chartered Accountants. Mr. Epps has been a resident of Bermuda since 1963.

In the future, other or additional Directors may be appointed by the Fund.

The Board of Directors meet periodically to assist the Manager in reviewing the investment and administrative affairs of the Fund.  The Fund's Memorandum and Articles of Association provide that the Directors shall not be liable to the Fund for any acts or omissions in the performance of their duties if such person acted honestly and in good faith with a view to the best interests of the Fund and in the case of criminal proceedings, such person had no cause to believe that his conduct was unlawful, and contains certain provisions for the indemnification of the Directors by the Fund, to the extent permitted by law, against liabilities to third parties arising in connection with the performance of their services.  The Directors may from time to time own Shares or dispose of Shares owned, in each case without notice to the Shareholders.

## The Manager

Kingate Management Limited has been appointed as the Manager of the Fund's capital (the "Manager").  The Manager was duly incorporated under the laws of Bermuda.  The Manager is not registered with the U.S. Securities and Exchange Commission as a registered investment adviser under the U.S. Investment Advisers Act of 1940, as amended, nor does it intend to do so in the near future.

The directors of the Manager are:

**Mr. Christopher Wetherhill** - See "MANAGEMENT - The Board of Directors" herein for biographical details.

**Michael G. Tannenbaum, Esq.** – Partner, Tannenbaum Helpern Syracuse & Hirschtritt LLP, where he heads the Firm's Financial Services and Capital Markets Group which concentrates in structuring collective investments (hedge funds and the like) and capital financing arrangements both on-shore and offshore the U.S.  He is the author of numerous articles relating to industry matters.  Mr. Tannenbaum is a past president of the Hedge Fund Association, an industry association, and is listed in *An International Who's Who of Private Fund Lawyers.*

**Phillip A. Evans.**  Trust Manager (Partner) at Moore Stephens Services SAM located in Monaco.  Mr. Evans joined in March 1993 to establish and manage a new trust management department and is responsible for designing and implementing systems and controls, client contact, and marketing worldwide.  During January 1990-February 1993, Mr. Evans served as Trust Officer at Georgam SAM located in Monaco, responsible for a large and varied number of Trusts and associated underlying companies.  During February 1988-December 1989, Mr. Evans served as Senior Trust Administrator at Barclays Bank Trust Company located in Reading, England.

**Ms. Shazieh Salahuddin** – A senior employee of the FIM group of companies, for whom she has worked since 1996 in a variety of roles including fund administration, operations, clients relations and marketing. She has been a director of the Manager since June 2008. Ms. Salahuddin holds an honors degree from Kingston University, England.

In the future, other and additional directors of the Manager may be elected.

The Manager performs services pursuant to the Manager Agreement effective January 1, 2006.  Pursuant to the terms of the Manager Agreement, the Manager has agreed (i) to manage all aspects of the investment advisory services provided to the Fund, including the selection and evaluation of the Investment Advisor and (ii) to arrange for the performance of all accounting and administrative services which may be required by the Fund's operations.  The Manager Agreement authorizes the Manager to delegate responsibilities to others, subject to retaining certain responsibilities for evaluating and coordinating the services offered by others.  The Manager is also permitted to manage directly the investment of a portion of the investment portfolio of the Fund and may do so from time to time as conditions warrant.

The Manager supervises distribution of the USD Shares.  The Manager may appoint other securities dealers or other financial institutions as authorized dealers for the USD Shares.  Such other, non-affiliated, authorized dealers may receive sales commissions either directly from the Fund (but pay-able only out of an investor's gross subscription proceeds before investment in USD Shares and only to the extent of the permitted five percent (5%) subscription charge as described herein) or from the Manager.  The Manager Agreement is automatically renewed for successive one-year periods, subject to termination by either party as of the end of any calendar month upon not less than one year's prior written notice or otherwise in accordance with the terms of the Manager Agreement.

The Manager Agreement provides that the Manager shall not be liable to the Fund or its Shareholders for any error of judgment or for any loss suffered by the Fund or its Shareholders in connection with its services in the absence of negligence, willful default, fraud, or dishonesty in the performance or non-performance of its obligations or duties.  The Manager Agreement contains provisions for the indemnification of the Manager by the Fund against liabilities to third parties arising in connection with the performance of its services, except under certain circumstances.  The Manager Agreement also contains provisions for the indemnification of the Fund by the Manager in certain circumstances.

See "FEES AND EXPENSES" herein for a general description of the fees payable to the Manager.

**The Investment Advisor**

The investment advisor is a New York based NASD registered broker-dealer employing approximately 350 people and acting primarily as a market-maker in listed and unlisted stocks and convertible securities (the "Investment Advisor"). The Manager has established a discretionary account with such Investment Advisor on behalf of the Fund for the management of the USD assets. The Investment Advisor utilizes a "split strike conversion" strategy consistent with the strategy of the Fund, as set forth under "THE FUND - The Fund's Investment Objective and Investment Process." All investment decisions in the account held with the Investment Advisor are effected by persons associated with the Investment Advisor. The Investment Advisor has managed the assets of the Fund since its inception and it is anticipated that the retention of such Investment Advisor will continue.

See "FEES AND EXPENSES" herein for a general description of the fees payable to the Investment Advisor.

**The Consultant**

The Manager has appointed FIM Advisers LLP ("FIM") as its consultant in relation to certain aspects of the Fund's operations (the "Consultant").

The Consultant was incorporated on October 8, 2004 as a limited liability partnership under English Law. On August 1, 2005, the Consultant took over the business of its affiliate, FIM Limited, an asset management company with over twenty years of experience. The Consultant is a leading alternative investment management company, specialising in the creation and management of portfolios of hedge funds for institutions and private clients on a global basis. The Consultant is authorised and regulated by the Financial Services Authority ("FSA") of the United Kingdom. As of the date of this document, the Consultant acts as Investment/Fund Adviser in respect of funds with assets totaling in excess of US$ 7.3 billion.

In addition to its role as Consultant to the Fund, the Consultant acts as investment and/or fund advisor to several other investment management companies that manage a variety of funds of funds and single-manager funds.

The founder members of the Consultant are:

**Mr. Carlo Grosso** - Carlo Grosso is a Founder Member and the Chief Investment Officer of FIM Advisers LLP. Mr. Grosso founded FIM Limited, an affiliate of FIM Advisers LLP, in 1981 and serves as Executive Chairman of FIM Limited. His previous experience includes: executive director of Euromobiliare Limited (1979-1980), president and general manager of Tucker Anthony S.A. (1974-1979), account executive at White, Weld & Co., Inc. (1972-1974) and securities analyst and foreign department manager at Tucker, Anthony & R.L. Day, Inc. (1969-1972). Mr. Grosso holds a Degree in Law from the University of Milano (Italy).

**Mr. Federico M. Ceretti** - Federico Ceretti is a Founder Member of FIM Advisers LLP. Mr. Ceretti joined FIM Limited, an affiliate of FIM Advisers LLP, in 1986, and is Chief Executive Officer of FIM Limited. Prior to joining FIM Limited, he worked in various positions with Merrill Lynch Pierce

Fenner and Smith in London. Mr. Ceretti holds a Degree in Business Administration from the University of Pavia (Italy).

Pursuant to the FIM Consulting Services Agreement, the Consultant renders consulting advice to the Manager with respect to certain aspects of the Fund's operational, administrative, marketing, accounting and legal matters.

The FIM Consulting Services Agreement is dated August 1, 2005, and will be automatically renewed for successive one-year periods, subject to termination by either party at the end of the current or subsequent term upon not less that thirty (30) days' prior written notice.  The FIM Consulting Services Agreement provides that FIM shall not be liable to the Manager, the Fund or its Shareholders for any acts or omissions in the performance of its services in the absence of negligence, willful default, fraud or dishonesty in the performance or non-performance of its obligations or duties.  The FIM Consulting Services Agreement contains provisions for the indemnification of FIM by the Manager and the Fund against liabilities to third parties arising in connection with the performance of its services, except under certain circumstances.

**The Administrator**

Citi Hedge Fund Services, Ltd (formerly BISYS Hedge Fund Services Limited) , a Bermuda registered company, has been appointed as the Fund's administrator (the "Administrator").

Pursuant to the Administration Agreement, as amended and restated effective June 1, 2007, and the Registrar Agreement, as amended and restated effective January 1, 2002, the Administrator is responsible for all matters pertaining to the administration of the Fund, including, without limitation, (i) communicating with the Fund's Shareholders; (ii) communicating with the general public; (iii) soliciting sales of the Fund's stock; (iv) accepting the subscriptions of new Shareholders; (v) maintaining the Fund's principal corporate records and books of account; (vi) disbursing payments of dividends, legal fees, accounting fees, and officers' and directors' salaries; (vii) calculating, publishing or furnishing the subscription or redemption price of the USD Shares; (viii) conducting meetings of the Fund's Shareholders and Directors; and (ix) making redemptions of the USD Shares.  The Administrator will also provide the services of an individual to act as the secretary of the Fund.

Both the Administration Agreement and the Registrar Agreement shall continue and remain in force and effect unless and until terminated by either party upon not less than three (3) months' notice or a shorter time period under certain circumstances.  The Administration Agreement provides that the Administrator shall not be liable to the Manager, the Fund or its Shareholders in the absence of negligence, willful default, fraud or dishonesty in the performance or non-performance of its obligations or duties.  The Administration Agreement and the Registrar Agreement contain provisions for the indemnification of the Administrator by the Fund against liabilities to third parties arising in connection with the performance of its services, except under certain circumstances.  .

See "FEES AND EXPENSES" herein for a description of the fees payable to the Administrator pursuant to the Administration Agreement and the Registrar Agreement.

**Banking and Custody**

The Bank of Bermuda Limited, located in Hamilton, Bermuda (the "Bank"), has been appointed as the Fund's banker for purposes of receiving subscription funds, disbursing redemption payments and

processing cash transactions not directly related to the Fund's portfolio.  Actual custody, however, is with the Investment Advisor.  See "CERTAIN RISK FACTORS."

The Bank of Bermuda Limited is a licensed bank incorporated in Bermuda under The Bank of Bermuda Act of 1890.  The Bank of Bermuda Limited is engaged in a wide range of international banking and trust services through its main office in Bermuda and its subsidiaries worldwide.  On February 18, 2004, the Bank of Bermuda Limited became an indirect wholly-owned subsidiary of HSBC Holdings plc, a public company incorporated in England.  As of December 31, 2005, HSBC Holdings plc had consolidated gross assets of approximately US$1.467 billion.

The Bank is not responsible for the safekeeping of any assets of the Fund deposited in any account opened with brokers or other intermediaries in connection with the trading activities of the Fund, and in particular, the operation of any accounts managed by the Investment Advisor.

The Manager does not have custody of any of the Fund's assets nor does it presently propose to perform any brokerage services for the Fund.  Brokerage services may be provided to the Fund by the Investment Advisor or their affiliated firms.

**Voting Rights of Shareholders**

Each USD Shareholder is entitled to one vote for each USD Share held on any matter affecting USD Shareholders presented to a meeting of Shareholders in accordance with the Fund's Memorandum and Articles of Association.  General meetings of the Fund's Shareholders will be held annually to approve the selection of auditors and to attend to such other business as may properly be placed before a meeting.  Shareholders will receive at least thirty (30) days' notice of any Shareholders' meeting (or ten (10) days' notice, if the Board of Directors determines that prompt Shareholder action is advisable) and will be entitled to vote their USD Shares either personally or by proxy.  If the proxy sent with the notice of meeting is not completed and returned prior to the meeting and the Shareholder does not appear personally at such meeting, such USD Shares will be voted in the discretion of the proxy and the attorney-in-fact designated in the Subscription Agreement executed by such Shareholder.

## FEES AND EXPENSES

**Organization Costs**

All costs and expenses associated with the organization of the Fund, including government incorporation charges and professional fees and expenses in connection with the preparation and restatement of the Fund's offering documents and the preparation of its basic corporate and contract documents, have been paid out of the Fund's assets.

**Fees of the Manager**

The Manager receives a monthly fee from the Fund calculated at an annual rate equal to approximately one and one-half percent (1.5%) of the month-end Net Asset Value of the Fund attributable to the USD Shares (the "Management Fee"). The Management Fee is generally payable as of the last Business Day of each month. The Manager may, in its sole discretion, waive all or part of the Management Fee otherwise due with respect to any Shareholder's investment, by rebate or otherwise or pay all or part of the Management Fee to placement agents under separate agreements.

**Fees of the Investment Advisor**

The Fund bears all direct and indirect costs associated with the investment advisory services of the Investment Advisor. The Investment Advisor's compensation is derived from the market making activities of its affiliated broker-dealer and bid-ask spreads.

**Fees of the Consultant**

The Consultant is paid by Manager for its services at no additional cost to the Fund.

**Fees of the Administrator**

For its administrative duties relating to the USD Shares, the Administrator receives customary fees paid out of the Fund assets based upon the nature and extent of the services performed by the Administrator for the Fund. The compensation provisions of the Administration Agreement may be revised in the future.

**Fees of the Bank**

Pursuant to the Custodian Agreement, the Bank receives a custodian services fee comprised of (i) an annual safekeeping charge equal to ten basis points (.10%) of the gross asset value of the Fund with a maximum of U.S. $25,000 per annum and (ii) the right to recover all sub-custodian charges which will be charged directly to the Fund. The Bank is entitled to reimbursement of actual out-of-pocket expenses. The compensation provisions of the Custodian Agreement may be revised in the future.

**Other Operating Expenses**

The Manager and the Administrator are responsible for providing all office personnel, space and facilities required for the performance of their respective services. The Fund bears all other expenses incident to its operations and business, including brokerage commissions, appraisers, pricing services, printing costs, the fees of its auditors and legal advisors; custody charges; interest and commitment fees on loans and debt balances; any income, withholding or other taxes; and the costs of communications with Shareholders, prospective investors and the Investment Advisor. In addition, the Fund pays for any expenses incurred in connection with listing the Shares on the Irish Stock Exchange, or any other suitable exchange, if such listing is deemed desirable in the sole discretion of the Directors.

Each Director of the Fund who is not an officer or employee of the Manager or the Administrator receives a fee in accordance with reasonable practice. All Directors receive reimbursement for travel and other costs incurred in connection with their services.

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

17

Fees and expenses that are directly identifiable with a particular class of shares of the Fund are charged against that class. Other fees and expenses will be charged to the Fund as a whole or otherwise in the discretion of the Board and allocated among the outstanding classes in a commercially reasonable manner in the Board's discretion.

## SUBSCRIPTIONS AND REDEMPTIONS

### Subscriptions

*Generally.* The USD Shares may be purchased as of the first Business Day (as defined herein) of the month (herein the "Subscription Date") at a price equal to the Net Asset Value per USD Share as of the last Business Day of the immediately preceding calendar month (the "Valuation Date"), plus any applicable subscription charges. "Business Day" refers to any day when the central banking systems of the U.S. and Bermuda are open and operating. As of December 31, 2007, the audited Net Asset Value per Share of the USD Shares was U.S.$421.37. The Fund may (i) discontinue the offering of USD Shares at any time or (ii) permit subscriptions on other than the first Business day of a month at the then Net Asset Value of the USD Shares. The minimum initial subscription from each investor is $250,000 and each minimum additional subscription is $100,000. Such minimums may be waived by the Fund.

*Procedure.* Subscriptions are generally payable in U.S. Dollars. The acceptance of subscriptions as of the commencement of each month is subject to (i) receipt by the Administrator of completed Subscription Forms by the last Business Day prior to the Subscription Date of the month in which prospective investors wish to subscribe for Share and (ii) confirmation of the receipt of cleared funds by the Bank at the latest by the Subscription Date. The Fund reserves the right to accept or reject subscriptions in its absolute discretion. Details of the Subscription procedure are set forth at page S-1 of the Subscription Forms attached hereto. As part of the Administrator's and the Fund's responsibility for protection against money laundering, the Administrator may require a detailed verification of the identity of a person or entity applying for Shares.

*Subscription Charge.* A subscription charge of up to five percent (5%) of the total dollar amount subscribed will be charged on subscription of the USD Shares, but such charge may be waived in whole or in part at the sole discretion of the Manager. The subscription charge, if any, will be retained by the Manager. The Manager may grant all or part of such charge to dealers and independent third parties in connection with the solicitation of subscriptions. The subscription charge will be deducted from the subscriber's payment for purposes of determining the net amount available for investment in USD Shares.

*Certain Special Arrangements.* Fractional USD Shares will not be issued and refunds of subscription funds will be made only if the surplus amount (corresponding to non-issued fractional USD Shares) is in excess of U.S.$450.

*Registration and Transfer.* USD Shares will be issued only in registered form; the Fund does not issue bearer shares. The Administrator maintains a current register of the names and addresses of the Fund's Shareholders. Certificates representing USD Shares will be issued, without charge, only if requested by a USD Shareholder. Certificates will be mailed or delivered to the USD Shareholder at the Shareholder's risk. Because certificates must be returned to the Administrator prior to the processing of redemption requests, the Fund discourages USD Shareholders from requesting certificates.

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

Transfers of USD Shares are permitted only with the prior consent of the Fund, which may be withheld for any reason or for no reason. For the avoidance of doubt, transfers will not be approved unless the proposed transfer includes all legal, economic and beneficial rights to the Shares. Proposed transferees are required to furnish the same information, which would be required in connection with a direct subscription in order for a transfer application to be considered by the Fund. Violation of applicable ownership and transfer restrictions may result in a compulsory redemption.

*Listing.* The USD Shares are not listed on any securities exchange, and it is not anticipated that there will be any secondary market for trading in the USD Shares. Notwithstanding the foregoing, the Fund reserves the right to list the USD Shares on The Irish Stock Exchange if, in its discretion, it deems the same desirable.

*Shortened Period Within Which to Make Claims.* By executing a subscription agreement for Shares, each investor in the Fund shall be deemed to have waived, to the maximum extent permissible under law, the right to bring any legal claim, action or other proceeding against the Fund, the Manager or the Consultant unless such claim, action or proceeding is commenced within six (6) months from the date of the first to occur of (i) the original occurrence allegedly giving rise to such claim, action or proceeding or (ii) the Shareholder's redemption of any Shares. See "CERTAIN RISK FACTORS."

**Anti Money Laundering**

To ensure compliance with all relevant rules and regulations designed to avoid money laundering, the Administrator will require a detailed verification of the identity of any applicant subscribing for USD Shares. Each applicant must undertake to provide verification of identity upon request from, and to the satisfaction of, the Administrator. Depending on the circumstances of each application, a detailed verification may not be required if the investor is an authorized financial institution. A detailed verification might not be required when:

(a)    the applicant makes payment by wire transfer from an account held in the applicant's name at a recognized financial institution residing in a recognized jurisdiction, as defined by applicable laws, and the applicant's details (name and account number) appear in the confirmation of the wire transfer; or

(b)    the application is made through a recognized intermediary.

This exception will only apply if the financial institution referred to above is within a country or territory which is a member of the Financial Action Task Force ("FATF") or Caribbean Financial Action Task Force ("CFATF") and has anti-money laundering procedures that are at least equivalent to those in the British Virgin Islands. The following countries are deemed to have anti-money laundering procedures at least equivalent to those in the British Virgin Islands: Aruba, Australia, Bahamas, Barbados, Bermuda, Belgium, Canada, Cayman Islands, Denmark, Finland, France, Germany, Gibraltar, Greece, Guernsey, Hong Kong, Iceland, Ireland, Isle of Man, Italy, Japan, Jersey, Luxembourg, Netherlands & Netherlands Antilles, New Zealand, Norway, Portugal, Singapore, Spain, Sweden, Switzerland, United Kingdom and United States of America.

An individual may be required to produce a copy of a passport or identification card certified by a notary public. In the case of corporate applicants, they may be required to produce a certified copy of the certificate of incorporation (and change of name), memorandum and articles of association (or

equivalent), and the names, occupations, dates of birth, and residential and business addresses of all directors.

The Administrator reserves the right to request such information as it deems necessary to verify the identity of an applicant and the applicant will be expected to make the representation set forth in the Subscription Agreement. To ensure compliance with statutory and other requirements relating to anti-money laundering, the Administrator may require verification of identity from any person submitting a completed Subscription Agreement. Pending the provision of evidence satisfactory to the Administrator as to identity, the evidence of title in respect of the USD Shares may be retained at the absolute discretion of the Administrator. If within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the USD Shares applied for in which event subscription monies will be returned without interest to the account from which such monies were originally debited, refuse to process a redemption request, or otherwise proceed in accordance with applicable laws. Subscription monies may be rejected by the Administrator if the remitting bank or financial institution is unknown to the Administrator.

**Eligible Investors**

Investment in the Fund is not available to Restricted Persons (as defined herein), unless the Fund determines otherwise in limited cases. The term "Restricted Person" as used in this Memorandum means any U.S. Person[*] and other persons from time to time designated as such by the Fund. Each prospective investor is required to certify that the Shares are not being acquired directly or indirectly for the account or benefit of a Restricted Person.

Any prospective investor acting in any fiduciary capacity is required to certify the number of beneficial owners for whom Shares are being purchased. Furthermore, it is the responsibility of each investor to verify that the purchase and payment for the Shares is in compliance with all relevant laws of the investor's jurisdiction or residence.

---

[*] For the purposes of this Memorandum, "U.S. Person" means: (a) any natural person resident in the United States; (b) any partnership or corporation organized or incorporated under the laws of the United States; (c) any estate of which any executor or administrator is a U.S. Person; (d) any trust of which any trustee is a U.S. Person; (e) any agency or branch of a foreign entity located in the United States; (f) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. Person; (g) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or, if an individual, resident in the United States; or (h) any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a U.S. Person principally for the purpose of investing in securities not registered under the United States Securities Act of 1933, as amended (the "Securities Act"), unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts. "U.S. Person" does not include: (a) any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. Person by a dealer or other professional fiduciary organized, incorporated or, if an individual, resident in the United States; (b) any estate of which any professional fiduciary acting as executor or administrator is a U.S. Person if (i) an executor or administrator of the estate who is not a U.S. Person has sole or shared investment discretion with respect to the assets of the estate and (ii) the estate is governed by foreign law; (c) any trust of which any professional fiduciary acting as trustee is a U.S. Person if a trustee who is not a U.S. Person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. Person; (d) an employee benefit plan established and administered in accordance with the law of a country other than the United States and customary practices and documentation of such country; (e) any agency or branch of a U.S. Person located outside the United States if (i) the agency or branch operates for valid business reasons and (ii) the agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located; or (f) the International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations and their agencies, affiliates and pension plans.

The Fund reserves the right to offer Shares to Restricted Persons upon compliance with applicable rules and regulations.  For example, the Fund may admit a number of U.S. tax-exempt entities such as, without limitation, employee benefit plans, charitable organizations, foundations, endowments and the like upon meeting certain eligibility standards such as being an "accredited investor" within the meaning of the U.S. Securities Act.  Such investors should request a U.S. Supplemental Disclosure Statement from the Administrator and comply with the instructions for U.S. subscribers as set forth therein.   In any event, the Fund reserves the right to reject subscriptions for Shares, in whole or in part, in its absolute discretion for any reason or for no reason.

The Fund is not a recognised collective investment scheme for the purposes of the Financial Services and Markets Act 2000 of the United Kingdom (the "Act") and the information contained in this Memorandum has not been approved for the purposes of Section 21(2) of the Act by a person authorised under the Act. The promotion of the Fund and this Memorandum in the United Kingdom are therefore prohibited by law. This Memorandum is being issued in the United Kingdom by the Fund (where permitted by applicable law and regulation) to persons who are of a kind to whom the Fund may lawfully be promoted by a person authorised under the Act by virtue of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes (Exemptions) Order 2001) and Chapter 4.12 of the FSA's Conduct of Business Sourcebook or as otherwise permitted by applicable law and regulation. The Fund is not regulated by the Financial Services Authority, and investors may not have the benefit of the Financial Services Compensation Scheme and other protections afforded by the Act or any of the rules and regulations made thereunder.

### Redemptions

USD Shares are redeemable at the option of the Shareholder on the terms and conditions provided herein.

*Generally.*  USD Shares are eligible for redemption as of the last Business Day of each calendar month (the "Redemption Date"), upon not less than thirty-five (35) days' prior written notice to the Administrator.  The net redemption proceeds normally will be settled within thirty (30) days after the redemption date, without interest.  In circumstances where the Fund is unable to liquidate securities positions in an orderly manner so as to fund redemptions or where the value of the assets of the Fund cannot reasonably be determined, the Fund may take longer than thirty (30) days to effect settlement of redemptions.  The notice requirement may be waived by the Fund in its discretion.  Redemption forms are available on request to the Administrator.  A redemption request is irrevocable unless the Fund consents to its withdrawal.  The Manager may elect to purchase or to procure the purchase of Shares offered for redemption at a price equal to their Net Asset Value rather than requiring the Fund to redeem them.

*Redemption Price.*  The redemption price is equal to the Net Asset Value of the USD Shares as of the Redemption Date, plus any applicable redemption charge as described below.   See "DETERMINATION OF NET ASSET VALUE".

*Settlement.*  Redemptions will be generally settled in U.S. Dollars, although the Fund may, in its discretion, settle redemptions in kind to the extent of such redeeming Shareholder's pro-rata share of non-illiquid, direct investments.  Cash settlements will be remitted either by wire transfer to an account designated by the Shareholder or by check posted at the Shareholder's risk (as specified by the Shareholder in his written redemption notice).  If USD Shares are held in certificate form, the redemption payment will not be remitted until the certificates have been tendered to the Administrator, and no interest

will accrue on the redemption proceeds pending the settlement date. The Fund may withhold a portion of any proceeds of redemption if necessary to comply with applicable regulatory requirements.

Redemption requests may be submitted by fax to the Administrator at (+1-441) 296-8227, Attn: Shareholder Services Unit, provided that: (i) the original Redemption Request (attached hereto) is received by the Administrator prior to the Redemption Date and (ii) the Shareholder receives written confirmation that the faxed Redemption Request has been received.

The Administrator will confirm in writing within five (5) Business Days of receipt of all faxed Redemption Request(s) which are received in good order.  Shareholders failing to receive such written confirmation from the Administrator within five (5) Business Days should contact Shareholder Services Unit at the Administrator at (+1-441) 295-9166 to obtain the same.  Failure to obtain such written confirmation will render faxed instructions void.

Requests for redemption received after 5:00 p.m. (Bermuda time) on the last day of the redemption notice will be treated as a request for redemption as of the next Redemption Date. Redemption payments will be made in U.S. Dollars, unless made in kind, and will be remitted either by wire transfer to an account designated by the Shareholder at the bank from which the subscription price was paid or by check posted at the Shareholder's risk (as specified by the Shareholder in its written redemption notice).  In circumstances where the Fund is unable to liquidate securities positions in an orderly manner in order to fund redemptions, or where the value of the assets and liabilities of the Fund cannot reasonably be determined, the Fund may take longer than the time periods mentioned above to effect settlements of redemptions or may even suspend redemptions.  Under extraordinary circumstances, in the discretion of the Directors, the Fund may settle redemptions in kind and may extend the duration of the redemption notice period beyond a full quarter if the Directors deem such an extension as being in the best interest of the Fund and the non-redeeming Shareholders.  Certain risks exist with regard to redemption requests made but not yet settled.  See "CERTAIN RISK FACTORS."

*Compulsory Redemptions*.  The Fund and the Manager each, independently, have the right to require the compulsory redemption of all USD Shares held by a Shareholder for any reason or for no reason.  Compulsory redemptions will be made at the current Net Asset Value of the USD Shares (plus any applicable redemption charge) as of the last Business Day of the month in which such notice of redemption is issued to the USD Shareholder.

*Redemption Charge*.  Generally, no redemption charge is imposed.  However, a redemption charge not to exceed one percent (1.0%) of the proceeds (waivable in whole or in part at the sole discretion of the Manager in exceptional circumstances) may be imposed on the redemption of Shares which are held for less than twelve (12) months from the Subscription Date.

*Temporary Suspension of Dealings and Determination of Net Asset Value*.  The Fund's Directors may declare a temporary suspension of the determination of the Fund's Net Asset Value and the sale, allotment, issue or redemption of the Shares during:  (i) any period during which, in the opinion of the Board, disposal by the Fund of securities which constitute a substantial portion of the assets of the Fund is not practically feasible or as a result of which any such disposal would be materially prejudicial to Shareholders;  (ii) any period when, in the opinion of the Board, for any reason it is not possible to transfer monies involved in the acquisition or disposition or realization of securities which constitute a substantial portion of the assets of the Fund at normal rates of exchange;  (iii) any period when, in the opinion of the Board, for any reason the prices of any securities which constitute a substantial portion of the assets of the Fund cannot be reasonably, promptly or accurately ascertained;  (iv) any period (other than customary holiday or weekend closings) when any recognized exchange or market on which the

Fund's securities are normally dealt in or traded is closed, or during which trading thereon is restricted or suspended; or (v) any period when proceeds of any sale or redemption of the Shares cannot be transmitted to or from the Fund's account.  The Fund may withhold payment to any person whose USD Shares have been tendered for redemption until after any suspension has been lifted.

---

## DETERMINATION OF NET ASSET VALUE

---

The net asset value of the USD Shares is the market value of the Fund's total assets calculated as described below, less all accrued debts and liabilities, including (i) fees of the Manager, the Administrator and the Bank earned or accrued but not yet paid, (ii)  monthly amortization of organization costs, (iii) an allowance for the Fund's estimated annual audit and legal fees, (iv) any contingencies for which reserves are determined to be required, (v) any other costs attributable to the USD Shares (the "Net Asset Value").  Net Asset Value of the USD Shares is expressed in U.S. Dollars, and any items denominated in other currencies are translated at prevailing exchange rates as determined by the Administrator.

The Administrator will determine the net asset value of the Fund's Portfolio assets attributable to the USD Shares as of the close of business on the last Business Day of each calendar month.  See "CERTAIN RISK FACTORS".  The Administrator verifies the prices attributed to the securities held by the USD Shares of the Fund by reference to pricing sources independent of the Investment Advisor whenever reasonably possible

The Fund's total assets include (i) all cash and cash equivalent, including bank deposits and interest bearing obligations, (ii) all securities positions, and (iii) all options positions.

Cash and cash equivalents, including bank deposits and interest bearing obligations, are valued at cost plus accrued interest and discount.

Securities are valued at the last sale price reported on the principal securities exchange or market on which the securities are traded.  In the absence of reported sales prices on the valuation date, securities generally are valued at the last reported bid quotation.

Options positions are valued at the last sale price reported on the principal securities exchange or market on which the options are traded.  In the absence of reported sales prices on the valuation date, options generally are valued at the last reported bid quotation.

The value of assets are recorded at their fair value as determined in good faith by the Administrator in the absence of current quotations or if the Administrator concludes that such quotations are not indicative of fair value by reason of illiquidity of a particular security or other factors. In special circumstances in which the Administrator determines that market prices or quotations do not fairly represent the value of particular assets, the Administrator is authorized to assign a value to such assets which differs from the market prices or quotations.  The cost of appraisers or pricing services employed by the Fund is an expense of the Fund and as such a charge against Net Asset Value of the USD Shares.

Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's net assets if judgments regarding

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

23

appropriate valuations made by the Administrator should prove incorrect.  See "CERTAIN RISK FACTORS."  In the absence of bad faith or manifest error, the Net Asset Value calculations of the USD Shares made by the Administrator are conclusive and binding on all Shareholders.

The Net Asset Value per USD Share shall equal the Net Asset Value of the assets of the Fund attributable to the USD Shares divided by the number of outstanding USD Shares on the relevant valuation date.

## POTENTIAL CONFLICTS OF INTEREST

The Manager, the Investment Advisor, the Administrator, the Consultant and their respective affiliates, which shall be deemed to include, in each case, their respective officers, directors, employees and entities owned by any of the aforementioned parties (the "Related Parties") may face certain conflicts of interests in relation to the Fund.  These conflicts include, but are not limited to, the following:

The Manager and each of its directors presently and may in the future, directly or indirectly, direct, sponsor or manage other managed pools or accounts in addition to the Fund and may have financial or other incentives to favor some such pools or accounts over the Fund.  The Manager's decisions with regard to the Fund may differ from those recommended for other arrangements for which the Manager exercises discretion.

The Investment Advisor is presently affiliated and manages investment programs for other investment entities with substantially the same or different objectives of the Fund.  Additionally, the Investment Advisor, in its role as a market-maker, trades with the Fund as a principal and no arms' length relationship exists between the Fund and the Investment Advisor.

Some or all of the Related Parties may be involved with other entities utilizing investment strategies similar to those of the Fund and with other business in general.  Execution of the strategy might not yield the same results in all cases.  The Investment Advisor may cause the Fund to invest in securities in which some or all of the Related Parties have a financial interest, or to engage in transactions with brokers or others with whom some or all of the Related Parties have financial or other relationships, as by way of example, the use, in this case, of an affiliated broker dealer by the Investment Advisor.  In such case, there is no assurance that the usual level of oversight or the degree of competition leading towards lower fees and commissions that might have resulted had the broker dealer been independent of the Investment Adviser would not be lost.

The Related Parties may engage for their own accounts, or for the accounts of others, in other business ventures of any nature, and the Fund has no right to participate in or benefit from such other management activities.  Related Parties are not obliged to account to the Fund for any profits or benefits made or derived therefrom, nor do they have any obligation to disclose or refer any of the investment or service opportunities obtained through such activities to the Fund.  Related Parties may own and sell Shares in the Fund, deal as principals with the Fund or Shareholders in the sale or purchase of investments of the Fund (or Shares) or act as brokers, whether to the Fund or to third parties, in the purchase or sale of the Fund's investments (or Shares) and entitled to retain any profits or customary commissions resulting from such dealings.

One or more directors of the Manager may also be a director of the Fund or otherwise provide services to the Fund, either directly or indirectly, in which event the likelihood of independence in dealing with issues facing the Fund is diminished. For example, the Manager's Director is Michael G. Tannenbaum who is a senior partner of the law firm that renders advice to the Fund as well as to both the Manager and the Consultant. See "ADDITIONAL INFORMATION – Counsel"

---

## TAXATION

### Introduction

This summary of the principal tax consequences applicable to the Fund and its Shareholders is based upon advice received from the Fund's U.S. and British Virgin Islands legal and tax advisers. Such advice is based upon factual representations made by the Manager, the Consultant and Administrator concerning the proposed conduct of the activities to be carried out by the Fund and by them on behalf of the Fund. The conclusions summarized herein could be adversely affected if any of the material factual representations on which they are based should prove to be inaccurate. Moreover, while this summary is considered to be a correct interpretation of existing laws in force on the date of this Memorandum, no assurance can be given that courts or fiscal authorities responsible for the administration of such laws will agree with such interpretations or that changes in such laws will not occur. Investors should consult their professional advisors on the possible tax consequences of their subscribing for, purchasing, holding, selling or redeeming Shares under the laws of their countries of citizenship, residence, ordinary residence or domicile.

THIS SUMMARY IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES. THIS SUMMARY WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND ANY TAXPAYER TO WHOM THE TRANSACTIONS OR MATTERS ARE BEING PROMOTED, MARKETED OR RECOMMENDED SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### The Fund

*British Virgin Islands Taxation.* The Fund should not be subject to any taxation or other governmental charges or fees in the British Virgin Islands other than an annual license fee payable to the Registrar of Companies (currently U.S.$1,150.00) and an annual license fee payable to the Registrar of Mutual Funds (currently U.S.$350). Under current British Virgin Island law, no income tax should be imposed on the Fund or on investors in the Fund who are not domiciled or resident in the British Virgin Islands. There are no withholding, capital gains, estate or inheritance taxes in the British Virgin Islands.

*US Federal Income Taxation.* The Fund has been advised that it should not be subject to U.S. Federal income taxes on income or gains from its trading (except in respect of any dividends received in the course of such trading) provided that it does not engage in a trade or business within the U.S. to which such income or gains are effectively connected. Pursuant to a safe harbor under the United States Internal Revenue Code of 1986, as amended, a non-U.S. corporation which trades stock or securities or commodities for its own account should not be treated as engaged in a trade or business within the U.S.

provided that the non-U.S. corporation is not a dealer in stock or securities or commodities.  The Fund intends to conduct its business in a manner so as to meet the requirements of this safe harbor.  If the activities of the Fund are not covered by the foregoing safe harbor, there is a risk that the Fund (but not any investor) will be required to file a U.S. federal income tax return for such year and pay tax at full U.S. corporate income tax rates as well as an additional thirty percent (30%) branch profits tax or other taxes on its income.

The Fund should not be subject to U.S. federal income or withholding tax on U.S. source interest income (other than in the case of certain contingent interest or interest received from a borrower ten percent (10%) or more of the equity of which is owned by the Fund, neither of which the Fund anticipates receiving) provided that the Fund is not engaged in a trade or business within the U.S. to which such interest income is effectively connected, and provided that the Fund's interest-bearing securities qualify as registered obligations and that the Fund periodically supplies an Internal Revenue Service Form W-8BEN or its equivalent.

*Other Jurisdictions.*  Capital gains and other revenues received by the Fund may be subject to withholding or similar taxes imposed on foreign corporations by the country in which such gains or other revenues originate.  In jurisdictions other than the United States, non-U.S. taxes may be withheld at source on dividend and other income derived by the Fund at rates generally ranging up to thirty percent (30%).  Capital gains derived by the Fund in such jurisdictions may often be exempt from non-U.S. income or withholding taxes at source, although the treatment of capital gains varies among jurisdictions.

Persons interested in purchasing the Fund's Shares should inform themselves as to any tax consequences particular to their circumstances arising in the jurisdiction in which they are resident or domiciled for tax purposes in connection with the acquisition, ownership, redemption or disposition of the Fund's Shares.

*Changes in Law.*   All laws, including laws relating to taxation in the British Virgin Islands, the United States and other jurisdictions are subject to change without notice.

**Shareholders of the Fund**

Shareholders who are not otherwise subject to British Virgin Islands or United States taxes by reason of their residence, domicile or other particular circumstances should not become subject to any such taxes by reason of the ownership, transfer or redemption of the Shares.

Shareholders who are or may be subject to U.S. Federal income tax on their worldwide income should be aware of certain tax consequences of investing directly or indirectly in Shares and should be certain to consult with their own tax advisers in this regard.

U.S. tax-exempt investors should review the materials set forth below under "ERISA CONSIDERATIONS" as well as any supplemental materials provided to such investors.

Dividend and redemption payments made by the Fund to Shareholders who are not U.S. Persons should not be subject to U.S. Federal income tax, provided that Shares are not held in connection with a U.S. trade or business of the Shareholder in the year of receipt.  Individual holders of Shares who are neither present nor former U.S. citizens nor U.S. residents (as determined for U.S. estate and gift tax purposes) should not be subject to U.S. estate and gift taxes with respect to their ownership of such Shares.  A Shareholder's change in status to a U.S. Person could result in adverse U.S. tax consequences

and will constitute a violation of the terms of this Memorandum, resulting in a compulsory redemption of Shares.

**Unrelated Business Taxable Income**

The term "Permitted U.S. Person" means a U.S. Person that is subject to ERISA, or is otherwise exempt from payment of U.S. Federal income tax. Generally, a Permitted U.S. Person is exempt from Federal income tax on certain categories of income, such as dividends, interest, capital gains and similar income realized from securities investment or trading activity. This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of a Permitted U.S. Person. Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the Permitted U.S. Person's exempt purpose or function. UBTI also includes (i) income derived by a Permitted U.S. Person from debt-financed property and (ii) gains derived by a Permitted U.S. Person from the disposition of debt-financed property.

A Permitted U.S. Person investing in a foreign corporation such as the Fund should not realize UBTI with respect to an unleveraged investment in Shares. Permitted U.S. Persons are urged to consult their own tax advisers concerning the U.S. tax consequences of an investment in the Fund.

**Information Returns**

Any U.S. Person transferring cash or other property to a foreign corporation such as the Fund or owning ten percent (10%) or more of the value or voting power of the shares of a foreign corporation such as the Fund will, with certain limited exceptions, likely be required to file an information return with the U.S. Internal Revenue Service containing certain disclosure concerning the filing shareholder, other shareholders and the corporation. The Fund has not committed itself to provide the information about the Fund or its Shareholders needed to complete the return.

**E.U. Savings Directive**

It should be noted that the BVI agreed in principle to implement the EU Savings Directive (2003/48/EC) ("EUSD").

According to Article 1 of the EUSD, "the ultimate aim of the EUSD is to enable savings income in the form of interest payments made in one Member State to beneficial owners, individuals, resident for tax purposes in another Member State to be made subject to effective taxation in accordance with the national laws of the latter Member State."

The EUSD applies:
   (i)      only to interest or interest-derived payments;

   (ii)     only to payments to EU resident individuals ("beneficial owners") and certain EU intermediary entities ("residual entities");

   (iii)    only when payments are made by paying agents in the EU and other defined territories (including the Caribbean Overseas Territories); and

(iv)      only when payments are made cross-border.

A paying agent is defined as an economic operator that is established in either the EU or certain defined territories (including the BVI) which either pays interest to, or secures the payment of interest for the immediate benefit of, the beneficial owner.  In a chain of economic operators, the last economic operator is the paying agent.

For the purposes of the EUSD, interest payments include interest paid in relation to debt claims, which include bonds and deposits, but not equities.  Such payments also include interest accrued or capitalized at sale or redemption of debt claims.

Under the EUSD, there are certain exclusions to the definition of interest payments.  These include the following:

(i)      Income derived from EU non-UCITS (non-retail) funds.  As explained below, this is of particular significance for BVI funds by virtue of the agreed basis of implementation;

(ii)      Income realized upon the sale or redemption of shares or units of a fund (whether a EU UCITS fund or not) if less than 40% of such fund's assets are invested in debt claims.  In determining the percentage of a fund's assets that are invested in debt claims, reference may be made to the investment policy stated in the fund's offering document.  However, if this does not place a limit on the amount of its assets that may be invested in debt claims and it is unknown from the information available what percentage of the fund's assets are in fact so invested, the fund will be deemed to exceed the 40% limits set out above.

Since the BVI are not directly subject to EU law, implementation of the EUSD will be by way of bilateral agreements between the BVI and each EU Member State.  The BVI government has agreed a model for these bilateral agreements ("Model Agreement"), which sets out the manner in which the EUSD will be implemented in relation to the BVI.  Under the Model Agreement, certain  mutual funds regulated under the Mutual Funds Law (such as the Fund) will be treated as non-UCITS funds.  By virtue of direct arrangements with the UK and Ireland, UK and Irish paying agents will be able to treat BVI non-UCITS funds in the same manner as EU non-UCITS funds, that is, as falling outside the scope of the EUSD.  Paying agents in the BVI will be able to do likewise.

According to Swiss rules published on 1 April 2005, a Swiss-based paying agent, when attempting to determine whether a fund that is based in a dependent territory (e.g. the BVI) is within the scope of the EUSD, is entitled to look to the laws of the fund's "home country".  Accordingly, if the fund would be considered to be outside of the scope of the EUSD for the purposes of the laws of the jurisdiction in which the fund is based, a Swiss-based paying agent is entitled to treat the fund as falling outside the scope of the EUSD.

The Fund has appointed the Administrator as its administrator and the Administrator is responsible for processing redemptions.  Accordingly, the Fund itself would not be considered to be a paying agent for the purposes of the EUSD.  The Administrator would also not be considered to be a paying agent for the purposes of the EUSD because it is located outside of the EU and the defined territories.  However, if the Administrator were to make redemption payments to a professional nominee that in turn were to forward the payments to the ultimate beneficial owner, the professional nominee may be considered to be a paying agent and the redemption payments may be considered to be interest payments for the purposes of the EUSD if the professional nominee is based in an EU Member State other

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

than the UK or Ireland or in one of the defined territories other than the BVI or Switzerland.  In such circumstances, advice should be obtained from counsel in the relevant jurisdiction as to whether the legislation in that jurisdiction would treat the Fund as falling outside the scope of the EUSD and, if it would not, the manner in which such legislation would treat a redemption payment made by the Fund to a beneficial owner or residual entity.

<center>*   *   *   *</center>

The foregoing summary does not address tax considerations which may be applicable to certain Shareholders under the laws of jurisdictions other than the BVI or the U.S.  The Fund has no present plans to apply for any certifications or registrations, or to take any other actions under the laws of any jurisdictions which would afford relief to local investors therein from the normal tax regime otherwise applicable to an investment in the USD Shares.  It is the responsibility of all persons interested in purchasing the USD Shares to inform themselves as to any income or other tax consequences arising in the jurisdictions in which they are resident or domiciled for tax purposes, as well as any foreign exchange or other fiscal or legal restrictions, which are relevant to their particular circumstances in connection with the acquisition, holding or disposition of the USD Shares.  The value of the Fund's investments may also be affected by repatriation and exchange control regulations.

## CERTAIN ERISA CONSIDERATIONS

The United States Employee Retirement Income Security Act of 1974, as amended ("ERISA").  imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans (collectively, "ERISA Plans") and on those persons who are fiduciaries with respect to ERISA Plans.  Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the plan.  The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances, including the ERISA Plan's existing investment portfolio, and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "CERTAIN RISK FACTORS".

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts (together with ERISA Plans, "Plans")) and certain persons (referred to as "parties in interest" for purposes of ERISA and "disqualified persons" for purposes of the Code) having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction.  A party in interest or disqualified person who engages in a non-exempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code, and the transaction might have to be rescinded.

The U.S.  Department of Labor has promulgated a regulation, 29 C.F.R.  Section 2510.3-101 (as modified by Section 3(42) of ERISA) (the "Plan Asset Regulation"), describing what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

<center>29</center>

ERISA, including the fiduciary responsibility and prohibited transaction provisions of Title I of ERISA and the related prohibited transaction provisions under Section 4975 of the Code. Under the Plan Asset Regulation, if a Plan invests in an "equity interest" of an entity that is neither a "publicly offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company", which includes for purposes of the Plan Asset Regulation a "venture capital operating company", or that equity participation in the entity by "Benefit Plan Investors" (as defined below) is not "significant".

Under the Plan Asset Regulation, equity participation in an entity by Benefit Plan Investors (as defined below) is "significant" on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25% or more of the value of any class of equity interests in the entity is held by Benefit Plan Investors. The term "Benefit Plan Investor" is defined in the Plan Asset Regulation as: (a) any employee benefit plan (as defined in Section 3(3) of ERISA) subject to Part 4 of Subtitle B of Title I of ERISA; (b) any plan subject to Section 4975 of the Code; and (c) any entity whose underlying assets include plan assets by reason of the investment in the entity by such employee benefit plan and/or plan. For purposes of this determination, (i) the value of equity interests held by a person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the entity or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any affiliate of any such person) is disregarded, and (ii) only that portion of the equity interests of an entity described in clause (c) of the preceding sentence investing in another entity that are held by employee benefit plans or other plans described in clauses (a) or (b) of the preceding sentence are included in the testing of such other entity.

A Share in the Fund should be considered to be an "equity interest" in the Fund for purposes of the Plan Asset Regulation, and the Shares will not constitute "publicly offered securities" for purposes of the Plan Asset Regulation. In addition, the Fund will not be registered under the Investment Company Act and it is not expected to qualify as a "venture capital operating company."

The Board intends to use commercially reasonable efforts to restrict transfers of any equity interest in the Fund so that ownership of each class of equity interests in the Fund by Benefit Plan Investors will remain below the 25% threshold contained in the Plan Asset Regulation. Although there can be no assurance that such will be the case, the assets of the Fund should not constitute "plan assets" for purposes of ERISA and Section 4975 of the Code.

If the assets of the Fund were deemed to constitute the assets of a Plan, the fiduciary making an investment in the Fund on behalf of an ERISA Plan could be deemed to have improperly delegated its asset management responsibility, the assets of the Fund could be subject to ERISA's reporting and disclosure requirements, and transactions involving the assets of the Fund would be subject to the fiduciary responsibility and prohibited transaction provisions of ERISA and the prohibited transaction rules of Section 4975 of the Code. Accordingly, certain transactions that the Fund might enter into, or may have entered into, in the normal course of its operations might result in non-exempt prohibited transactions and might have to be rescinded. A party in interest or disqualified person that engaged in a non-exempt prohibited transaction may be subject to non-deductible excise taxes and other penalties and liabilities under ERISA and the Code. In addition, such "plan asset" treatment would subject the calculation and payment of the Board's fees to applicable prohibited transaction and certain conflict of interest provisions of ERISA and the Code. Consequently, if at any time the Board determines that assets of the Fund may be deemed to be "plan assets" subject to ERISA and Section 4975 of the Code, the Board may take certain actions it may determine to be necessary or appropriate, including requiring one

or more investors to redeem or otherwise dispose of all or part of their Shares in the Fund or terminating and liquidating the Fund.

Each Plan fiduciary who is responsible for making the investment decisions whether to invest in the Fund should determine whether, under the general fiduciary standards of investment prudence and diversification and under the documents and instruments governing the Plan, an investment in the Shares is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio. Any Plan proposing to invest in Shares should consult with its counsel to confirm that such investment will not result in a prohibited transaction and will satisfy the other requirements of ERISA and the Code.

The sale of any Shares to a Benefit Plan Investor is in no respect a representation by the Board or its affiliates that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

Regardless of whether the assets of the Fund are deemed to be "plan assets", the acquisition of an Share by a Plan could, depending upon the facts and circumstances of such acquisition, be a prohibited transaction, for example, if the Board or its affiliates was a party in interest or disqualified person with respect to the Plan. However, such a prohibited transaction may be treated as exempt under ERISA and the Code if the Shares were acquired pursuant to and in accordance with one or more "class exemptions" issued by the U.S. Department of Labor, such as Prohibited Transaction Class Exemption ("PTCE") 84-14 (a class exemption for certain transactions determined by an independent qualified professional asset manager), PTCE 90-1 (a class exemption for certain transactions involving an insurance company pooled separate account), PTCE 91-38 (a class exemption for certain transactions involving a bank collective investment fund), PTCE 95-60 (a class exemption for certain transactions involving an insurance company general account), and PTCE 96-23 (a class exemption for certain transactions determined by an in-house asset manager).

Any insurance company proposing to invest assets of its general account in the Shares should also consider the extent to which such investment would be subject to the requirements of ERISA in light of the U.S. Supreme Court's decision in John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank and under any subsequent legislation or other guidance that has or may become available relating to that decision, including Section 401(c) of ERISA and the regulations thereunder published by the U.S. Department of Labor in January, 2000.

The Board will require a fiduciary of an ERISA Plan that proposes to acquire a Share to represent that it has been informed of and understands the Fund's investment objectives, policies, strategies and limitations, that the decision to acquire an Share was made in accordance with its fiduciary responsibilities under ERISA and that neither the Board nor any of its affiliates has provided investment advice with respect to such decision. The Board will also require any investor that is, or is acting on behalf of, a Plan to represent and warrant that its acquisition and holding of a Share will not result in a non-exempt prohibited transaction under ERISA and/or Section 4975 of the Code.

Governmental plans and certain church plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to state or other federal laws that are substantially similar to the foregoing provisions of ERISA and the Code. The Board will require similar representations and warranties with respect to the purchase of a Share by any such plan. Fiduciaries of such plans should consult with their counsel before purchasing any Shares.

The discussion of ERISA and Section 4975 of the Code contained in this memorandum is, of necessity, general and does not purport to be complete.  Moreover, the provisions of ERISA and Section 4975 of the Code are subject to extensive and continuing administrative and judicial interpretation and review.  Therefore, the matters discussed above may be affected by future regulations, rulings and court decisions, some of which may have retroactive application and effect.

**ANY POTENTIAL INVESTOR CONSIDERING AN INVESTMENT IN THE SHARES THAT IS, OR IS ACTING ON BEHALF OF, A PLAN (OR A GOVERNMENTAL PLAN SUBJECT TO LAWS SIMILAR TO ERISA AND/OR SECTION 4975 OF THE CODE) IS STRONGLY URGED TO CONSULT ITS OWN LEGAL, TAX AND ERISA ADVISERS REGARDING THE CONSEQUENCES OF SUCH AN INVESTMENT AND THE ABILITY TO MAKE THE REPRESENTATIONS DESCRIBED ABOVE.**

---

## ADDITIONAL INFORMATION

---

### Reports to Shareholders

The Fund will furnish annual reports to its Shareholders containing financial statements examined by the Fund's independent auditors.  Shareholders will be sent copies of the audited financial statements prior to the Fund's annual general meeting each year prepared in accordance with U.S. Generally Accepted Accounting Principles.  In addition, Shareholders will receive from the Administrator monthly reports relating to the Fund's performance.

### Available Documents

This Memorandum is not intended to provide a complete description of the Fund's Memorandum of Association and Bye-laws or the agreement with the Manager, Administrator, Investment Advisor, and the Bank.  Copies of such documents are available for inspection by Shareholders and prospective investors during normal business hours at the Administrator's office or at the office of the Manager in Hamilton, Bermuda.

### Auditor's Consent

PricewaterhouseCoopers has given its written consent to the inclusion of its name, report and reference to itself in the form and context in which they appear in this Memorandum.

### Counsel

The law firms of Tannenbaum Helpern Syracuse & Hirschtritt LLP (New York) and O'Neal Webster O'Neal (BVI) serve as counsel to the Fund in connection with matters pertaining to U.S. law and BVI law, respectively, and to the Manager and, together or individually, may serve as counsel to other investment funds sponsored or managed by the Manager and its affiliates.  Should a future dispute arise between the Fund and the Manager, separate counsel may be retained as circumstances and professional responsibilities then dictate.  Counsel to the Fund do not represent the Shareholders.  See "POTENTIAL CONFLICTS OF INTEREST."

**Inquiries and Communication with the Fund**

　　All communications and correspondence with the Fund and inquiries concerning the Fund and the Shares, including information concerning subscription and redemption procedures and current Net Asset Value, should be directed to the Administrator at the address set forth in the "DIRECTORY" appearing elsewhere in this Memorandum.

# KINGATE GLOBAL FUND, LTD.

---

**SUBSCRIPTION INSTRUCTIONS FOR NON U.S. INVESTORS ONLY**

(U.S. Investors are directed to the Subscription Documents appended to the
Supplemental Disclosure Statement available on request from the Administrator)

---

## USD Class Common Shares

**Subscription Applications**

Applications to subscribe for USD Class Common Shares (the "USD Shares") of the Kingate Global Fund, Ltd., a British Virgin Islands corporation (the "Fund"), may be made only by written application using the enclosed Subscription Agreement and certain related documentation, outlined for ease of reference as follows:

| | |
|---|---|
| Individual Investors from a FATF [*] Jurisdiction | 1. Subscription Agreement |
| Individual Investors from a non-FATF Jurisdiction | 1. Subscription Agreement<br>2. Form Letter of Reference (Exhibit C) |
| Entity Investors from a FATF Jurisdiction | 1. Subscription Agreement<br>2. Form of Incumbency Certificate (Exhibit A) |
| Entity Investors from a non-FATF Jurisdiction | 1. Subscription Agreement<br>2. Form of Incumbency Certificate (Exhibit A)<br>3. Form Letter of Reference (Exhibit C)<br>4. If privately held: Beneficial Ownership Information Form (Exhibit D)<br>5. If a trust: Trust Beneficiaries' Information Form (Exhibit E) |
| Funds of Funds and Other Entities Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a FATF Jurisdiction | 1. Subscription Agreement<br>2. Form of Incumbency Certificate (Exhibit A)<br>3. AML Certification (Exhibit B) |

---

\* A FATF Jurisdiction is a country or territory which is a member of the Financial Action Task Force on Money Laundering.

| Funds of Funds and Other Entities Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a non-FATF Jurisdiction | 1. Subscription Agreement<br>2. Form of Incumbency Certificate (Exhibit A)<br>3. Form Letter of Reference (Exhibit C)<br>4. If privately held: Beneficial Ownership Information Form (Exhibit D)<br>5. If a trust: Trust Beneficiaries' Information Form (Exhibit E) |
|---|---|

All completed Subscription Agreements should be directed to the Administrator at the address shown thereon no later than the last Business Day (as defined in the Fund's amended and restated Information Memorandum, as may be further amended and restated (the "Information Memorandum")) prior to the Subscription Date (as defined in the Fund's Information Memorandum). The Fund reserves the right to reject subscriptions in whole or in part, in which event subscription payments will be refunded at the applicant's risk, without interest.  The Manager of the Fund may, in its sole discretion, discontinue the offering of USD Shares at any time.  A properly completed and signed copy of the Subscription Agreement may be submitted to the Administrator by telecopier (+ 1-441) 296-8227 in advance of submitting the original in order to expedite processing of the application.  The signed original, however, must be sent to the Administrator immediately thereafter.

**Subscription Payments**

Payments in full for the amount subscribed (not less than U.S. $250,000, unless otherwise agreed in advance by the Fund) are to be made in U.S. Dollars by Fed Fund transfer at the latest by the Subscription Date (as defined in the Fund's Information Memorandum) as follows:

(Note: Send Via SWIFT MT 103)

Wire to:

| Correspondent Bank: | HSBC Bank USA, N.A.<br>452 Fifth Avenue<br>New York, New York 10018<br>U.S.A.<br> (ABA No. 021001088)<br>(CHIPS UID no. 0108)<br>(Swift Code MRMDUS33) |
|---|---|
| Beneficiary Bank: | The Bank of Bermuda Limited<br>6 Front Street<br>Hamilton, Bermuda<br>(CHIPS UID no. 005584)<br>(Swift Code BBDABMHM) |
| Beneficiary: | Kingate Global Fund, Ltd. (USD Shares) |
| Account No: | 010-424174-561 |

Notification to the Administrator may be made via facsimile to the attention of Shareholder Services Unit at telecopier number (+ 1-441) 296-8227.

In order to facilitate prompt and accurate crediting of subscription payments, subscribers must notify the Administrator, prior to remitting payment, of the details of the subscription payment, indicating (i) the name of the subscriber, (ii) the dollar amount subscribed, (iii) the subscriber's address (including a

telex or telecopier number if available), (iv) the name and address of the financial institution remitting the subscription payment and (v) the approximate date as of which the payment is being wired to the Fund's account.

**Confirmations**

Confirmations will be sent to subscribers showing the details of each transaction. The USD Shares will ordinarily be issued in respect of accepted applications at the Net Asset Value (as defined in the Fund's Information Memorandum) per USD Share as of the last Business Day of the month following the date on which the Fund has verified the receipt of the cleared funds.

A Share certificate will be issued only if specifically requested by the subscriber.

**Local Rules**

Persons interested in subscribing for the USD Shares should inform themselves as to (1) the legal requirements within their own countries for the purchase of the USD Shares, (2) any foreign exchange restrictions which they might encounter, (3) the income tax or other tax consequences, if any, which might be relevant to the purchase, holding or sale of the USD Shares, and (4) the applicable anti-money laundering rules set forth in the Memorandum and below.

As part of the Administrator's and the Fund's responsibility for protection against money laundering, the Administrator may require a detailed verification of the identity of a person or entity applying for Shares. Depending on the circumstances of each application, a detailed verification might not be required where:

    a.    the applicant makes payment by wire transfer from an account held in the applicant's name at a recognized financial institution residing in a recognized jurisdiction, as defined by applicable laws, and the applicant's details (name and account number) appear in the confirmation of the wire transfer; or

    b.    the application is made through a recognized intermediary.

These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti-money laundering regulations. As such, it is the current policy of the Board to accept subscription monies only from financial institutions that are licensed to conduct banking or securities business in jurisdictions designated by the Board as "qualified jurisdictions" based on the nature of the jurisdictions' regulatory regime, or the clients of such financial institutions.

A list of the jurisdictions that have been designated as "qualified jurisdictions" is available from the Fund.

The Administrator and the Fund reserve the right to request such information as they deem necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Administrator may refuse to accept the application and the subscription monies relating thereto or may refuse to process a redemption request until proper information has been provided.

<div style="border: 1px solid black;">

# KINGATE GLOBAL FUND, LTD.
# USD SHARES

</div>

## SUBSCRIPTION AGREEMENT
### (for non-U.S. Investors)

Kingate Global Fund, Ltd. – USD Shares
c/o Citi Hedge Fund Services, Ltd
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Fax No.: (+ 1-441) 296-8227
Attn: Shareholder Services Unit

Dear Sirs:

      The undersigned subscriber (the "Subscriber") acknowledges having received, reviewed and understood the Amended and Restated Information Memorandum dated as of 22 September, 2008 as may be further amended and restated (the "Information Memorandum") for the offering of USD Participating Common Shares (the "Shares") of Kingate Global Fund, Ltd. (the "Fund") and hereby subscribes for as many Shares as may be purchased for the amount indicated below on the terms of the Information Memorandum and subject to the provisions of the Memorandum and Articles of Association of the Fund.

***Entity Subscriber***

**Date and Jurisdiction of Incorporation:**       _____

**Tax ID Number:**       _____

***Natural Person Subscribers***

**Date and Place of Birth:**       _____

**Social Security Number:**       _____

**Nationality:**       _____

***All Subscribers***

**Subscription Date:**       _____

**Amount of Subscription:**       _____

_____ ***Kingate Global Fund, Ltd. – USD Shares*** _____

S-4

**Name and Address of Subscriber(s):**

**Telephone Number:** _____

**Fax Number:** _____

**E-Mail:** _____

**Name and Address for Share Registration (if different):**

**Postal Address (if other than address of registration):**

**Name, Address and Account Number of Financial Institution**
**Remitting Payment for Subscriber's  Account***:

---
\*
Such account details will be used to remit proceeds on redemption of Shares unless otherwise instructed in writing of alternative instructions.

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

**Payment Date:** _____

The Subscriber agrees that all or any funds payable to the Subscriber (including redemption proceeds) may be wire transferred to the Subscriber in accordance with the following instructions, until further written notice, signed by one or more of the following individuals authorized to act on behalf of the Subscriber, and delivered to the Administrator (*).

Bank Name: _____

Bank Address: _____

_____

ABA or CHIPS No: _____

Account Name: _____

Account No: _____

For Further credit: _____

Number of beneficial owners represented by Subscriber (if Subscriber is acting in any sort of nominee or fiduciary capacity) _____

Is the Subscriber, or an affiliate of the Subscriber, a pension profit-sharing, annuity, or employee benefit plan (whether private, governmental, or charitable)?

[  ] Yes  [  ] No      *(Initial one)*

The undersigned Subscriber is *(tick one and refer to the Subscription Instructions for the documentation to enclose for different categories of investors)*:

☐ An Individual Investor from a FATF Jurisdiction

☐ An Individual Investor from a non-FATF Jurisdiction

☐ An Entity Investor from a FATF Jurisdiction

☐ An Entity Investor from a non-FATF Jurisdiction

☐ An Entity Investor from a non-FATF Jurisdiction – privately held

☐ An Entity Investor from a non-FATF Jurisdiction – trust

☐ A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a FATF Jurisdiction

☐ A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a non-FATF Jurisdiction

_____*Kingate Global Fund, Ltd. – USD Shares*_____

☐    A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a non-FATF Jurisdiction – privately held

☐    A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a non-FATF Jurisdiction – trust

**Authorized Signatories:**

Set forth below are the names of persons authorized by the Subscriber to give and receive instructions between the Fund (or its Administrator) and the Subscriber, together with their respective signatures.  Such persons are the only persons so authorized until further written notice to the Administrator signed by one or more of such persons.

(please attach additional pages if needed)

| Name | Signatures |
|------|------------|
|      |            |
|      |            |
|      |            |
|      |            |
|      |            |
|      |            |
|      |            |

## PROFESSIONAL INVESTOR REPRESENTATIONS AND WARRANTIES

The Subscriber represents and warrants that:

(a) The Subscriber is subscribing for, or acquiring, Shares herein with a value of at least U.S.$250,000;

(b) It is (i) an institution whose ordinary business or professional activity includes the buying and selling of investments, whether as principal or agent; (ii) in the case of a natural person, his/her individual net worth, or joint net worth with his/her spouse, exceeds U.S.$1 million; or (iii) an institution with a minimum amount of assets under discretionary management of U.S.$5 million; and

(c) It (i) has the knowledge, expertise and experience in financial matters to evaluate the risks of investing in the Fund; (ii) is aware of the risks inherent in investing in the assets proposed to be acquired by the Fund and the method by which the assets of the Fund are held and/or traded; and (iii) can bear the risk of loss of its/his/her entire investment.

## SUBSCRIBER REPRESENTATIONS AND WARRANTIES

The Subscriber represents and agrees that none of the Shares (nor any interest therein) is being acquired or will at any time be held, directly or indirectly, for the account or benefit of any "Restricted Person" (as defined in the Information Memorandum), and further agrees that none of the Shares will be transferred to any person who has failed to supply a similar representation.  The Subscriber represents and warrants that:

(a) **Reliance on Information Memorandum**.  The Subscriber acknowledges that the Fund has delivered to the Subscriber the Information Memorandum.  The Subscriber has not relied on any representations or other information purported to be given on behalf of the Fund except as set forth in the Information Memorandum or the published, financial accounts of the Fund.

(b) **No Resale**.  The Subscriber is acquiring the Shares for its own account, or on behalf of a third party or third parties for investment and not with a view to resale, transfer or other disposition in whole or in part.

(c) **No Need for Liquidity.** The undersigned understands that the Shares have not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or under the laws of any other jurisdiction, and that the Fund does not contemplate and is under no obligation to so register the Shares.  The undersigned understands and agrees that the Shares must be held indefinitely unless they are subsequently registered under the Securities Act and, where required, under the laws of other jurisdictions or unless an exemption from registration is available.  Even if such exemption is available, the undersigned agrees that the assignment and transferability of the Shares will be governed by the Memorandum and Articles of Association of the Fund (the "Memorandum and Articles of Association").  The Memorandum and Articles of Association require that Shares in the Fund shall not be transferred without the prior consent of the Fund.  The undersigned recognizes that there will be no established trading market for the Shares and it is extremely unlikely that any public market for the Shares will develop.  The undersigned has no need for liquidity in connection with its purchase of Shares.

(d) **Legality and Validity of Consents**.  All consents required to be obtained and all legal requirements necessary to be complied with or observed in order for this Agreement or the issuance of the

Shares to be lawful and valid under the laws of any jurisdiction to which the Subscriber is subject have been obtained, complied with or observed.

(e) **Anti-Money Laundering**.  The Subscriber acknowledges that due to money laundering requirements, the Fund, the Manager, the Investment Advisor and/or the Administrator may require certain identification and/or other information of the Subscriber before the application can be processed.

(f) **Subscriber Knowledge**.  The Subscriber possesses requisite knowledge and experience in financial matters such that it is capable of evaluating the merits and risks of an investment in the Fund (including without limitation, the ability to suffer a complete loss of the investment and need to hold the Shares for an indefinite period of time).

(g) **Transfer Request Form**.  Subscriber agrees to complete and submit to the Board of Directors the Transfer Request Form (annexed hereto) and any other documents requested by the Board of Directors in the event the Subscriber seeks to transfer its Shares, in whole or in part.  No transfer shall be effective without the express consent of the Board of Directors.

(h) **No Performance Guarantees**.  No guarantees have been made to the Subscriber about future performance or financial results of the Fund.

(i) **Ability to Bear Risks**. The Subscriber is and will be able to bear the economic risks of its investment in the Shares.

(j) **Suitability**.  The Subscriber has read carefully and understands the Information Memorandum and has consulted its own attorney, accountant or investment advisor with respect to the investment contemplated hereby and its suitability for the Subscriber and Subscriber consents to every provision therein.

(k) **Opportunity to Verify Information**.  The Subscriber acknowledges that the representatives of the Fund, the Manager, Investment Advisor, Administrator and Consultant have made available to the Subscriber, during the course of this transaction and prior to the purchase of any Shares, the opportunity to ask questions of and receive answers from them concerning the terms and conditions of the offering described in the Information Memorandum, and to obtain any additional information necessary to verify the information contained in the Information Memorandum or otherwise relevant to the suitability of the proposed investment and to the proposed activities of the Fund.

(l) **Investment Objectives**.  The purchase of the Shares by the Subscriber is consistent with the general investment objectives of the Subscriber.

(m) **No Borrowings**.  The Subscriber has not borrowed any portion of its contribution to the Fund, either directly or indirectly, from the Fund, the Manager, Investment Advisor, Administrator, or any affiliate of the foregoing.

(n) **Conflicts of Interest; Fund Counsel Does Not Represent Investors**.  The Subscriber understands and acknowledges the various conflicts of interest that are set forth in the Information Memorandum.  The Subscriber understands and acknowledges that Tannenbaum Helpern Syracuse & Hirschtritt LLP and O'Neal Webster O'Neal represent only the Fund and the Manager and not the Subscriber, in connection with the offer and sale of the Shares.  The Subscriber has had the opportunity to consult with legal counsel of its own choosing.

(o) **Amendments**.   Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except with the written consent of the Fund's Board of Directors.

(p) **Change in Information**.   The Subscriber agrees to notify the Board of Directors immediately if any of the information provided herein by the Subscriber changes or becomes inaccurate.

(q) **Authorization**. The Subscriber acknowledges that it has the legal capacity and authority and is permitted by applicable law to execute and deliver this Agreement and is authorized to purchase Shares and to perform its obligations pursuant to the provisions hereof and pursuant to the Memorandum and Articles of Association and such Subscriber has not been formed for the specific purpose of acquiring an interest in the Fund.

(r) **Broker Dealer Arrangements**. The Subscriber acknowledges that the Fund and/or the Investment Advisor have the power to enter into agreements pursuant to which a registered broker-dealer affiliate of the Fund or any member of the Investment Advisor, splits commissions earned from any trades in respect of Fund assets with any other registered broker-dealer on such terms as the Fund or the Investment Advisor (as the case may be) in their sole discretion deem advisable and proper.

(s) **Restricted Person**.   The Subscriber certifies that it is not now, and for as long as it owns the Shares, a Restricted Person, nor a custodian, nominee or trustee of such a person. The Subscriber further certifies that it is not acquiring the Shares for and will not hold the Shares on behalf of or transfer Shares to any person or entity that is a Restricted Person.   The Subscriber agrees that it will promptly notify the Fund at any time when it becomes a Restricted Person, and the Subscriber agrees that in such event the Fund shall be entitled to (but shall not be obliged to) repurchase or to require the Subscriber to redeem or sell the Shares to a person designated by the Fund at a price equal to the Net Asset Value per Share as calculated by the Administrator as at the date of the repurchase or sale or as at the date of any unauthorised transfer giving rise to such repurchase or sale.

(t) **Legal Entity**.   Where the Subscriber is a company, trust or partnership, it agrees to produce a certified copy or copies of the certificate of incorporation (and any change of name), bye-laws (or other document evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity and any other relevant documentation as requested by the Fund.

(u) **Subscriptions**.   The Subscriber acknowledges that the Fund reserves the right to reject in its absolute discretion this and any other subscription for Shares in whole or in part, in any order, at any time prior to a Subscription Date (as defined in the Information Memorandum), notwithstanding prior receipt by the Subscriber of notice of acceptance of the subscription. If the Shares are oversubscribed, the Fund will determine in its sole discretion which subscriptions shall be accepted.  If this subscription is rejected or if the sale of the Shares is not completed for any reason (in which event this subscription shall be deemed to be rejected), the Fund shall as soon as practicable return any funds transferred by the Subscriber (without interest) along with this Agreement and any other documents delivered by the Subscriber.

(v) **Entire Agreement**.   This Agreement represents the entire agreement of the parties in respect of the subscription for Shares and may not be changed or terminated orally.

(w)      **Waiver**.  No waiver by any party of any breach of any term of this Agreement shall be construed as a waiver of any subsequent breach of that term or any other term of the same or of a different nature.

(x)      **Legal Actions**. If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they may be entitled.

(y)      **Waiver of Statute of Limitations**.  Each investor in the Fund agrees to have waived, to the maximum extent permissible under law, the right to bring any legal claim, action or other proceeding against the Fund, its Board of Directors and other officers unless such claim, action or proceeding is commenced within six (6) months from the date of the first to occur of (i) the original occurrence allegedly giving rise to such claim, action or proceeding or (ii) the Shareholder's redemption of any Shares.

(z)      **Governing Law**.  The Subscriber agrees when entering into the Agreement to be bound by the laws of the BVI and in addition to the non-exclusive jurisdiction of the relevant courts therein subject to which laws this Agreement shall be governed and interpreted.

(aa)      **Facsimile Instructions**.   The Subscriber acknowledges that the Fund and the Administrator are entitled to act upon facsimile instructions from or purported to be from the Subscriber and that all such instructions, where accepted by the Fund or the Administrator, will be final and binding upon the Subscriber. The Subscriber agrees to indemnify the Fund or Administrator against any and all claims, demands, liabilities, costs, charges, damages and expenses that the Fund or the Administrator may incur by reason of any act or failure to act on the part of the Fund with regard to all facsimile instructions so provided by the Subscriber.

(bb)      **Survival of Representations**.   The representations, warranties, agreements and indemnification obligations of the Subscriber contained in this Agreement shall survive the execution of this Agreement and the purchase of the Shares.

(cc)      **General**.   This Agreement shall be binding upon the Subscriber and the legal representatives, successors and assigns of the Subscriber, and shall, if the Subscriber consists of more than one person, be the joint and several obligation of all such persons.  Two or more duplicate counterparts of this Agreement may be executed by the Subscriber and accepted by the Fund, each of which shall be an original, but all of which together shall constitute one and the same instrument.

## BENEFIT PLAN INVESTOR STATUS

*Please respond yes or no to the following questions:*

(1)  The Subscriber is not a, and is not using to acquire the Shares the assets of any, "benefit plan investor" as defined in 29 C.F.R. 2510.3-101(f)(2) (as modified by Section 3(42) of ERISA) (the "Plan Asset Regulation").  For purposes of illustration, "benefit plan investors" include pension plans, profit-sharing plans, or other "employee benefit plans" subject to part 4 of subtitle B of Title I of ERISA, and plans subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"). "Benefit plan investors" also include simplified employee pension plans, KEOGH plans and individual retirement accounts.   "Benefit plan investors" also include entities

_____
*(Initial)*

deemed under Department of Labor regulations to hold "plan assets" due to investments made in the entity by such employee benefit plans and other plans.

If the Subscriber is an entity, the Subscriber certifies that less than 25% of the value of each class of equity interests in the Subscriber (excluding any equity interests held by an individual or entity with discretionary authority or control over the equity interests of the Subscriber) is held by "benefit plan investors".

*Or*

(2)  The Subscriber, an affiliate of the Subscriber, or the person or entity for which the Subscriber is acting is a "benefit plan investor" as defined in the Plan Asset Regulation.

_____
*(Initial)*

If the Subscriber is a "benefit plan investor," please indicate whether the Subscriber is a plan defined in Section 4975 of the Code (e.g., an individual retirement account, Coverdell account, ERISA Plans, etc.):

_____          _____
     Yes                    No

(3) The Subscriber is a life insurance company acquiring the Shares with the assets of the Subscriber's general account.

_____
*(Initial)*

If so, the portion of such general account assets which represents "plan assets" within the meaning of the Plan Asset Regulation will not exceed the following percentage during the period the Subscriber holds the Shares:

_____%

(4)  The Subscriber is a person who has discretionary authority or control with respect to the assets of the Fund or provides investment advice to the Fund for a fee, direct or indirect, with respect to such assets or any affiliate of any such person (a "Controlling Person").

_____
*(Initial)*

(5)  The Subscriber is an entity whose underlying assets are deemed to include "plan assets" by reason of an employee benefit plan or other plan's investment in the Subscriber.  If so, the percentage of equity interests of the Subscriber held by employee benefit plans subject to part 4 of subtitle B of Title I of ERISA or plans subject to Section 4975 of the Code will not exceed the following percentage during the period the Subscriber holds the Shares:

_____
*(Initial)*

_____%

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

**The Subscriber understands and agrees that the information supplied above will be utilized to determine whether benefit plan investors own less than 25% of the value of the Shares, as determined under the Plan Asset Regulation, both upon the original issuance of Shares and upon subsequent transfer of Shares.**

### TRUSTEE, AGENT, REPRESENTATIVE, NOMINEE OR OTHER THIRD PARTIES

If the Subscriber is acting as trustee, agent, representative or nominee for an investor (a "Beneficial Owner"), the Subscriber understands and acknowledges that the representations, warranties and agreements made herein are made by the Subscriber with respect to the Subscriber *and* with respect to the Beneficial Owner. The Subscriber further represents and warrants that it has all requisite power and authority from said Beneficial Owner to execute and perform the obligations under this Subscription Agreement. The Subscriber also agrees to indemnify the Fund, the Manager, the Investment Advisor, the Consultant and the Administrator and their officers and agents for any and all costs, fees and expenses (including legal fees and disbursements) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein, or the assertion of the Subscriber's lack of proper authorization from the Beneficial Owner to enter into this Subscription Agreement or perform the obligations hereof.

If the Subscriber enters into a swap, structured note or other derivative instrument, the return from which is based in whole or in part on the return of the Fund (the "Swap") with a third party (a "Third Party"), the Subscriber represents and warrants that with respect to a Third Party entering into a Swap: (a) the Third Party is authorized under its constitutional documents (e.g., certificate of incorporation, by-laws, partnership agreement or trust agreement) and applicable law to enter into the Swap and would also be so authorized to invest directly into the Fund; (b) the Third Party has received and reviewed a copy of the Information Memorandum, the U.S. Supplement and the Subscription Agreement; (c) the Third Party acknowledges that the Fund and its affiliates are not responsible for the legality, suitability or tax consequences of the Swap and that the Subscriber is not an agent of the Fund; and (d) the Third Party is an "eligible contract participant" under the U.S. Commodity Exchange Act, as amended and, as necessary, an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended. The Subscriber also agrees to indemnify the Fund, the Manager, the Investment Advisor and the Consultant and the Administrator and their officers and agents for any and all costs, fees and expenses (including legal fees and disbursements) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein. Nothing herein constitutes an agreement or statement by the Fund as to the legality of a Swap or the suitability of a Swap for the Third Party.

### ANTI-MONEY LAUNDERING REPRESENTATIONS

(a)       The Subscriber represents that all evidence of identity provided in connection with the Subscription Agreement is true and correct and all related information furnished is genuine and accurate.

(b)       The Subscriber agrees to provide any information deemed necessary by the Fund in its sole discretion to comply with its anti-money laundering program and related responsibilities from time to

time.  In the event of delay or failure by the Subscriber to produce any information requested in this Subscription Agreement or required for verification purposes, the Fund may refuse to accept the subscription.

(c)       The Subscriber represents and covenants that neither it, nor any person controlling, controlled by, or under common control with it, nor any person having a beneficial interest in it, is an individual, organization, or entity listed on the List of Specially Designated Nationals and Blocked Persons (the "OFAC Control List") maintained by the US Office of Foreign Assets Control ("OFAC"), and that it is not investing and will not invest in the Fund on behalf of or for the benefit of any individual, organization, or entity listed on the OFAC Control List.

(d)       The Subscriber represents that (i) the amounts contributed by it to the Fund were not and are not directly or indirectly derived from activities that contravene U.S. federal or state laws or regulations and international laws and regulations, including anti-money laundering laws and regulations, and (ii) the proceeds from the Subscriber's investment in the Fund will not be used to finance any illegal activities.

(e)       The Subscriber acknowledges (i) that additional subscriptions by the Subscriber may be refused and/or (ii) that requests for withdrawals may be delayed or declined if the Manager reasonably believes it does not have satisfactory evidence of the Subscriber's identity.

(f)       The Subscriber acknowledges that, if, following its subscription in the Fund, the Manager and/or the Administrator reasonably believes that the Subscriber is listed on the OFAC Control List or has otherwise breached its representations and covenants as to its identity, the Manager and/or the Administrator may be obligated to block the Subscriber's investment in accordance with applicable law, and the Subscriber shall have no claim against the Manager and/or the Administrator for any form of damages as a result of blocking the investment.

(g)       If the Subscriber is a "fund of funds" or an entity that invests on behalf of others, the Subscriber, in addition to and not by way of limiting the foregoing, represents and certifies that it is aware of the requirements of the USA PATRIOT Act of 2001, and rules and regulations promulgated thereunder and other applicable anti-money laundering measures in any jurisdiction (collectively, the "AML Rules") and that it has adopted anti-money laundering policies and procedures in place reasonably designed to verify the identity of its beneficial owners or underlying investors, as the case may be, and their respective sources of funds.  Such policies and procedures are properly enforced and are consistent with such AML Rules.  The Subscriber represents and certifies that to the best of its knowledge, the beneficial owners or investors, as the case may be, are not individuals, entities, or countries that may subject the Fund or any of its affiliates to criminal or civil violations of any AML Rules.   The Subscriber acknowledges that it is to furnish a copy of its anti-money laundering policies and procedures to the Fund when requested.  Among its other obligations hereunder, the Subscriber agrees to promptly notify the Fund if the foregoing representation and certification becomes inaccurate.

(h)       Subscriber represents that:

(1)       it is <u>not</u> a Senior Foreign Political Figure[‡], a member of a Senior Foreign Political Figure's Immediate Family[§], and/or any Close Associate[**] of a Senior

---

[‡] The term "senior foreign political figure" is defined to mean  a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation.

[§] The term "immediate family" is defined to mean the  parents, siblings, spouse, children and in-laws of a senior foreign political figure.

Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated by the US Treasury as warranting special measures due to money laundering concerns;

(2)      it is <u>not</u> a <u>former</u> Senior Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated as warranting special measures due to money laundering concerns;

(3)      it is <u>not</u> resident in, or organized or chartered under the laws of a jurisdiction that has been designated by the US Secretary of Treasury under Sections 311 and 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns;

(4)      it is <u>not</u> a Foreign Shell Bank as the term is defined in the USA PATRIOT Act; and

(5)      its subscription funds do <u>not</u> originate from, <u>nor</u> will they be routed through, an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or charted under the laws of a jurisdiction deemed to be a non-cooperative country or territory ("NCCT")[††].

### STANDING PROXY

Subscriber hereby designates and appoints Kingate Management Limited, or any successor thereof, with full powers of substitution, as Subscriber's true and lawful Proxy for the purpose of voting any Shares issued pursuant to this Agreement (or such portion thereof from time to time owned by Subscriber) as said Proxy may determine on any and all matters arising at any meeting of the Fund or any Class meeting upon which such Shares could be voted by Subscriber  (or the person in whose name the Shares hereby subscribed are registered at Subscriber's direction) if present in person at the meeting.  This proxy may be revoked by Subscriber (or his registered nominee) either personally or by presentation of a subsequently executed form of proxy at any meeting of the Fund or by written notice to Kingate Management Limited received by Kingate Management Limited prior to any such meeting provided however that such revocation may lead to the compulsory redemption of such Subscriber's Shares

### POWER OF ATTORNEY

The Subscriber hereby irrevocably constitutes and appoints Kingate Management Limited, with full power of substitution, as the Subscriber's true and lawful attorney-in-fact with full power and authority for the Subscriber, and in the Subscriber's name, place and stead and either personally or by attorney-in-fact, to execute, deliver, acknowledge, publish, file and record and swear to the execution, delivery, acknowledgment, filing and/or recording of:

(a)      The Information Memorandum, the Memorandum and Articles of Association and all amendments thereto required or permitted by law or the provisions of the Memorandum and Articles of Association and all instruments that the attorney-in-fact deems appropriate to reflect any change or

---

[**]  The term close associate" is defined to mean a person who is widely and publicly known to maintain an unusually close relationship with s senior foreign political figure.
[††]  The Financial Action Task Force on Money Laundering ("FATF") has designated certain countries or territories as NCCTs. The list of countries or territories deemed to be NCCTs is available at: http://www1.oecd.org/fatf.

*Kingate Global Fund, Ltd. – USD Shares*

modification of the Information Memorandum and the Memorandum and Articles of Association in accordance with the Memorandum and Articles of Association;

(b)        all such other agreements, applications, instruments, documents, certifications, certificates and reports which may from time to time be required by the laws of any jurisdiction in which the Fund shall determine to do business, or any political subdivision or agency thereof, or any regulator to effectuate, implement and continue the valid and subsisting existence of the Fund;

(c)        all conveyances and other instruments which the Board of Directors deems appropriate to reflect the dissolution and termination of the Fund; and

(d)        all certificates and other instruments deemed necessary or advisable by the Board of Directors to carry out the provisions of the Information Memorandum and the Memorandum and Articles of Association.

The Power of Attorney granted hereby is coupled with an interest and is irrevocable and shall (i) continue in full force and effect notwithstanding the subsequent death, incapacity, dissolution, termination or bankruptcy of the Subscriber or the transfer of all or any portion of the Subscriber's Shares in the Fund and (ii) extend to the Subscriber's successors, assigns and legal representatives.  The Subscriber agrees to be bound by any representation made by the attorney-in-fact acting in good faith pursuant to this Power of Attorney, and hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the attorney-in-fact taken in good faith under this Power of Attorney.

In the event of any conflict between the provisions of the Memorandum and Articles of Association and any document executed or filed by the attorney-in-fact pursuant to this Power of Attorney, the Memorandum and Articles of Association shall govern.

## <u>INDEMNIFICATION</u>

The Subscriber acknowledges that the Subscriber understands the meaning and legal consequences of the representations and warranties contained in this Agreement and agrees to indemnify and hold harmless the Fund, the Manager, Investment Advisor, Consultant and Administrator, and their respective affiliates, employees, officers, directors and agents and each other Subscriber from and against any and all loss, damage, liability or expense, including, without limitation, legal fees, due to or arising out of a breach of any representation or warranty of the Subscriber contained in any document furnished by the Subscriber in connection with the offering and sale of the Shares, including, without limitation, this Agreement, the Information Memorandum and the Memorandum and Articles of Association, and all schedules, appendices and exhibits hereto or thereto, submitted by the Subscriber, or failure by the Subscriber to comply with any covenant or agreement by the Subscriber herein or in any other document furnished by the Subscriber to any of the foregoing in connection with this transaction.  The indemnified parties shall be entitled to advances with regard to the indemnification made hereunder provided that such indemnified party deliver to the indemnifying party an undertaking pursuant to which it promises to return such advanced amount if the indemnity is ultimately found to be inapplicable.

| **INDIVIDUALS** | **ENTITIES** |
|---|---|

_____   _____
Signature                                                                  Print Name of Entity

_____   By: _____
Print Name                                                                    Authorized Signature(s)

_____   _____
Additional Investor Signature                                Print Name(s) and Title(s)

_____
Print Name

_____   _____
Date                                                                         Date

I/We enclose *(tick as appropriate)*:

☐    Exhibit A – Form of Incumbency Certificate

☐    Exhibit B – Anti Money Laundering ("AML") Certificate

☐    Exhibit C – Letter of Reference

☐    Exhibit D – Beneficial Ownership Information (Entities)

☐    Exhibit E – Trust Beneficiaries' Information (Trusts)

___

The foregoing Subscription Agreement is hereby accepted by the undersigned as of the date set forth below:

Amount Accepted          USD_____

Kingate Global Fund, Ltd.
By:                      _____
                         Name:
                         Title:

Date of Acceptance:      _____

___

_____*Kingate Global Fund, Ltd. – USD Shares* _____

S-17

# EXHIBIT A

### FORM OF INCUMBENCY CERTIFICATE

The undersigned        _____
                       *Insert Name*

Being the              _____
                       *Insert Title*

Of                     _____
                       *Insert Name of Entity*

A                      _____
                       *Insert Type of Entity*

Organized under the laws of  _____
                       *Insert Jurisdiction of Entity*


(the "Company"), does hereby certify on behalf of the Company that the persons named below are directors and/or officers of the Company and that the signature at the right of said name, respectively, is the genuine signature of said person and that the persons listed below are each an authorized signatory for the Company.

| <u>Name</u> | <u>Title</u> | <u>Signature</u> |
| --- | --- | --- |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |


IN WITNESS WHEREOF, the undersigned has hereunto set his hand as of the _____ day of _____, 200__.


_____
Name:
Title:


_____ ***Kingate Global Fund, Ltd. – USD Shares*** _____

The undersigned               _____

*Insert Name*

a Duly Authorized            _____of the Company

*Insert Title*

does hereby certify that      _____

*Insert Name of First Signatory*

is a duly authorized Officer of   _____

*Insert Name of Company*

and that the signature set forth above is [his][her] true and correct signature.


      IN WITNESS WHEREOF, the undersigned has executed this certificate as of the _____day of _____, 200\_\_.


_____

Name:

Title:

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

S-19

# EXHIBIT B

**By Using This Form, the Undersigned Represents that it is Located in a FATF Jurisdiction**

**AML CERTIFICATION FORM FOR FUND OF FUNDS OR ENTITIES THAT INVEST ON BEHALF OF THIRD PARTIES**

The undersigned, being the

_____
*Insert Title*

of

_____
*Insert Name of Entity*

a

_____
*Insert Type of Entity*

organized under the laws of

_____
*Insert Jurisdiction of Entity*

(the "Investor"), does hereby certify that it is aware of the requirements of the USA PATRIOT Act of 2001, the regulations administered by the U.S. Department of Treasury's Office of Foreign Assets Control, and other applicable U.S. federal, state or non-U.S. anti-money laundering laws and regulations (collectively, the "anti-money laundering/OFAC laws"). As an entity regulated by

_____ (*Insert Appropriate Regulatory Agency*) in the

_____ (*Insert Jurisdiction*) (a FATF member jurisdiction) the Investor has/have anti-money laundering policies and procedures in place reasonably designed to verify the identity of its [beneficial holders] [underlying investors] and, to the extent required, their sources of funds. Such policies and procedures are properly enforced by the Investor.

After due inquiry, the Investor hereby represents to Kingate Global Fund, Ltd. that, to the best of its knowledge, the Investor's [beneficial holders(s)] [underlying investor(s)] are not individuals, entities or countries that are identified on the list maintained by the U.S. Office of Foreign Assets Control[1].

Date: _____     By: _____

                                              Name:
                                              Title:

---

[1] The list may be found at http://www.ustreas.gov/ofac/t11/sdn.pdf

_____ ***Kingate Global Fund, Ltd. – USD Shares*** _____

# EXHIBIT C

**FORM LETTER OF REFERENCE**

[TO BE PRINTED ON THE LETTERHEAD OF LOCAL OFFICE OF FATF
MEMBER BANKING INSTITUTION OR BROKERAGE FIRM]

Kingate Global Fund, Ltd.
c/o Citi Hedge Fund Services, Ltd
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Attn: Shareholder Services Unit

To Whom It May Concern:

I, _____, the _____ of _____, do hereby
 *Name*                           *Title*                    *Name of Institution*

certify that _____ has maintained an account at our institution for _____
              *Name of Investor*                                                    *Insert Period*

years and, during this period, nothing has occurred that would give our institution cause to be

concerned regarding the integrity of _____.
                                          *Name of Investor*

Do not hesitate to contact me at _____ if you have any further questions.
                                  *Insert Telephone Number*

Very truly yours,


_____
Name:

Title:

# **EXHIBIT D**

**BENEFICIAL OWNERSHIP INFORMATION**

**To Be Completed By Entity Subscribers That Are Privately Held Entities**

**Instructions:  Please complete and return this _Exhibit D_ and provide the name of every person who is directly, or indirectly through intermediaries, the beneficial owner of 25% or more of any voting or non-voting class of equity interests of the Investor.   If the intermediary's shareholders or partners are not individuals, continue up the chain of ownership listing their 25% or more equity interest holders until individuals are listed.  If there are no 25% beneficial owners, please write none.**

| Full Name | If Shareholder is an Individual, Insert Name and Address of Principal Employer and Position | Citizenship (for Individuals) or Principal Place of Business (for Entities) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

# EXHIBIT E

### TRUST OWNERSHIP INFORMATION

**To Be Completed By Entity Subscribers That Are Trusts**

**Instructions:  Please complete and return this _Exhibit E_ and provide the name of: i) every current beneficiary that has, directly or indirectly, an interest of 25% or more in the trust; ii) every person who contributed assets to the trust (settlors or grantors); and iii) every trustee.  If there are intermediaries that are not individuals, continue up the chain of ownership listing their 25% or more equity interest holders until individuals are listed.**

| Full Name and Address | Status (Beneficiary/Settlor/ Trustee) | Citizenship (for Individuals) or Principal Place of Business (for Entities) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

## KINGATE GLOBAL FUND, LTD.
## USD Shares

### REDEMPTION REQUEST

Kingate Global Fund, Ltd. – USD Shares
c/o Citi Hedge Fund Services, Ltd
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Fax No.: (+ 1-441) 296-8227
Attn: Shareholder Services Unit

Dear Sirs:

I/We hereby requests Redemption of the number of USD Shares OR the U.S. Dollar amount detailed below, subject to all the terms and conditions of the Memorandum and Articles of Association of Kingate Global Fund, Ltd. (the "Fund"), and the Amended and Restated Information Memorandum of Kingate Global Fund, Ltd. – USD Shares, as may be further amended and supplemented from time to time.

Redemption shall be effective as of the last Business Day of the calendar month detailed below, provided that this Redemption Request, accompanied by a share certificate(s) (if applicable) is received by the Fund at least thirty-five (35) days prior to such effective date and that (i) the original signed Redemption Request is received by the Administrator prior to the Redemption Date and (ii) I/we receive written confirmation from the Administrator that the faxed Redemption Request has been received.

Please accept this letter as written notice of my/our intention to redeem the number of Class USD Shares indicated below or the USD amount indicated below.

I/We (either in an individual capacity or as an authorized representative of an entity, if applicable) hereby represents and warrants to be the true, lawful and beneficial owner of the Shares to which this Redemption Request relates, with full power and authority to request redemption of such Shares. Such Shares are not subject to any pledge or otherwise encumbered in any fashion.

**Redemption Date:**    _____

**Number of Shares Being Redeemed:**

[    ]    USD Shares (number of shares) _____

**OR**

**Amount Being Redeemed:**

[   ]      USD (Amount in US $)  _____

**Name and Address of Redeeming Shareholder(s):**

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |

**Telephone Number:**          _____

**Fax Number:**                _____

**E-Mail:**                    _____

**Name and Address of Share Registration (if different):**

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |

**Telephone Number:**          _____

**Fax Number:**                _____

**E-Mail:**                    _____

**Name and Address of Bank for the Payment of Redemption Proceeds**

Bank Name:            _____

Bank Address:        _____

                     _____

                     _____

ABA or CHIPS No:     _____

Account Name:          _____

Account No:            _____

For Further credit:    _____

Telephone Number:   _____

Fax Number:            _____

E-Mail:                _____

| INDIVIDUALS | ENTITIES |
|---|---|
| _____ | _____ |
| Signature | Print Name of Entity |
| _____ | By: _____ |
| Print Name | Authorized Signature(s) |
| _____ | _____ |
| Additional Investor Signature | Print Name(s) and Title(s) |
| _____ | |
| Print Name | |
| _____ | _____ |
| Date | Date |

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

S-26

<div style="border:1px solid">

# KINGATE GLOBAL FUND, LTD.
## USD Shares

</div>

---

## TRANSFER REQUEST FORM

---

**Kingate Global Fund, Ltd.**
c/o Citi Hedge Fund Services, Ltd
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Fax No.: (+ 1-441) 296-8227
Attn: Shareholder Services Unit

Dear Sirs:

The undersigned (herein referred to as the "Transferor") hereby requests transfer, as defined in and subject to all the terms and conditions of the Amended and Restated Information Memorandum of the Fund, as may be further amended, restated and supplemented from time to time, to the transferee (the "Transferee") designated below, of the number of USD Shares of the Fund detailed below in an amount equal to their Net Asset Value, as defined in the Information Memorandum.

Request is hereby made that effective as of _____ (insert date), Shares specified below are deemed transferred from the Transferor to the Transferee. It is understood that the Fund's consent is required for this proposed transaction to be effective.

The Transferor (either in an individual capacity or as an authorized representative of an entity, if applicable) hereby represents and warrant to be the true, lawful and beneficial owner of the USD Shares to which this Transfer Request relates, with full power and authority to request transfer of such USD Shares. Such USD Shares are not subject to any pledge or otherwise encumbered in any fashion. The Transferor hereby further represents and warrants that upon the requested transfer herein, the Transferor will continue to remain the beneficial owner of the Shares.

### <u>TRANSFER INFORMATION</u>

<div style="border:1px solid">

NUMBER OF USD SHARES
REQUESTED FOR TRANSFER:          SHARES………....................
**OR**
US$ AMOUNT
BEING TRANSFERRED               US$…………………………

PLEASE INDICATE IF THE BENEFICIAL OWNER OF THE USD SHARES IN THE HANDS OF THE TRANSFEROR WILL REMAIN THE SAME:

YES: ……NO: …… (initial applicable answer)

</div>

<div style="border:1px solid">

EFFECTIVE TRANSFER DATE:          …………….................................................................

</div>

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

NAME AND MAILING      ………………………………………..…………………….
ADDRESS OF TRANSFEROR(S)
WISHING TO TRANSFER ………………………………………………..…………….

………………………………………………………………….

NAME AND MAILING
ADDRESS OF TRANSFEREE(S) …………………………………..…………………….

NAME AND ADDRESS OF ……………………………………………………………
SHARE REGISTRATION
(IF DIFFERENT)       ………………………………………………………….

………………………………………………………………

NAME AND ADDRESS OF ……………………………………………………………
FINANCIAL INSTITUTION
TO WHICH TRANSFER       ……………………..…………………………..……………
PROCEEDS ARE TO BE
TRANSFERRED FROM       …………………………………………………………..…
(INCLUDING A BANK
ACCOUNT NUMBER AND……………………………………………………………
WIRING INSTRUCTIONS
IF APPROPRIATE)

DATE                ………………………………………………………………

SIGNATURE           ………………………………………………………………

NAME OF TRANSFEROR[*] …………………………………………………………..

NAME AND TITLE          …………………………………………………...
(IF SIGNING IN A REPRESENTATIVE CAPACITY)

---

[*] See **EXHIBIT I** attached hereto for a sample letter that must be provided to the Fund and the Administrator when anyone other than an individual makes a request to transfer Shares.

## KINGATE GLOBAL FUND, LTD.
## USD Shares

## SUBSCRIPTION AGREEMENT FOR ADDITIONAL SUBSCRIPTIONS BY
## EXISTING NON-U.S. SHAREHOLDERS

**Kingate Global Fund, Ltd.**
c/o Citi Hedge Fund Services, Ltd
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Fax No.: (+ 1-441) 296-8227
Attn: Shareholder Services Unit

Dear Sirs:

1.      The undersigned, an existing Shareholder of Kingate Global Fund, Ltd., a British Virgin Islands business company (the "Fund"), does hereby subscribe for and agrees to purchase additional shares (the "Shares") in the Fund in the amount of $_____, such subscription to be effective as of _____, _____ (the "Effective Date").

2.      The undersigned agrees and acknowledges that in connection with its original investment in the Fund, it tendered a subscription agreement (the "Subscription Agreement") to the Fund.

3.      The undersigned reaffirms all of the representations, warranties, covenants and agreements on the part of the undersigned which were set forth in the Subscription Agreement (which are incorporated herein by reference), except for the subscription amount and date of purchase, with the same force and effect as if set forth in full herein on the date hereof.  The undersigned also confirms to the Fund that all of the information contained in the Subscription Agreement, including, without limitation, information contained in the "SUBSCRIBER REPRESENTATIONS AND WARRANTIES" and "PROFESSIONAL INVESTOR REPRESENTATIONS AND WARRANTIES" sections, is true and correct as of the date hereof and that the effect of the execution of this instrument by the undersigned is the same as the re-execution of the Subscription Agreement on the date hereof except as above provided.

4.      The undersigned hereby tenders wire transfer payable to "Kingate Global Fund, Ltd." in the amount of his subscription and agrees that such wire, and this Additional Subscription Agreement are being delivered subject to the Fund's acceptance of the additional subscription contained herein and subject further to the terms and conditions of this Subscription Agreement for Additional Subscriptions, the Fund's Amended and Restated  Information Memorandum (as the same may be further amended from time to time) and the Fund's Memorandum and Articles of Association (as the same may be amended from time to time).

IN WITNESS WHEREOF the undersigned agrees to be bound by this Additional Subscription Agreement as provided herein.

Dated: _____, _____

IF THE UNDERSIGNED IS AN INDIVIDUAL,
COMPLETE THE FOLLOWING:

_____
Print name of individual

_____
Print name of spouse if funds are to be invested in joint name

_____
Signature of individual

_____
Signature of spouse if funds are to be invested in joint name

IF THE UNDERSIGNED IS A CORPORATION,
PARTNERSHIP, TRUST OR ANOTHER ENTITY,
COMPLETE THE FOLLOWING:

_____
Print name of corporation, partnership, trust or another entity

_____
Print capacity of authorized representative

By: _____
Signature of authorized
Representative

_____
Print name of authorized representative

_____

Accepted by:

Kingate Global Fund, Ltd.:

_____

By: _____
Title: _____

**EXHIBIT I**

Sample Letter For Approved Transfers

[to be placed on letterhead of a financial institution in a recognized
jurisdiction for money laundering regulations on behalf of the Shareholder requesting a Share transfer]

**Kingate Global Fund, Ltd.**
c/o Citi Hedge Fund Services, Ltd
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Fax No.: (+ 1-441) 296-8227
Attn: Shareholder Services Unit

Re:  Transfers of USD Shares in Kingate Global Fund, Ltd. (the "Fund")

Dear Sirs:

We act as a nominee or intermediary for our customers with respect to investments in various investment funds.  We may from time to time be the recipient of shares (by way of a transfer from an existing Shareholder) in the Fund and/or in funds which are administered by the Fund's administrator, Citi Hedge Fund Services, Ltd (the "Administrator"), or one of your subsidiary or affiliated companies.  We are providing this letter to you, the Fund, and the Administrator, in connection with your obligations under the various anti-money laundering and similar laws applicable to you.

We confirm that we are a financial institution which is subject to regulation in our jurisdiction of residence the purpose or effect of which is to prevent money laundering (the "AML Rules").

We confirm that we have in place policies and procedures which meet or exceed the requirements imposed by the AML Rules.

We confirm that prior to acting as a nominee or intermediary for our customers we verify the identity of the customer and, if not an individual, its beneficial owners.

The above information is given in strictest confidence and may only be relied upon by you and the Administrator.

Yours truly,

Signed:  _____

Full Name:  _____

Position:  _____

Address and Telephone Number of Branch Providing this Letter:

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

**EXHIBIT J**

**PRIVACY NOTICE**

Kingate Management Limited (the "Manager") recognizes the importance of protecting Shareholder privacy and have appropriate policies in place to maintain the confidentiality and security of our Shareholders' information.

**Categories Of Information We May Collect**

In the normal course of business, we may collect the following types of information:

- Information you provide in the subscription documents and other forms (including name, address, date of birth, social security or taxpayer identification number, income and other financial-related information)

- Data about your transactions with us (such as the types of investments you have made and your account status)

**How We Use Your Information That We Collect**

Any and all nonpublic personal information received by the Manager with respect to the Shareholders who are natural persons, including the information provided to the Fund by a Shareholder in the subscription documents, will not be shared with nonaffiliated third parties which are not service providers to the Fund or the Manager without prior consent from such Shareholders. In the normal course of business, we may disclose the kinds of nonpublic personal information listed above to nonaffiliated third party service providers involved in servicing and administering products and services on our behalf. Such service providers include but are not limited to the Administrator, the auditors and the legal advisors of the Fund. Additionally, the Fund and/or the Manager may disclose such nonpublic personal information as required by law (such as to respond to a subpoena or to prevent fraud). In addition, if the Fund chooses to dispose of any Shareholder's nonpublic personal information that the Fund is not legally bound to maintain, then the Fund will do so in a manner that reasonably protects such information from unauthorized access.

The same privacy policy applies to the former Shareholders.

**Confidentiality and Security**

We restrict access to nonpublic personal information about our customers to those employees and agents who need to know that information in order to provide products and services to you. We maintain physical, electronic and procedural safeguards to protect your nonpublic personal information.

For questions about this privacy policy, please contact the Manager.

# EXHIBIT 2

**THE SECURITIES DESCRIBED IN THIS CONFIDENTIAL INFORMATION MEMORANDUM AS THE SAME MAY BE AMENDED, SUPPLEMENTED AND RESTATED FROM TIME TO TIME (THE "MEMORANDUM") HAVE NOT BEEN REGISTERED OR QUALIFIED FOR OFFER OR SALE TO THE PUBLIC UNDER THE SECURITIES LAWS OF ANY COUNTRY OR JURISDICTION.**

**THE SHARES ISSUED BY KINGATE EURO FUND, LTD. (THE "FUND") ARE NOT FOR SALE TO U.S. PERSONS OR TO ANY MEMBER OF THE PUBLIC IN THE BRITISH VIRGIN ISLANDS OR IN ANY OTHER PLACE WHERE SUCH SALE IS UNAUTHORIZED. NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN AS CONTAINED IN THIS MEMORANDUM. PLEASE DIRECT ANY INQUIRIES TO THE ADMINISTRATOR.**

---

# KINGATE EURO FUND, LTD

*A British Virgin Islands Company*

**Private Offering of Participating Common Shares**
**(herein "Shares")**

---

## AMENDED AND RESTATED
## INFORMATION MEMORANDUM

**22 September, 2008**

Price per Share: Net Asset Value
Minimum Initial Subscription: EUR €250,000

| | |
|---|---|
| Manager: | Kingate Management Limited |
| Consultant: | FIM Advisers LLP |
| Administrator: | Citi Hedge Fund Services, Ltd. |

---

INVESTMENT IN THE FUND INVOLVES RISK.
YOUR ATTENTION IS DRAWN TO THE RISK FACTORS
AND CONFLICTS OF INTEREST DETAILED HEREIN.

Recipient: _____

Memorandum no. _____

THIS CONFIDENTIAL INFORMATION MEMORANDUM IS BEING GIVEN TO THE RECIPIENT SOLELY FOR THE PURPOSE OF EVALUATING AN INVESTMENT IN THE SHARES DESCRIBED HEREIN. IT MAY NOT BE REPRODUCED OR DISTRIBUTED TO ANYONE ELSE (OTHER THAN TO THE IDENTIFIED RECIPIENT'S PROFESSIONAL ADVISORS FOR THE PURPOSES OF EVALUATING THE INVESTMENT IN SHARES.) THE RECIPIENT, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN IT AND ALL RELATED DOCUMENTS TO THE FUND IF THE RECIPIENT DETERMINES NOT TO SUBSCRIBE FOR SHARES.

# IMPORTANT NOTICES

Neither Kingate Euro Fund, Ltd. (the "Fund") nor the Participating Common Shares of the Fund (the "Shares") described in this Amended and Restated Information Memorandum dated as of 22 September, 2008, as may be further amended and restated (this "Memorandum"), have been or will be registered or qualified under the securities laws of the United States ("U.S.") or any other jurisdiction. This Memorandum does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of Shares in any jurisdiction in which such offer, solicitation or sale is not authorized or to any person to whom it is unlawful to make such offer, solicitation or sale. The direct or indirect ownership of Shares by "Restricted Persons" as defined in this Memorandum, is prohibited except to a limited number of tax exempt investors in the Fund's discretion and then only after supplementary offering materials have been distributed to such potential investors. No person has been authorized to make any representations concerning the Fund or the Shares which are inconsistent with those contained in this Memorandum, and any such representations should accordingly be treated as unauthorized and may not be relied upon by the recipient.

Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice. All prospective investors should consult their own professional advisors as to the legal, tax, financial or other matters relevant to the suitability of an investment in the Shares for such investor.

The purchase of Shares is speculative and involves a high degree of risk. There is no assurance that the Fund will continue to be profitable and past performance of the Investment Advisor (as defined herein), is no assurance of continued future success. Moreover, since the Fund's Net Asset Value and the Net Asset Value of the Shares are calculated in Euros, each investor, and not the Fund or any other person, bears the risk of any foreign currency exposure resulting from differences, if any, in the value of the euro relative to the currency of the country in which such investor resides. And since the Investment Advisor will maintain the Fund's trading account in US Dollars, the Fund will maintain a forward hedging strategy which also entails costs and risks. See section entitled "CERTAIN RISK FACTORS" within this Memorandum for a more detailed description of the risks involved in the purchase of Shares.

This Memorandum is intended solely for the use of the person to whom it has been delivered by the Fund for the purpose of evaluating a possible investment by the recipient in the Shares described herein, and it is not to be reproduced or distributed to any other persons (other than professional advisors of the prospective investor receiving this document from the Fund). Kingate Euro Fund, Ltd. may offer other classes of Shares pursuant to separate offering materials and may issue and offer other such classes without notice to, or obtaining consent from, the investors. At present there are no other classes of shares on offer.

Investors (and each employee, representative or other agent of investors) may disclose to any and all persons, without limitations of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including options or other tax analysis) that are provided to investors relating to such tax treatment and tax structure. This authorization of tax disclosure is retroactively effective to the commencement of the first discussions between such investor and the Fund regarding the transactions contemplated herein.

Discussions in this Memorandum below as they relate to certain United Stated Federal Income Tax Consequences are not intended or written to be used, and cannot be used, for the purpose of avoiding United States Federal tax penalties. Such discussions were written to support the promotion or marketing of the transactions or matters addressed in this Memorandum, and any taxpayer to whom the transactions or matters are being promoted, marketed or recommended should seek advice based on its particular circumstances from an independent tax advisor.

Any questions relating to the purchase of Shares in the Fund or this Information Memorandum should be directed to the Fund's Manager, Kingate Management Limited ("Manager").

This Memorandum supersedes the Fund's Amended and Restated Information Memorandum dated August 1, 2007.

_____ *Kingate Euro Fund, Ltd.* _____

i

## KINGATE EURO FUND, LTD.

### SUMMARY

The information set out below should be read in conjunction with, and is qualified in its entirety by, the full text of this Amended and Restated Information Memorandum, as may be further amended and restated (the "Memorandum"), the memorandum and articles of association (the "Memorandum and Articles of Association") of Kingate Euro Fund, Ltd. and the documents and agreements referred to herein, all of which are available from the Administrator upon request.

**THE FUND**

*Generally*. Kingate Euro Fund, Ltd. (the "Fund") is an open-end investment company organized as an international business company in the British Virgin Islands ("BVI") on or about, April 19, 2000. The Fund is registered in the Territory of the British Virgin Islands as a "Professional Fund" as that term is defined in the British Virgin Islands Mutual Funds Act (1996), as amended by the Mutual Fund Amendment Act (1997).

*Offering*. The Fund is offering, through this Memorandum, Participating Common Shares (the "Shares") at a price per Share equal to the Net Asset Value per Share (as defined herein). As of December 31, 2007, the audited Net Asset Value of each Share was Euro €164.89 and there were 3,819,438 Shares outstanding. The Fund may discontinue this offering at any time for any reason or no reason. Investors are referred to herein as "Shareholders."

*Board of Directors.* The Fund has three (3) Directors on its Board of Directors (the "Board") who exercise ultimate authority over the Fund. The Directors meet quarterly, either in person or by telephone, to review the investment and administrative affairs of the Fund. See "MANAGEMENT - The Fund's Board of Directors."

*Other Classes.* The Fund is authorized to issue other classes of shares subject to terms and conditions that may differ from the terms and conditions applicable to the Shares discussed herein at any time without notice to or obtaining consent from the Shareholders. No offering of any other class is made by this Memorandum. There are no other classes on offer at the present time.

**INVESTMENT OBJECTIVE
AND PROCESS**

*Objective:* The Fund's investment objective is long-term capital appreciation.

*Stock/Options Trading.* The Fund seeks to obtain capital appreciation of its assets through the utilization of a non-traditional stock/options trading strategy. The Fund is designed for long term investment. See "THE FUND – The Fund's Investment Objective and Investment Process."

*Leverage.* The Fund may employ leverage for investment purposes or to fund redemptions.

**INVESTMENT ADVISOR**

The Fund's assets are managed by a New York based NASD[*] registered broker-dealer employing approximately 350 people and acting primarily as a market-maker in listed and unlisted stocks and convertible securities (the "Investment Advisor"). The Investment Advisor utilizes a "split strike conversion" options  strategy consistent with that of the Fund, as set forth under "THE FUND – The Fund's Investment Objective and Investment Process." The Investment Advisor has managed the assets of the Fund since its inception and it is anticipated that the retention of such Investment Advisor will continue.  In addition, from time to time, a portion of the Funds' assets may be managed by the Manager (as defined herein).   See "MANAGEMENT - The Investment Advisor."

**PAST PERFORMANCE**

There can be no assurance that the Manager or the Investment Advisor will continue to be successful in pursuing the Fund's investment objective or that their strategy will be profitable. Past results of the Manager, the Investment Advisor, or their respective principals and affiliates, are not necessarily indicative of the future favorable performance of the Fund.

**MANAGER**

Kingate Management Limited, a company duly incorporated under the laws of Bermuda on February 24, 1994 (the "Manager") is the Manager of the Fund.  The Manager acts pursuant to a Manager Agreement, dated May 1, 2000, by and between the Fund and the Manager (herein the "Manager Agreement").    Pursuant to the Manager Agreement, the Manager evaluates and monitors the Investment Advisor and, in general, provides all necessary management services to the Fund. The Manager may also manage directly the investment of a portion of the Fund's assets.  See "MANAGEMENT - The Manager."

**CONSULTANT**

FIM Advisers LLP, located in London, United Kingdom (herein the "Consultant"), has been appointed as consultant to the Manager in relation to the investments of the Fund pursuant to a Consulting Services Agreement by and among the Fund, the Manager and the Consultant dated as of August 1, 2005 (the "FIM Consulting Services Agreement").  Pursuant to the FIM Consulting  Services  Agreement,  the  Consultant  renders

---

[*] The term NASD" refers to the U.S. National Association of Securities Dealers, Inc.

*Kingate Euro Fund, Ltd.*

consulting advice to the Manager with respect to certain aspects of the Fund's operational, administrative, marketing, accounting and legal matters.  See "MANAGEMENT - The Consultant."

**ADMINISTRATOR**

Citi Hedge Fund Services, Ltd., (formerly BISYS Hedge Fund Services, Limited) located in Bermuda (herein the "Administrator") is the Fund's  Administrator pursuant to an Administration Agreement, as amended and restated effective June 1, 2007, by and among the Fund, the Manager and the Administrator (herein the "Administration Agreement"). Pursuant to the Administration Agreement, the Administrator administers the day-to-day activities of the Fund's operations, which include, without limitation, receiving subscriptions and processing redemption requests, calculating the Net Asset Value, responding to shareholder inquiries and similar matters.  In addition to its administrative duties, an affiliate of the Administrator has been appointed as Registrar and Transfer Agent of the Shares pursuant to a Registrar Agreement, as amended and restated effective January 1, 2002, by and among the Fund, Manager and the Administrator (herein the "Registrar Agreement").  See "MANAGEMENT - Administrator."

**BANKING**

The Bank of Bermuda Limited (the "Bank"), based in Hamilton, Bermuda, has been appointed as the Fund's banker for purposes of receiving subscription funds, disbursing redemption payments and processing cash transactions not directly related to the Fund's investment portfolio. See "MANAGEMENT - Banking and Custody."

**SUBSCRIPTIONS**

*Price of Subscription.*  The Shares may be purchased  by Eligible Investors (as defined herein) as of the first Business Day (as defined below) of the month (herein the "Subscription Date") at a price equal to the Net Asset Value per Share as of the last Business Day of the immediately preceding calendar month (the "Valuation Date") plus any applicable subscription charges. "Business Day" refers to any day when the central banking systems in New York, Bermuda and London are open and operating. See "Subscription Charge" below.

*Minimum Subscription.* The minimum initial investment per subscriber is Euro €250,000.   The minimum subsequent investment per subscriber is Euro €100,000.  Such amounts may be waived or reduced at the discretion of the Directors.

*Procedure.*  Completed Subscription Forms must be received by the Administrator three (3) Business Days prior to the first Business Day of the month in which prospective investors wish to subscribe for Shares and cleared funds must be received by the Bank at the latest by three (3) Business Days before the Subscription Date.  All subscriptions are required to be made in

_____*Kingate Euro Fund, Ltd.*_____

euros.    Fractional Shares are not issued and refunds of subscription funds are made only if the surplus amount (corresponding to non-issued fractional Shares) is in excess of Euro €200.  The Fund reserves the right to accept or reject any subscription in its absolute discretion.  The Manager, in its sole discretion, may permit subscriptions on other than the first Business Day of a month.

*Subscription Charge.*  A sales charge of up to five percent (5%) of the amount invested is payable on subscription of the Shares, but such charge may be waived in whole or in part at the sole discretion of the Manager.  The Manager may grant all or part of such charge to dealers and independent third parties in connection with the solicitation of subscriptions.

*U.S. Tax Exempt Investors.*  U.S. tax exempt investors wishing to subscribe should request a U.S. Supplemental Disclosure Statement and follow the additional procedures set forth therein.

**ELIGIBLE INVESTORS**

The Shares may be purchased only by "Eligible Investors," as described herein, except in a limited number of cases and then only after supplementary offering materials have been distributed to such potential investors (such as, without limitation, U.S. tax-exempt investors).  Persons interested in purchasing Shares should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange restrictions with which they must comply.  A limited number of Shares may be sold to U.S. investors and then only in a limited number of cases.  See "SUBSCRIPTIONS AND REDEMPTIONS-Eligible Investors."

**NET ASSET VALUE**

*Generally.*  The Net Asset Value of the Fund is equal to the Fund's assets less the Fund's liabilities and any accrued but unpaid expenses and reasonable reserves that have not yet been charged.  Expenses, fees and other liabilities are determined in accordance with U.S. Generally Accepted Accounting Principles. The Net Asset Value per Share is determined by dividing the Net Asset Value by the number shares outstanding.  The Net Asset Value is calculated as of the close of business in New York on the last Business Day of each month or on such other date when such computation is necessary or appropriate (each a "Valuation Date"). See "DETERMINATION OF NET ASSET VALUE."

**CERTAIN US REGULATORY MATTERS**

The Fund is not registered as an investment company and therefore is not required to adhere to certain investment policies under the U.S. Investment Company Act of 1940, as amended (the "Company Act").  In addition, the Manager is not registered as an investment adviser with the U.S. Securities and Exchange Commission under the Investment Advisers Act of 1940, as

_____*Kingate Euro Fund, Ltd.*_____

amended (the "Advisers Act").   This Memorandum may be amended by the Fund without further notice to the Shareholders so as to comply with any rule, regulation or statute.

**REDEMPTIONS**

*Generally.* Redemptions may be made as of the last Business Day of each calendar month (herein the "Redemption Date") upon thirty-five (35) days' prior notice, at the Net Asset Value per Share as of the Redemption Date.  Settlements are generally made within thirty (30) days after the Redemption Date.   In circumstances where the Fund is unable to liquidate securities positions in an orderly manner in order to fund redemptions or where the value of the assets of the Fund cannot reasonably be determined, the Fund may take longer than thirty (30) days to effect settlements of redemptions or may even suspend redemptions.   The notice requirement may be waived by the Fund in its discretion. A redemption request is irrevocable unless the Fund consents to its withdrawal. See "SUBSCRIPTIONS AND REDEMPTIONS."

*Redemption Charge.*    Generally,  no  redemption  charge  is imposed.   However, a redemption charge not to exceed one percent (1.0%) of the proceeds (waivable in whole or in part at the sole discretion of the Manager in exceptional circumstances) may be imposed on the redemption of Shares which are held for less than twelve (12) months from the Subscription Date.

**TRANSFERS**

No transfer of Shares may be made other than with the consent of the Directors, which consent may be withheld at the discretion of the Directors without the need for assigning any reason therefor. As part of the transfer process, the proposed transferee is required to complete the subscription documents and make the representations required of all other investors.   Shareholders requesting transfer of their Shares must submit a completed Transfer Request Form (available from the Administrator on request) to the Fund and the Administrator.   Note that in the event that the Shareholder is an entity or acts as nominee for others, certain additional information will be required.   No transfer will be valid without a completed Transfer Request Form and the express consent of the Directors.

**DISTRIBUTIONS**

It is the present intention of the Directors not to distribute net income by way of dividends.    Accordingly, net income effectively will be represented in the value of the Shares.  The Directors reserve the right to change such policy.

**FEES AND EXPENSES**

*Manager.* The Manager receives a monthly fee from the Fund at an aggregate annual rate equal to approximately one and one-half percent (1.50%) of the Fund's month-end Net Asset Value attributable to the Shares (the "Management Fee"), payable pursuant to the Manager Agreement. In addition, the Manager

_____ *Kingate Euro Fund, Ltd.* _____

receives an annual administration fee equal to one tenth of one percent (.10%) of the Fund's Net Asset Value attributable to the Shares computed and paid monthly (the "Manager Administration Fee"). Appropriate adjustments are made to account for subscriptions and redemptions which may occur during the month.

*Investment Advisor.* The Investment Advisor does not charge any fees for managing the assets of the Shares. Its source of compensation is derived from the market making activity of its affiliated broker-dealer.

*Administrator.* For its administrative duties, the Administrator receives fees as negotiated from time to time consistent with its customary charges for providing administrative services to the Fund. The Administrator is entitled to reimbursements of actual out-of-pocket expenses.

*Consultant.* The Consultant is paid by the Manager for its services at no additional cost to the Fund.

*Operations.* The Fund bears all other costs of its investment program (including brokerage and custody charges, interest and taxes) as well as professional fees of its auditors and attorneys. Expenses relating to the offering of the Shares are borne by the Shareholders and paid out of the proceeds of this offering. The Shares' organizational costs are being amortized and are not considered material.

*Directors' Fees.* Each Director who is not an officer or employee of the Manager, the Administrator or a related company, receives a flat annual fee for serving in such capacity. The fee may vary from time to time but will be in accordance with reasonable and customary directors' fees. The Directors shall be entitled for reimbursement from the Fund for reasonable out-of-pocket expenses incurred by them on behalf of the Fund.

**RISK FACTORS**

Investment in the Fund is speculative and involves a high degree of risk. Past performance of the Manager or of the Investment Advisor is no guarantee of future performance. There is no assurance that the Fund will be profitable. The risks of an investment in the Fund include, but are not limited to, the speculative nature of the Fund's strategies and the charges that the Fund will incur regardless of whether any profits are earned. Moreover, each Shareholder, and not the Fund, bears the risk of any foreign currency exposure resulting from differences, if any, in the value of the euro relative to the currency of the country in which such Shareholder resides. See "CERTAIN RISK FACTORS."

**CONFLICTS OF INTEREST**

The Fund is also subject to certain conflicts of interest. The Investment Advisor or the Manager may directly or indirectly manage the assets of funds that in some respects compete with the Fund for certain investments. See "POTENTIAL CONFLICTS OF INTEREST."

**LISTING**

The Fund may seek to list the Shares on the Irish Stock Exchange or a similar securities exchange, at the sole discretion of the Board and without the consent of the Shareholders.

**REPORTING**

Shareholders will receive from the Fund annual audited financial statements within a reasonable time after the Fund's fiscal year-end. In addition, Shareholders will receive from the Administrator monthly reports relating to the Fund's performance. Net Asset Value quotations are also published weekly (estimated to the extent required) in the *International Herald Tribune*, *Financial Times*, *Bloomberg* and *Telekurs*.

**FISCAL YEAR**

The Fund's fiscal year-end is December 31st.

**TAX STATUS**

The Fund should not be subject to any BVI or U.S. income taxes (other than U.S. withholding taxes on dividend or certain interest income, if any, derived from U.S. sources.) Shareholders of the Fund who are not otherwise subject to BVI or U.S. taxation by reason of their residence, nationality or other particular circumstances should not become subject to any such taxation by reason of the ownership or redemption of the Shares. Prospective investors should inform themselves as to the tax consequences, if any, in their own countries, which might be relevant to the purchase, holding, repurchase, redemption or transfer of the Shares.

**CERTAIN ERISA CONSIDERATIONS**

Investment in the Fund generally will be open to employee benefit plans and other funds subject to ERISA and/or Section 4975 of the Code. Except as described below under "CERTAIN RISK FACTORS – Compliance with ERISA Transfer Restrictions," the Fund intends to use commercially reasonable efforts to cause "benefit plan investors" not to own a significant portion of any class of shares in the Fund, so that the assets of the Fund should not be considered to be "plan assets" for purposes of ERISA and Section 4975 of the Code, although there can be no assurance that non "plan asset" status will be obtained or maintained. Prospective purchases and subsequent transferees of Shares in the Fund may be required to make certain representations regarding the compliance with ERISA and Section 4975 of the Code. See "CERTAIN ERISA CONSIDERATIONS."

**FUNCTIONAL CURRENCY;**

| | |
|---|---|
| **CURRENCY HEDGING** | The Fund's functional currency, *i.e.*, the currency in which it maintains its books and records and its financial statements is the Euro. However, because the Investment Advisor invests the Fund's assets in U.S. Dollar-denominated securities, the Fund will always hedge the U.S. Dollar-denominated portfolio into Euros with the use of interbank forward currency contracts or other means. See "INVESTMENT OBJECTIVE AND PROCESS – Currency Hedging" and "CERTAIN RISK FACTORS." |
| **PRIVACY NOTICE** | Any and all nonpublic personal information received by the Fund, the Manager and/or the Investment Advisor with respect to the Shareholders who are natural persons, including the information provided to the Fund by the Shareholder in the subscription documents, will not be shared with nonaffiliated third parties which are not service providers to the Fund, the Manager and/or the Investment Advisor without prior notice to such Shareholders.  Service providers that may receive such nonpublic information include but are not limited to the Administrator, the auditors and the legal advisors of the Fund. Additionally, the Fund, the Manager and/or the Investment Advisor may disclose such nonpublic personal information as required by law or regulation, including without limitation, any disclosure that may be required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 and any relevant British Virgin Islands anti-money laundering laws and regulations.  See the exhibit to the Subscription Agreement entitled "Privacy Notice." |

---

## DIRECTORY

---

| | | |
|---|---|---|
| **Fund's Registered Office** | Kingate Euro Fund, Ltd.<br>c/o Bison Financial Services Limited<br>Bison Court<br>P.O. Box 3460<br>Road Town, Tortola<br>British Virgin Islands | Telephone: (+ 1-284) 494-5239<br>Telecopier: (+ 1-284) 494-6728 |
| **Fund's Directors** | Mr. Christopher Wetherhill<br>Mr. John E. Epps<br>Mr. Graham H. Cook | |
| **Manager** | Kingate Management Limited<br>99 Front Street<br>Hamilton HM11, Bermuda<br>Attn.:  Mr. Christopher Wetherhill<br>     Ms. Patra Phillips | Telephone: (+ 1-441) 296-2888<br>Telecopier: (+ 1-441) 296-6775<br>E-mail: admin@kingate.bm |
| **Administrator** | Citi Hedge Fund Services, Ltd.<br>9 Church Street<br>P.O. Box HM 951<br>Hamilton, Bermuda HM DX<br>Attn.:  Shareholder Services | Telephone: (+ 1-441) 295-9166<br>Telecopier: (+ 1-441) 296-8227 |
| **Consultant** | FIM Advisers LLP<br>20 St. James St.<br>London SW1A1ES<br>United Kingdom<br>Attn.:  Mr. Carlo Grosso<br>     Mr. Federico M. Ceretti | Telephone: (+ 44-20) 7389-8900<br>Telecopier: (+ 44-20) 7389-8911<br>E-mail:      main@fim-group.com |
| **Bank** | The Bank of Bermuda Limited<br>6 Front Street<br>P.O. Box HM 1020<br>Hamilton HM 11, Bermuda<br>Attn.:  Ms. Chandra Arandjelovic | Telephone: (+ 1-441) 299-5071<br>Telecopier: (+ 1-441) 299-6565<br>Email: chandra.arandjelovic@bob.hsbc.com |

| | | |
|---|---|---|
| **Auditors** | PricewaterhouseCoopers<br>Dorchester House<br>7 Church Street<br>Hamilton HM11, Bermuda<br>Attn.:  Mr. Andrew Brook | Telephone: (+ 1-441) 295-2000<br>Telecopier: (+ 1-441) 295-1242<br>E-mail:<br>andrew.brook@bm.pwcglobal.com |

**Legal Advisors**    *In the British Virgin Islands:*

| | | |
|---|---|---|
| | O'Neal Webster O'Neal<br>30 DeCastro Street<br>Road Town, Tortola<br>British Virgin Islands<br>Attn:  Ms. Barbara O'Neal, Esq. | Telephone: (+ 1-284) 494-5808<br>Telecopier: (+ 1-284) 494-5811<br>E-mail:     boneal@owomfg.com |

*In the United States*

| | | |
|---|---|---|
| | Tannenbaum Helpern<br>Syracuse & Hirschtritt LLP<br>900 Third Avenue<br>New York, N.Y. 10022<br>U.S.A.<br>Attn.:  Michael G.Tannenbaum, Esq. | Telephone: (+ 1-212) 508-6701<br>Telecopier: (+ 1-212) 355-3034<br>E-mail:     tannenbaum@thshlaw.com |

# Table of Contents

                                                                                          Page

Summary ......................................................................................................................... i

Directory ....................................................................................................................... x

The Fund ........................................................................................................................ 1

Investment Objective and Process ................................................................................. 1
    Investment Objective ................................................................................................ 1
    Investment Process.................................................................................................... 2
    Currency Hedging..................................................................................................... 2
    Temporary Investments ............................................................................................ 3
    Investment Restrictions............................................................................................. 3
    Borrowing and Lending ........................................................................................... 4
    Transaction Execution .............................................................................................. 4
    Distributions and Reinvestment ............................................................................... 4

Certain Risk Factors....................................................................................................... 5
    Operating History ..................................................................................................... 5
    Achievement of Investment Objective..................................................................... 5
    Illiquidity of Investment .......................................................................................... 5
    Dependence on the Manager..................................................................................... 5
    Dependence on the Investment Advisor ................................................................... 6
    General Economic Conditions .................................................................................. 6
    Market Risks ............................................................................................................ 6
    Trading Strategies of the Investment Advisor ......................................................... 6
    Special Techniques Used by the Investment Advisor............................................... 6
    Concentration ........................................................................................................... 8
    Currency Hedging..................................................................................................... 8
    Regulation ................................................................................................................ 8
    No Manager Liability Beyond Fund Assets.............................................................. 9
    Shortened Claims Period........................................................................................... 9
    Litigation ................................................................................................................. 9
    Early Termination .................................................................................................... 9
    Effect of Substantial Withdrawals ......................................................................... 10
    Possibility of Fraud or Misappropriation............................................................... 10
    Changes in Applicable Law .................................................................................... 10
    Reserve for Contingent Liabilities ......................................................................... 10
    Certain Conflicts of Interest................................................................................... 10
    Other Clients of Investment Advisor ..................................................................... 10
    Common Counsel.................................................................................................... 10
    Lack of Independent Experts Representing Investors.............................................. 11
    Institutional Risk.................................................................................................... 11
    Settlements ............................................................................................................. 11
    Pricing Information................................................................................................. 11
    Anti-Money Laundering ......................................................................................... 12
    Compliance with ERISA Transfer Restrictions ..................................................... 12

Management.................................................................................................................. 13
    The Fund's Board of Directors ............................................................................... 13

*Kingate Euro Fund, Ltd.*

The Manager ................................................................................................................ 14
The Investment Advisor ................................................................................................ 15
The Consultant .............................................................................................................. 15
The Administrator ......................................................................................................... 16
Banking and Custody .................................................................................................... 17
Voting Rights of Shareholders ..................................................................................... 17

Fees and Expenses ............................................................................................................. 17
Organization Costs ....................................................................................................... 17
Fees of the Manager ..................................................................................................... 17
Fees of the Investment Advisor ................................................................................... 18
Fees of the Consultant .................................................................................................. 18
Fees of the Administrator ............................................................................................. 18
Other Operating Expenses ........................................................................................... 18

Subscriptions and Redemptions ........................................................................................ 19
Subscriptions ................................................................................................................ 19
Anti Money Laundering ............................................................................................... 20
Eligible Investors ......................................................................................................... 21
Redemptions ................................................................................................................. 22

Determination of Net Asset Value ................................................................................... 24

Potential Conflicts of Interest .......................................................................................... 25

Taxation ............................................................................................................................. 27
Introduction .................................................................................................................. 27
The Fund ....................................................................................................................... 27
Shareholders of the Fund ............................................................................................. 28

Additional Information ...................................................................................................... 34
Reports to Shareholders ............................................................................................... 34
Available Documents .................................................................................................... 34
Auditor's Consent ......................................................................................................... 34
Counsel ......................................................................................................................... 34
Inquiries and Communication with the Fund ............................................................... 34

Subscription Instructions ..............................................................................................S-1
Subscription Agreement ................................................................................................S-4
Exhibit A .....................................................................................................................S-18
Exhibit B .....................................................................................................................S-20
Exhibit C .....................................................................................................................S-21
Exhibit D .....................................................................................................................S-22
Exhibit E .....................................................................................................................S-23
Redemption Request ....................................................................................................S-24
Transfer Request Form ................................................................................................S-27
Additional Subscription Agreement ...........................................................................S-29
Exhibit I ......................................................................................................................S-31
Exhibit J ……………………………………………………………………………..S-32

## KINGATE EURO FUND, LTD.

---

### THE FUND

---

KINGATE EURO FUND, LTD. (the "Fund") is an open-end investment company organized as an international business company in the British Virgin Islands (BVI). The Fund seeks long-term capital growth by allocating share capital to a selected investment advisor to execute the Fund's Investment Objective and Process as set forth herein. See "INVESTMENT OBJECTIVE AND PROCESS." The Fund's authorized capital is Euro €300,000 consisting of 30,000,000 participating common shares (the "Shares") of Euro €0.01 par value. The Fund is a "Professional Fund" as that term is defined in the British Virgin Islands Mutual Funds Act (1996), as amended by the Mutual Fund Amendment Act (1997).

The Shares offered hereby are privately placed at Net Asset Value per Share plus any applicable subscription fee. See "SUBSCRIPTIONS AND REDEMPTIONS." The net proceeds of the offering are invested in accordance with the policies set forth under "INVESTMENT OBJECTIVE AND PROCESS." The Fund, without limitation, may hold cash or invest in cash equivalents for short-term investments.

No offering other than the Shares is made by this Amended and Restated Information Memorandum dated as of 22 September, 2008, as may be further amended and restated (the "Memorandum"). Accordingly, all references in the Memorandum shall be deemed to refer to the Shares. The information in this Memorandum is qualified in its entirety by the Fund's memorandum and articles of association (the "Memorandum and Articles of Association") and operative agreements, all which are available on request to the Administrator.

The Fund presently has no other outstanding classes of shares. The Fund has reserved the right to issue additional classes of shares from time to time, which in the Fund's discretion, may have preferences and fee arrangements which differ from those relating to the existing class of shares, in order to meet the needs of, for example, certain institutional investors or investors facing different tax or foreign exchange requirements. Any increased administrative charges by virtue of such new classes will be borne by Shareholders of such classes only. Additional classes may be issued by the Fund without consent of or notice to the Shareholders.

An investment in the Fund is subject to certain risks (see "CERTAIN RISK FACTORS") and certain conflicts of interest. See "POTENTIAL CONFLICTS OF INTEREST."

---

### INVESTMENT OBJECTIVE AND PROCESS

---

**Investment Objective**

The Fund's investment objective is long-term capital appreciation. The Fund seeks to obtain capital appreciation of its assets through the utilization of a non-traditional stock/options trading strategy. In attempting to achieve its objective, the Fund has established a discretionary account with an Investment Advisor (as defined herein) who is based in the United States and who invests or trades in a wide range of

equity securities, and, to a lesser extent, other securities and derivatives.  In certain instances and at certain times, the Manager (as defined herein) may directly invest certain of the Fund's assets, rather than allocating such assets to the Investment Advisor as may be consistent with, and in furtherance of, the Fund's investment objective.  All investments involve investment risk and may result in losses instead of gains, as the achievement of the Fund's investment objective cannot be assured. See "CERTAIN RISK FACTORS."

**Investment Process**

The Investment Advisor invests primarily in the United States and utilizes a non-traditional investment strategy that is a variation of the traditional "option conversion" strategies (generally consisting of the purchasing of equity shares, the selling of related options representing a number of underlying shares equal to the number of shares purchased, and the buying of related put options representing the same number of underlying shares.) The strategy utilized by the Fund's Investment Advisor is called "split-strike conversion" and entails:

(i)    purchasing a basket of forty-five (45) to fifty (50) large-capitalization S&P 100 stocks (*e.g.*, General Electric, Microsoft, Pfizer, Exxon Mobil, Wal-Mart Stores, Citigroup, Intel, American International, IBM, Johnson & Johnson, etc.), which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general market;

(ii)    selling out-of-the money S&P 100 Index call options representing a dollar amount of the underlying Index equivalent to the dollar amount of the basket of shares purchased;

(iii)    purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount.

The strategy aims to limit losses when stock prices decline while still affording an upside potential that is capped to the strike price of the short call when stock prices rise.  The long put/short call position constitutes a "synthetic" short of the market, which provides a hedge against the long stock positions.  Proprietary systems continuously optimize the basket of stocks to replicate the performance of the overall market at low cost.  Put and call option positions are actively managed as strike prices and maturities are adjusted in response to relative valuations and general market movements.

**Currency Hedging**

The Fund will implement a risk management strategy designed to manage the currency risk associated with a Euro based investor in a U.S. Dollar-denominated pool of assets. The risk management strategy implemented will generally consist of a "passive" currency risk hedging program, whereby the U.S. Dollar exposure is controlled on a permanent basis through the purchase of forward currency contracts.  The aim of such a passive currency risk hedging program is to provide for the Euro investor in the Fund a hedge against the impact of changes in the Euro/U.S. Dollar exchange rate (subject to certain inherent limitations of such a program, as described below) and thus translating into Euro the changes in the Fund's (U.S. Dollar-based) net asset valuation.

When a "passive" hedging program is implemented, the investor will be foregoing participation in any appreciation against the Fund's underlying investments due to upward fluctuations in the value of the U.S. Dollar against the Euro, and will be subject to costs and expenses associated with hedging.  However, the investor will be protected against any depreciation of the Fund's underlying investments

_____*Kingate Euro Fund, Ltd.*_____

due to downward fluctuations in the value of the U.S. Dollar against the Euro, subject to hedging costs and expenses.

When hedging contracts are outstanding, their maximum aggregate amount will not exceed the U.S. Dollar value equivalent of the Net Asset Value of the Fund, adjusted on a monthly basis in conformity with the Fund's monthly subscription and redemption experience.  The investor's currency risk will generally be hedged only to the extent that the forward currency contracts are based on the Fund's beginning-of-month assets, subject to regular review of anticipated cash and transactional requirements of the Fund. Therefore investment gains in the course of the month will generally not be protected against currency fluctuations in the same manner, although from time to time the hedge strategy may also include forward currency transactions throughout the month in order to protect investment gains generated in the course of the month against currency fluctuations.  While the hedge intends to cover month-end net assets, the operational aspects of purchases and sale of investments may render the Fund moderately overhedged at some times or moderately underhedged at other times.

Hedging contracts will generally be established for maturities ranging from one to twelve months and, if required by the hedging strategy, may be reestablished ("rolled over") for additional term(s).  At the last Business Day of each month, outstanding forward contracts are "marked-to-market" at the then prevailing market prices.  Unrealized gains and losses on outstanding contracts based on the existing relative values of the U.S. Dollar and Euro to the extent of the total amount hedged, as well as gains and losses realized on hedging contracts during the month will be added to or deducted (as the case may be) from the Fund's net assets.

The Fund may also in the future implement a risk management strategy designed to manage the currency risk with the use of instruments other than forward currency contracts.

See "CERTAIN RISK FACTORS."

**Temporary Investments**

Pending investment of capital of the Fund in accordance with the Fund's Investment Objective and Process, or to facilitate withdrawals of capital by Shareholders as permitted by this Memorandum, the Fund may, among other things, hold cash or invest in cash equivalents. Among the cash equivalents in which the Fund may invest are: obligations of the United States Government, its agencies or instrumentalities, commercial paper, and certificates of deposit and bankers' acceptances issued by United States banks that are members of the Federal Deposit Insurance Corporation. The Fund may also enter into repurchase agreements and may purchase shares of money market mutual funds in accordance with applicable legal restrictions.

**Investment Restrictions**

The following investment restrictions of the Fund may not be changed without the approval of the Shareholders holding at least 67% of the Shares: the Fund will not purchase real estate or interests in real estate, except that the Fund may purchase and sell securities that are secured by real estate or interests therein and may purchase securities issued by companies that invest or deal in real estate.

**Borrowing and Lending**

The Fund is authorized to borrow in order to fund redemption requests and to enhance its investment leverage.  There are no restrictions on the Fund's borrowing capacity other than limitations imposed by lenders and any applicable credit regulations.  Loans generally may be obtained from securities brokers and dealers or from other financial institutions; such loans are secured by securities or other assets of the Fund pledged to such brokers.  Loans may also be made from or to other investment companies on such terms as are commercially reasonable, including without limitation, from or to investment companies similar to the Fund, or from or to finance companies with respect to which the Manager (or one or more affiliates) have an interest, either as sponsor, manager, administrator, owner or otherwise.

**Transaction Execution**

The Investment Advisor acts as a market-maker in the stocks purchased and sold by the portfolio, and acts as a principal in connection with its sales of securities to the  portfolio and the purchase of securities from the  portfolio.

The options transactions executed for the benefit of the  portfolio are effected primarily in the over-the-counter market, not on a registered options exchange.  See "POTENTIAL CONFLICTS OF INTEREST" and "CERTAIN RISK FACTORS".

**Distributions and Reinvestment**

The Fund does not expect to declare and/or pay dividends or make any other distributions to Shareholders out of the Fund's current earnings and profits.  Rather, the Fund will reinvest such income. Potential investors should keep this limitation in mind when determining whether or not an investment in the Fund is suitable for their particular purposes.  The Fund reserves the right to change such policy.  The Manager is solely responsible for ensuring compliance by the Fund with all investment objectives, investment guidelines and investment restrictions contained in this Memorandum.

# CERTAIN RISK FACTORS

Prospective investors should give careful consideration to the following risk factors in evaluating the merits and suitability of an investment in the Fund as they relate specifically to the Shares or to the Fund, in general, as the context requires.  The following does not purport to be an adequate summary of all the risks associated with an investment in the Shares of the Fund.  Rather, the following are only certain particular risks to which the Fund is subject that the Manager wishes to encourage prospective investors to discuss in detail with their professional advisors.

**Operating History**

The Fund commenced operations with respect to the Shares on May 1, 2000 and as such has an operating history with regard to such Shares since such date.  There can be no assurance that future returns will be similar to returns achieved since inception to date.

**Achievement of Investment Objective**

There can be no assurance that the Fund will continue to achieve its investment objective or that the Manager or the Investment Advisor will continue to succeed in achieving the Fund's investment objective.  Given the factors which are described below, and due to the fact that an investment in the Fund entails a high degree of risk, there exists a possibility that an investor could suffer a substantial loss as a result of an investment in the Fund.

**Illiquidity of Investment**

There is no market for the Shares of the Fund and, accordingly, investments in the Shares of the Fund may be disposed of only through the redemption procedures described elsewhere in this Information Memorandum.

The consent of the Manager must be obtained prior to any transfer of Shares.  In light of the restrictions imposed on a transfer of Shares, and in light of the limitations imposed on a  Shareholder's ability to withdraw all or part of his or its capital from the Fund, an investment in the Fund should be viewed as illiquid and subject to risk.

**Dependence on the Manager**

All decisions with respect to the general management of the Fund are made by the Manager, who has complete authority and discretion in the management and control of the business of the Fund, including the authority to delegate all investment management activities to the selected Investment Advisor.  Shareholders will have no right or power to take part in the management of the Fund, nor in any decision with regard to the allocation of management of the Fund's assets to the selected Investment Advisor. As a result, the success of the Fund for the foreseeable future will depend largely upon the ability of the Manager, and no person should invest in the Fund unless willing to entrust all aspects of the management of the Fund to the Manager, having evaluated its capability to perform such functions.

The  Shareholders have certain limited rights to consent as set forth in this Memorandum but will not have any authority or power to act for or bind the Fund.

**Dependence on the Investment Advisor**

The Manager has delegated all investment management duties with regard to Shares to the Investment Advisor. As a result, the success of the Fund for the foreseeable future will depend on the ability of the Investment Advisor to achieve the Fund's investment objective. Neither the Manager nor the Shareholders have any control over the investment and trading decisions of the Investment Advisor, and no person should invest in the Fund unless willing to entrust all aspects of the investment management of the Fund to the selected Investment Advisor, having evaluated its capability to perform such functions.

**General Economic Conditions**

The success of any investment activity is influenced by general economic conditions, which may affect the level and volatility of interest rates and the extent and timing of investor participation in the markets for both equity and interest-rate-sensitive securities. Unexpected volatility or illiquidity in the markets in which the Fund directly or indirectly holds positions could impair the Fund's ability to carry out its business and could cause it to incur losses.

**Market Risks**

The success of a significant portion of the Fund's investment program depends, to a great extent, upon correctly assessing the future course of price movements of stocks, bonds and other securities. There can be no assurance that the Investment Advisor will be able to predict accurately these price movements.

**Trading Strategies of the Investment Advisor**

The Fund is a single-advisor fund and the overall success of the Fund depends upon the ability of the Investment Advisor to be successful in its own strategy.  The past performance of such strategy or strategies is not necessarily indicative of its or their future profitability, and no strategy can consistently determine which security to purchase or sell at a profit.  Any factor which would make it more difficult to execute more timely trades, such as, without limitation, a significant lessening of liquidity in a particular market, changes in taxation or regulation, interest rate changes, would also be detrimental to profitability. Further, the Investment Advisor may modify its strategy from time to time in an attempt to evaluate market movements more favorably.  As a result of such periodic modifications, it is possible that the strategy used by such Investment Advisor in the future may be different from those presently in use.  No assurance can be given that the strategy to be used by the Investment Advisor will be successful under all or any market conditions.  In addition, it is not known what effect, if any, the size of the Fund's account or the increase in total funds being managed by the Investment Advisor will have on the performance of the Investment Advisor's trading methods.

**Special Techniques Used by the Investment Advisor**

The Investment Advisor uses special investment techniques that may subject the Fund's investments to certain risks. Certain, but not all, of these techniques and the risks that they entail are summarized below. The Fund, in any event, is not designed to correlate to the broad equity market, and should not be viewed as a substitute for equity investments.

*Risk of Lack of Independent Data.* The Investment Advisor's strategy, involving split strike conversions, is a unique investment program, and is often not well followed by the Wall Street community. Accordingly, there is very little independent data available to assist a prospective investor in his analysis of the Fund.

*Risks of Transactions Executions.* The Investment Advisor, in its role as a market-maker, trades with the portfolio as a principal. As a result, the portfolio is subject to counterparty risk.

*Risks of Market Illiquidity.* Despite the heavy volume of trading in securities, the markets for some securities have limited liquidity and depth. The lack of depth could be a disadvantage to the Fund, both in the realization of the prices which are quoted and in the execution of orders at desired prices.

*Risks of Arbitrage Transactions.* The success of arbitrage strategies depends often on the ability to execute two or more simultaneous transactions at desired prices. Should such transactions not be executed simultaneously at the desired prices, losses may be incurred on both sides of the transaction. Additionally, separate costs are incurred on both sides of an arbitrage transaction, and substantial favorable price moves may be required before a profit can be realized.

*Risks of Options Trading.* In seeking to enhance performance or hedge assets, the Investment Advisor may purchase and sell call and put options on stock indexes. A stock index measures the movement of a certain group of stocks by assigning relative values to the common stocks included in the index. Examples of well-known stock indexes are the Standard & Poor's Composite Index of 500 Stocks and the Standard & Poor's 100 Index. Both the purchasing and the selling of call and put options contain risks. Although an option buyer's risk is limited to the amount of the purchase price of the option, an investment in an option may be subject to greater fluctuation than an investment in the underlying securities. In theory, the exposure to loss is potentially unlimited in the case of an uncovered call writer (i.e. a call writer who does not have and maintain during the term of the call an equivalent long position in the stock or other security underlying the call), but in practice the loss is limited by the term of existence of the call. The risk for a writer of an uncovered put option (i.e., a put option written by a writer that does not have and maintain an offsetting short position in the underlying stock or other security) is that the price of the underlying security may fall below the exercise price. The effectiveness of purchasing or selling stock index options as a hedging technique will depend upon the extent to which price movements in assets that are hedged correlate with price movements of the stock index selected. Because the value of an index option depends upon movement in the level of the index rather than the price of a particular stock, whether a gain or loss will be realized from the purchase or writing of options on an index depends upon movements in the level of stock prices in the stock market generally, rather than movements in the price of a particular stock. Successful use of options on stock indexes will depend upon the ability of the Investment Advisor to predict correctly movements in the direction of the stock market generally. This ability requires skills and techniques different from those used in predicting changes in the price of individual stocks.

*Risks of Over-the-Counter Options Trading.* The Investment Advisor may execute options transactions in the over-the-counter market. Trading equity and options in the over-the-counter market is subject to counterparty risk and is without the protection afforded with respect to options transactions on regulated exchanges through the Options Clearing Corporation.

*Risks of Loss of Entire Options Investment.* An option is a wasting asset. Its value is reduced as its life shortens, and it becomes worthless upon expiry. As a consequence, an option buyer that does not sell an option in the secondary market prior to expiry nor exercises an option prior to expiry loses his entire investment in the option.

_____ *Kingate Euro Fund, Ltd.* _____

*Risks of Assignment of Options.* In the event a short option position is assigned by its buyer, a hedged options position becomes net long or net short. Although the remaining portion of the previously hedged position may be liquidated or otherwise adjusted to limit exposure to price changes, substantial losses may result if, for instance, a trading halt occurs in the remaining options position (either in the option or the underlying security) followed by a price gap at the reopening of trading.

*Risks of Prohibition of Exercise Rights.* The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option is halted, holders and writers of that option will be locked into their position until one of the two restrictions is lifted.

**Concentration**

There is no requirement that investments of the Fund be diversified.

**Currency Hedging**

Generally, the Fund will enter forward foreign currency ("FX") contracts ("Hedging Transactions") to manage the FX fluctuation risk between the Euro and U.S. Dollar. Hedging involves special risks including the possible default by the counterparty to the transaction, illiquidity of the FX agreement in the event the need arises to close the FX agreement before its forward date, and the risk of error in establishing the Hedging Transaction. Hedging involves costs and liabilities which will be borne for the Fund. With regard to the risk of failure or default by the counterparty to such a transaction, the Fund will have contractual remedies pursuant to the agreements related to the transaction (which may or may not be meaningful depending on the financial position of the defaulting counterparty). The Manager seeks to minimize the Fund's counterparty risk through the selection of financial institutions and types of transactions employed.

**Regulation**

The Fund is not registered as an investment company under the U.S. Company Act or any similar legislation in any jurisdiction. Investors, therefore, will not be accorded the protective measures provided by such legislation.

Registered investment companies are required, under applicable U.S. Securities Exchange Commission forms relating to the registration of their interests, to state definitive policies with respect to certain enumerated types of activities, some of which may not be changed without security holder approval. Such policies are considered to be "fundamental" policies with respect to such securities investments (i.e., policies which the registered investment company deems to be fundamental or policies which may not be changed without the approval of a majority of the registered investment company's security holders). The following discussion summarizes the Fund's currently anticipated policies with respect to such activities.

*Type of Securities in which the Fund May Invest.* As set out in this Memorandum and as generally authorized by the Memorandum and Articles of Association, the Fund may invest in securities and other business interests of any and all types and descriptions, including "restricted" securities. The Fund may buy or write put and call options. Notwithstanding the foregoing, the Fund will not invest in real estate without the consent of Shareholders holding 67% of the Shares.

*Use of Leverage*.  The Fund may trade in securities on margin and may effect short sales.  The Fund also may borrow, pledge, mortgage, lend or hypothecate securities or other assets.

*Making of Loans*.  The Fund may make loans.

*Underwriting of Securities and Other Issuers*.  The Fund will not underwrite securities of other issuers in connection with the distribution of securities.

*Concentration of Investments in Particular Industries or Companies*.  The Manager and the Investment Advisor may concentrate investments in particular industries and, from time to time to a lesser extent, in particular companies.  The Fund will not invest more than 20% of the value of its total assets in securities of any one issuer (other than obligations of the U.S. government, certificates of deposits, time deposits, short-term commercial paper, shares of money market funds and bankers' acceptances).  The Fund may not change these policies without the approval of  Shareholders holding at least 67% of the Shares.

*Policy with respect to Portfolio Turnover*.  The Fund has no definite policy with respect to portfolio turnover.  The Fund may incur a significant turnover rate, since the Fund's investment strategies sometimes may involve short-term considerations.

**No Manager Liability Beyond Fund Assets**

The Manager shall have no personal liability to the Shareholders for the return of any capital contributions, it being understood that any such return shall be made solely from the Fund assets.

**Shortened Claims Period**

By subscribing for the Shares, the Shareholder is agreeing to shortening the period during which a claim may be made against the Fund, the Manager or the Consultant with regard to any matter relating to such Shareholder's investment in the Fund.

**Litigation**

The Fund and the Manager, as independent legal entities, may be subject to lawsuits or proceedings by governmental entities or private parties.  Except in the event of a lawsuit or proceeding arising from a Director's or Manager's gross negligence, willful default, or fraud in the performance of its duties, expenses or liabilities of the Fund arising from any suit shall be borne by the Fund.

**Early Termination**

In the event of the early termination of the Fund, the Fund would have to distribute to the Shareholders their pro rata interest in the assets of the Fund.  The Manager can withdraw from the Fund at any time upon 6 months' prior notice, and may thereby cause the dissolution of the Fund.  The Manager may terminate the appointment of the Investment Advisor to manage the Fund's assets and henceforth withdraw assets from the Investment Advisor in the ordinary course.  The Investment Advisor may terminate the authority granted to it to manage the Fund's assets at any time, and may return to the Fund all or part of the Fund's assets henceforth managed by the Investment Advisor. Certain assets held by the Fund may be highly illiquid and might have little or no marketable value.  It is possible that at the time of such sale or distribution, certain securities held by the Fund would be worth less than the initial cost of such securities, resulting in a loss to the  Shareholders.  Moreover, any organizational expenses with

_____*Kingate Euro Fund, Ltd.* _____

regard to the Shares that had not yet become fully amortized would be debited against Fund capital at that time.

## Effect of Substantial Withdrawals

Substantial withdrawals by Shareholders within a short period of time could require the Manager to liquidate positions more rapidly than would otherwise be desirable, which could adversely affect the value of the Fund's assets. The resulting reduction in the Fund's assets could make it more difficult to generate a positive rate of return or to recoup losses due to a reduced equity base.

## Possibility of Fraud or Misappropriation

The Fund does not have actual custody of the assets. Such actual custody rests with the Investment Advisor and its affiliated broker-dealer. Therefore, there is the risk that such entity could abscond with those assets. There is always the risk that the assets with the Investment Advisor could be misappropriated. In addition, information supplied by the Investment Advisor may be inaccurate or even fraudulent. The Manager is entitled to rely on such information (provided it does so in good faith) and is not required to undertake any due diligence to confirm the accuracy thereof.

## Changes in Applicable Law

The Fund and the Investment Advisor must comply with various legal requirements, including requirements imposed by the federal securities laws, tax laws and pension laws. Should any of those laws change over the scheduled term of the Fund, the legal requirements to which the Fund, the Shareholders, and the Investment Advisor may be subject could differ materially from current requirements.

## Reserve for Contingent Liabilities

Under certain circumstances, the Manager may find it necessary upon a redemption by a Shareholder to set up a reserve for contingent liabilities and withhold a certain portion of the Shareholder's redemption proceeds.

## Certain Conflicts of Interest

An investment in the Fund constitutes the acceptance and acknowledgement of certain conflicts of interest (See "POTENTIAL CONFLICTS OF INTEREST").

## Other Clients of Investment Advisor

The Investment Advisor has responsibility for making trading decisions on behalf of the Fund. In addition, the Investment Advisor may also manage other accounts (including other partnerships and accounts in which the Investment Advisor may have an interest) which together with accounts already being managed could increase the level of competition for the same trades the Fund might otherwise make, including the priorities of order entry. This could make it difficult or impossible to take or liquidate a position in a particular security at a price indicated by an Investment Advisor's strategy.

## Common Counsel

Tannenbaum Helpern Syracuse & Hirschtritt LLP ("THSH") acts as counsel to the Fund in connection with this offering of Shares; THSH also acts as counsel to the Manager. In connection with

_____*Kingate Euro Fund, Ltd.* _____

this offering of Shares and ongoing advice to the Fund, the Manager and their affiliates, THSH has not and will not be representing the Shareholders.  No independent counsel has been retained to represent the Shareholders.  THSH's representation of the Fund, its Manager and their affiliates is limited to those specific matters upon which it has been consulted.  There may exist other matters which would have a bearing on the Fund, its Manager and their affiliates upon which THSH has not been consulted.  THSH does not undertake to monitor the compliance of the Fund, its Manager and their affiliates with the investment program, valuation procedures and other guidelines set out herein, nor does it monitor compliance with applicable laws.  Additionally, in all cases, including the preparation of this Amended and Restated Information Memorandum, THSH relies upon information furnished to it by the Fund, its Manager and their affiliates, and does not investigate or verify the accuracy and completeness of such information.  In the course of advising the Fund, its Manager and their affiliates, there may be times when the interests of the Manager may differ from those of the Shareholders.  THSH does not represent the interests of the Shareholders in resolving such issues.

### Lack of Independent Experts Representing Investors

The Manager has consulted with counsel, accountants and other experts regarding the formation of the Fund.  Each prospective investor should consult his own legal, tax and financial advisors regarding the desirability of an investment in the Fund.

### Institutional Risk

The institutions, including brokerage firms and banks, with which the Fund (directly or indirectly) does business, or to which securities have been entrusted for custodial and prime brokerage purposes, may encounter financial difficulties that impair the operational capabilities or the capital position of the Fund.  Brokers may trade with an exchange as a principal on behalf of the Fund, in a "debtor-creditor" relationship, unlike other clearing broker relationships where the broker is merely a facilitator of the transaction.  Such broker could, therefore, have title to all of the assets of the Fund (for example, the transactions which the broker has entered into on behalf of the Fund as principal as well as the margin payments which the Fund provides).  In the event of such broker's insolvency, the transactions which the broker has entered into as principal could default and the Fund's assets could become part of the insolvent broker's estate, to the detriment of the Fund.  In this regard, Fund assets may be held in "street name" such that a default by the broker may cause Fund's rights to be limited to that of an unsecured creditor.

### Settlements

The Fund is not required to distribute cash or other property to the Shareholders, and the Fund does not intend to make any such distributions.  Notwithstanding the foregoing, the Fund may, in its discretion, settle redemptions in kind in which event the Shareholders may be required to obtain advice with regard to disposing of such assets (and bear the expense thereof).  Moreover, during the period between submitting a notice of redemption and obtaining settlement, the redemption proceeds remains at risk of loss, without interest, and under certain circumstances, such proceeds may be required to be restored to the Fund.

### Pricing Information

While pricing information is generally available for securities in which the Fund invests, and for the value of the forward currency contracts, reliable pricing information may at times not be available from any source.  Prices quoted by different sources are subject to material variation.  For purposes of

*Kingate Euro Fund, Ltd.*

calculating the Fund's Net Asset Value and valuing investments, valuations of investments for which pricing information cannot be obtained are made by the Administrator based upon such information as is available, including the advice of the Investment Advisor. The Administrator may rely upon appropriate pricing services and information provided the Investment Advisor and shall not, in the absence of gross negligence or willful default be liable for any loss suffered by the Fund or any Shareholder by reason of any error in calculation resulting from any inaccuracy in the information provided by any pricing service or the Investment Advisor.

## Anti-Money Laundering

If the Fund, Manager, Investment Advisor, Administrator, or any governmental agency believes that the Fund has accepted subscriptions for Shares by, or is otherwise holding assets of, any person or entity that is acting directly or indirectly, in violation of an U.S., international or other anti-money laundering laws, rules, regulations, treaties or other restrictions, or on behalf of any suspected terrorist or terrorist organization, suspected drug trafficker, or senior foreign political figure(s) suspected in engaging in foreign corruptions, the Fund, Manager, Investment Advisor, Administrator or such governmental agency may freeze the assets of such person or entity invested in the Fund or suspend their redemption rights. The Fund may also be required to remit or transfer those assets to a governmental agency.

## Compliance with ERISA Transfer Restrictions

The Board intends to use commercially reasonable efforts to cause employee benefit plans subject to ERISA and/or Section 4975 of the Code and other "benefit plan investors," as defined in the Plan Asset Regulation, in the aggregate to hold less than 25% of the Shares in the Fund and of any class of shares in the Fund. The Board shall use commercially reasonable efforts to restrict transfers of any interest in the Fund so that ownership of the Fund by benefit plan investors will remain below the 25% threshold contained in the Plan Asset Regulation. In this event, although there can be no assurance that such will be the case, the assets of the Fund should not constitute "plan assets" for purposes of ERISA and Section 4975 of the Code.

If the assets of the Fund were to become "plan assets" subject to ERISA and Section 4975 of the Code, certain investments made or to be made by the Fund in the normal course of its operations might result in non-exempt prohibited transactions and might have to be rescinded (see "EMPLOYEE BENEFIT CONSIDERATIONS"). If at any time the Board determines that assets of the Fund may be deemed to be "plan assets" subject to ERISA and Section 4975 of the Code, the Board may take certain actions it may determine necessary or appropriate, including requiring one or more investors to redeem or otherwise dispose of all or part of their Shares in the Fund or terminating and liquidating the Fund. See "CERTAIN ERISA CONSIDERATIONS."

# MANAGEMENT

## The Fund's Board of Directors

The Fund has three (3) Directors, each of whom serves in accordance with the laws of the British Virgin Islands and in accordance with the Fund's Memorandum and Articles of Association.  The Directors are:

**Mr. Graham H. Cook** is the Managing Director of TMF (BVI) Ltd., part of the TMF Group, an international organization providing trust, management and accounting services, financial services and fund administration services. Mr. Cook has worked in private practice as a solicitor in England and since 1981 has pursued a career in providing management and trust services. He has been a director of trust and management companies in the British Virgin Islands, Curacao, Gibraltar and latterly in London with TMF Management  (UK) Ltd. In 2002 he became a Director of TMF (BVI) Limited and Bison Financial Services Limited. He also has work experience in South Africa and Brazil. Mr. Cook is an Honors Law graduate from the University of Birmingham, England, completed his post graduate studies at the College of Law with a distinction, and was admitted as a Solicitor of the Supreme Court of England and Wales in 1973. Mr. Cook resides in the British Virgin Islands.

**Mr. John E. Epps,** FCA, CA, is Director, President and CEO of Consolidated Management Limited, a financial management company that he established in Bermuda in 1981, specialising in the shipping and investment industry. Prior to setting up his own company, Mr. Epps was employed in the treasury department of a major shipping company listed on the London Stock Exchange and based in Bermuda. He is active in the property, oil trading and investment markets and is a board member of numerous companies. He is currently a Trustee to a number of high profile Foundations and has served as a director of a major marine insurance company. He is a qualified chartered accountant, a Fellow of the Institute of Chartered Accountants in England and Wales as well as being a member of the Canadian and Bermuda Institutes of Chartered Accountants. Mr. Epps has been a resident of Bermuda since 1963.

**Mr. Christopher Wetherhill**  Mr. Wetherhill, F.C.A., C.A., formerly the President and Chief Executive Officer of MRM Financial Services Ltd., which is the holding company of Hemisphere Management Limited and MRM Securities Ltd., now acts as an advisor to the company.  He is President of Kingate Management Limited and is a Director of a number of offshore funds.  Mr. Wetherhill is a Chartered Accountant, a Fellow of the Institute of Chartered Accountants in England and Wales, a member of the Bermudian and Canadian Institutes of Chartered Accountants and a Freeman of the City of London.  Mr. Wetherhill is a resident of Bermuda.

In the future, other or additional Directors may be appointed by the Fund.

The Board of Directors meet periodically to assist the Manager in reviewing the investment and administrative affairs of the Fund.  The Fund's Memorandum and Articles of Association provide that the Directors shall not be liable to the Fund for any acts or omissions in the performance of their duties if such person acted honestly and in good faith with a view to the best interests of the Fund and in the case of criminal proceedings, such person had no cause to believe that his conduct was unlawful, and contains certain provisions for the indemnification of the Directors by the Fund, to the extent permitted by law, against liabilities to third parties arising in connection with the performance of their services.  The Directors may from time to time own Shares or dispose of Shares owned, in each case without notice to the Shareholders.

_____*Kingate Euro Fund, Ltd.* _____

**The Manager**

Kingate Management Limited has been appointed as the Manager of the Fund's capital (the "Manager").  The Manager was duly incorporated under the laws of Bermuda.  The directors of the Manager are:

**Mr. Christopher Wetherhill** - See "MANAGEMENT - The Board of Directors" herein for biographical details.

**Michael G. Tannenbaum, Esq.** – Partner, Tannenbaum Helpern Syracuse & Hirschtritt LLP, where he heads the Firm's Financial Services and Capital Markets Group which concentrates in structuring collective investments (hedge funds and the like) and capital financing arrangements both on-shore and offshore the U.S.  He is the author of numerous articles relating to industry matters.  Mr. Tannenbaum is a past president of the Hedge Fund Association, an industry association, and is listed in *An International Who's Who of Private Fund Lawyers.*

**Phillip A. Evans** - Trust Manager (Partner) at Moore Stephens Services SAM located in Monaco.  Mr. Evans joined in March 1993 to establish and manage a new trust management department and is responsible for designing and implementing systems and controls, client contact, and marketing worldwide.  During January 1990-February 1993, Mr. Evans served as Trust Officer at Georgam SAM located in Monaco, responsible for a large and varied number of Trusts and associated underlying companies.  During February 1988-December 1989, Mr. Evans served as Senior Trust Administrator at Barclays Bank Trust Company located in Reading, England.

**Ms. Shazieh Salahuddin** – A senior employee of the FIM group of companies, for whom she has worked since 1996 in a variety of roles including fund administration, operations, clients relations and marketing. She has been a director of the Manager since June 2008. Ms. Salahuddin holds an honors degree from Kingston University, England.

In the future, other and additional directors of the Manager may be elected.

The Manager performs services pursuant to the Manager Agreement.  Pursuant to the terms of the Manager Agreement, the Manager has agreed (i) to manage all aspects of the investment advisory services provided to the Fund, including the selection and evaluation of the Investment Advisor and (ii) to arrange for the performance of all accounting and administrative services which may be required by the Fund's operations and (iii) make the decisions with regard to the Hedging Transactions utilizing the recommendation of the Consultant.  The Manager Agreement authorizes the Manager to delegate responsibilities to others, subject to retaining certain responsibilities for evaluating and coordinating the services offered by others.  The Manager is also permitted to manage directly the investment of a portion of the investment portfolio of the Fund and may do so from time to time as conditions warrant.

The Manager supervises distribution of the Shares.  The Manager may appoint other securities dealers or other financial institutions as authorized dealers for the Shares.  Such other, non-affiliated, authorized dealers may receive sales commissions either directly from the Fund (but payable only out of an investor's gross subscription proceeds before investment in Shares and only to the extent of the permitted five percent (5%) subscription charge as described herein) or from the Manager.  The initial term of the Manager Agreement was to expire on December 31, 2001 but was automatically renewed thereafter for successive one-year periods, subject to termination by either party as of the end of any

calendar month upon not less than one year's prior written notice or otherwise in accordance with the terms of the Manager Agreement.

The Manager Agreement provides that the Manager shall not be liable to the Fund or its Shareholders for any error of judgment or for any loss suffered by the Fund or its Shareholders in connection with its services in the absence of negligence, willful default, fraud, or dishonesty in the performance or non-performance of its obligations or duties. The Manager Agreement contains provisions for the indemnification of the Manager by the Fund against liabilities to third parties arising in connection with the performance of its services, except under certain circumstances. The Manager Agreement also contains provisions for the indemnification of the Fund by the Manager in certain circumstances.

See "FEES AND EXPENSES" herein for a general description of the fees payable to the Manager.

**The Investment Advisor**

The Fund's assets are managed by a New York based NASD registered broker-dealer employing approximately 350 people and acting primarily as a market-maker in listed and unlisted stocks and convertible securities (the "Investment Advisor"). The Manager has established a discretionary account with such Investment Advisor on behalf of the Fund for the management of the assets. The Investment Advisor utilizes a "split strike conversion" strategy consistent with the strategy of the Fund, as set forth under "THE FUND - The Fund's Investment Objective and Investment Process." All investment decisions in the account held with the Investment Advisor are effected by person associated with the Investment Advisor. The Investment Advisor has managed the assets of the Fund since its inception and it is anticipated that the retention of such Investment Advisor will continue.

See "FEES AND EXPENSES" herein for a general description of the fees payable to the Investment Advisor.

**The Consultant**

The Manager has appointed FIM Advisers LLP ("FIM") as its consultant in relation to certain aspects of the Fund's operations (the "Consultant").

The Consultant was incorporated on October 8, 2004 as a limited liability partnership under English Law. On August 1, 2005, the Consultant took over the business of its affiliate, FIM Limited, an asset management company with over twenty years of experience. The Consultant is a leading alternative investment management company, specialising in the creation and management of portfolios of hedge funds for institutions and private clients on a global basis. The Consultant is authorised and regulated by the Financial Services Authority ("FSA") of the United Kingdom. As at the date of this document, the Consultant acts as discretionary investment manager, or as Investment/Fund Advisor, in respect of funds totaling in excess of US$ 7.3 billion.

In addition to its role as Consultant to the Fund, the Consultant acts as investment and/or fund advisor to several other investment management companies that manage a variety of funds of funds and single-manager funds.

The founder members of the Consultant are:

_____ *Kingate Euro Fund, Ltd.* _____

15

**Mr. Carlo Grosso** - Carlo Grosso is a Founder Member and the Chief Investment Officer of FIM Advisers LLP.  Mr. Grosso founded FIM Limited in 1981 and serves as Executive Chairmen of FIM Limited. His previous experience includes: executive director of Euromobiliare Limited (1979-1980), president and general manager of Tucker Anthony S.A. (1974-1979), account executive at White, Weld & Co., Inc. (1972-1974) and securities analyst and foreign department manager at Tucker, Anthony & R.L. Day, Inc. (1969-1972). Mr. Grosso holds a Degree in Law from the University of Milano (Italy).

**Mr. Federico M. Ceretti** - Federico Ceretti is a Founder Member of FIM Advisers LLP.  Mr. Ceretti joined FIM Limited in 1986, and is the Chief Executive Officer of FIM Limited, London.  Prior to joining FIM Limited, he worked in various positions with Merrill Lynch Pierce Fenner and Smith in London. Mr. Ceretti holds a Degree in Business Administration from the University of Pavia (Italy).

Pursuant to the FIM Consulting Services Agreement, the Consultant renders consulting advice to the Manager with respect to certain aspects of the Fund's operational, administrative, marketing, accounting and legal matters.

The FIM Consulting Services Agreement is dated August 1, 2005, and will be automatically renewed thereafter for successive one-year periods, subject to termination by either party at the end of the current or subsequent term upon not less that thirty (30) days' prior written notice.  The FIM Consulting Services Agreement provides that FIM shall not be liable to the Manager, the Fund or its Shareholders for any acts or omissions in the performance of its services in the absence of negligence, willful default, fraud or dishonesty in the performance or non-performance of its obligations or duties.  The FIM Consulting Services Agreement contains provisions for the indemnification of FIM by the Manager and the Fund against liabilities to third parties arising in connection with the performance of its services, except under circumstances.

**The Administrator**

Citi Hedge Fund Services, Ltd. (formerly BISYS Hedge Fund Services, Limited located in Bermuda, has been appointed as the Fund's Administrator (the "Administrator").

Pursuant to the Administration Agreement, as amended and restated effective June 1, 2007, and the Registrar Agreement, as amended and restated effective January 1, 2002, the Administrator is responsible for all matters pertaining to the administration of the Fund, including, without limitation, (i) communicating with the Fund's Shareholders; (ii) communicating with the general public; (iii) soliciting sales of the Fund's stock; (iv) accepting the subscriptions of new Shareholders; (v) maintaining the Fund's principal corporate records and books of account; (vi) disbursing payments of dividends, legal fees, accounting fees, and officers' and directors' salaries; (vii) calculating, publishing or furnishing the subscription or redemption price of the Shares; (viii) conducting meetings of the Fund's Shareholders and Directors; and (ix) making redemptions of the Shares.  The Administrator will also provide the services of an individual to act as the secretary of the Fund.

Both the Administration Agreement and the Registrar Agreement shall continue and remain in force and effect unless and until terminated by either party upon not less than three (3) months' notice or a shorter time period under certain circumstances.  The Administration Agreement provides that the Administrator shall not be liable to the Manager, the Fund or its Shareholders in the absence of negligence, willful default, fraud or dishonesty in the performance or non-performance of its obligations or duties.  The Administration Agreement and the Registrar Agreement contain provisions for the indemnification of the Administrator by the Fund against liabilities to third parties arising in connection with the performance of its services, except under certain circumstances.

_____*Kingate Euro Fund, Ltd.* _____

16

See "FEES AND EXPENSES" herein for a description of the fees payable to the Administrator pursuant to the Administration Agreement and the Registrar Agreement.

**Banking and Custody**

*Banking.* The Bank of Bermuda Limited, located in Hamilton, Bermuda (the "Bank"), has been appointed as the Fund's banker for purposes of receiving subscription funds, disbursing redemption payments and processing cash transactions not directly related to the Fund's portfolio. See "CERTAIN RISK FACTORS."

*Custody.* Neither the Bank nor the Manager has custody of any of the Fund's assets nor do they presently propose to perform any such services for the Fund. Actual custody of the Funds' assets will be maintained by the Investment Advisor or its affiliated broker dealer. See "CERTAIN RISK FACTORS."

**Voting Rights of Shareholders**

Each Shareholder is entitled to one vote for each Share held on any matter affecting Shareholders presented to a meeting of Shareholders in accordance with the Fund's Memorandum and Articles of Association. General meetings of the Fund's Shareholders will be held annually to approve the selection of auditors and to attend to such other business as may properly be placed before a meeting. Shareholders will receive at least thirty (30) days' notice of any Shareholders' meeting (or ten (10) days' notice, if the Board of Directors determines that prompt Shareholder action is advisable) and will be entitled to vote their Shares either personally or by proxy. If the proxy sent with the notice of meeting is not completed and returned prior to the meeting and the Shareholder does not appear personally at such meeting, such Shares will be voted in the discretion of the proxy and the attorney-in-fact designated in the Subscription Agreement executed by such Shareholder.

---

## FEES AND EXPENSES

---

**Organization Costs**

All costs and expenses associated with the organization of the Fund, including government incorporation charges and professional fees and expenses in connection with the preparation and restatement of the Fund's offering documents and the preparation of its basic corporate and contract documents, have been paid out of the Fund's assets. The amount remaining to be amortized is not considered material.

**Fees of the Manager**

The Manager receives a monthly fee from the Fund calculated at an annual rate equal to approximately one and one-half percent (1.5%) of the month-end Net Asset Value of the Fund attributable to the Shares (the "Management Fee"). The Management Fee is generally payable as of the last Business Day of each month. The Manager may, in its sole discretion, waive all or part of the

Management Fee otherwise due with respect to any Shareholder's investment, by rebate or otherwise or pay all or part of the Management Fee to placement agents under separate agreements.

The Manager also receives a monthly administration fee from the Fund calculated at an annual rate equal to ten basis point (.10%) of the Fund's month-end Net Asset Value (the "Manager Administration Fee").

**Fees of the Investment Advisor**

The Fund bears all direct and indirect costs associated with the investment advisory services of the Investment Advisor.  The Investment Advisor's compensation is derived from the market making activities of its affiliated broker-dealer and bid-ask spreads.

**Fees of the Consultant**

The Consultant is paid by the Manager for its services at no additional cost to the Fund.

**Fees of the Administrator**

For its administrative duties relating to the Shares, the Administrator receives customary fees paid out of the Fund assets based upon the nature and extent of the services performed by the Administrator for the Fund. The Administrator will also be reimbursed for all out-of-pocket expenses. The compensation provisions of the Administration Agreement may be revised in the future.

**Other Operating Expenses**

The Manager and the Administrator are responsible for providing all office personnel, space and facilities required for the performance of their respective services.  The Fund bears all other expenses incident to its operations and business, including brokerage commissions, the expenses and risks of hedging; appraisers, pricing services, printing costs, the fees of its auditors and legal advisors; custody charges; interest and commitment fees on loans and debt balances; any income, withholding or other taxes; and the costs of communications with Shareholders, prospective investors and the Investment Advisor. In addition, the Fund pays for any expenses incurred in connection with listing the Shares on the Irish Stock Exchange, or any other suitable exchange, if such listing is deemed desirable in the sole discretion of the Directors.

Each Director of the Fund who is not an officer or employee of the Manager or the Administrator receives an annual fee in accordance with reasonable practice.   All Directors receive reimbursement for travel and other costs incurred in connection with their services.

Fees and expenses that are directly identifiable with a particular class of shares of the Fund are charged against that class.  Other fees and expenses will be charged to the Fund as a whole or otherwise in the discretion of the Board and allocated among the outstanding classes in a commercially reasonable manner in the Board's discretion.

---

## SUBSCRIPTIONS AND REDEMPTIONS

---

### Subscriptions

*Generally.* The Shares may be purchased as of the first Business Day (as defined herein) of the month (herein the "Subscription Date") at a price equal to the Net Asset Value per Share as of the last Business Day of the immediately preceding calendar month (the "Valuation Date"), plus any applicable subscription charges. "Business Day" refers to any day when the central banking systems in New York London and Bermuda are open and operating. As of December 31, 2007, the audited Net Asset Value per Share was Euro €164.37. The Fund may (i) discontinue the offering of Shares at any time or (ii) permit subscriptions on other than the first Business day of a month at the then Net Asset Value of the Shares. The minimum initial subscription from each investor is Euro €250,000 and each minimum additional subscription is Euro €100,000. Such minimums may be waived by the Fund.

*Procedure.* Subscriptions are generally payable in Euros. The acceptance of subscriptions as of the commencement of each month is subject to (i) receipt by the Administrator of completed Subscription Forms three (3) Business Days prior to the Subscription Date of the month in which prospective investors wish to subscribe for Share and (ii) confirmation of the receipt of cleared funds by the Bank at the latest three (3) Business Days prior to the Subscription Date. The Fund reserves the right to accept or reject subscriptions in its absolute discretion. Details of the Subscription procedure are set forth at page S-1 of the Subscription Forms attached hereto. As part of the Administrator's and the Fund's responsibility for protection against money laundering, the Administrator may require a detailed verification of the identity of a person or entity applying for Shares.

*Subscription Charge.* A subscription charge of up to five percent (5%) of the total Euro amount subscribed will be charged on subscription of the Shares, but such charge may be waived in whole or in part at the sole discretion of the Manager. The subscription charge, if any, will be retained by the Manager. The Manager may grant all or part of such charge to dealers and independent third parties in connection with the solicitation of subscriptions. The subscription charge will be deducted from the subscriber's payment for purposes of determining the net amount available for investment in Shares.

*Certain Special Arrangements.* Fractional Shares will not be issued and refunds of subscription funds will be made only if the surplus amount (corresponding to non-issued fractional Shares) is in excess of Euro €200.

*Registration and Transfer.* Shares will be issued only in registered form; the Fund does not issue bearer shares. The Administrator maintains a current register of the names and addresses of the Fund's Shareholders. Certificates representing Shares will be issued, without charge, only if requested by a Shareholder. Certificates will be mailed or delivered to the Shareholder at the Shareholder's risk. Because certificates must be returned to the Administrator prior to the processing of redemption requests, the Fund discourages Shareholders from requesting certificates.

Transfers of Shares are permitted only with the prior consent of the Fund which may be withheld for any reason or for no reason. Proposed transferees are required to furnish the same information which would be required in connection with a direct subscription in order for a transfer application to be considered by the Fund. Violation of applicable ownership and transfer restrictions may result in a compulsory redemption.

_____*Kingate Euro Fund, Ltd.* _____

*Listing.*  The Shares are not listed on any securities exchange, and it is not anticipated that there will be any secondary market for trading in the Shares.  Notwithstanding the foregoing, the Fund reserves the right to list the Shares on The Irish Stock Exchange if, in its discretion, it deems the same desirable.

*Shortened Period Within Which to Make Claims.*  By executing a subscription agreement for Shares, each investor in the Fund shall be deemed to have waived, to the maximum extent permissible under law, the right to bring any legal claim, action or other proceeding against the Fund, the Manager or the Consultant unless such claim, action or proceeding is commenced within six (6) months from the date of  the first to occur of (i) the original occurrence allegedly giving rise to such claim, action or proceeding or (ii) the Shareholder's redemption of any Shares.  See "CERTAIN RISK FACTORS."

**Anti Money Laundering**

To ensure compliance with all relevant rules and regulations designed to avoid money laundering, the Administrator will require a detailed verification of the identity of any applicant subscribing for Shares.  Each applicant must undertake to provide verification of identity upon request from, and to the satisfaction of, the Administrator.  Depending on the circumstances of each application, a detailed verification may not be required if the investor is an authorized financial institution.  A detailed verification might not be required when:

(a)     the applicant makes payment by wire transfer from an account held in the applicant's name at a recognized financial institution residing in a recognized jurisdiction, as defined by applicable laws, and the applicant's details (name and account number) appear in the confirmation of the wire transfer; or

(b)     the application is made through a recognized intermediary.

This exception will only apply if the financial institution referred to above is within a country or territory which is a member of the Financial Action Task Force ("FATF") or Caribbean Financial Action Task Force ("CFATF") and has anti-money laundering procedures that are at least equivalent to those in the British Virgin Islands.  The following countries are deemed to have anti-money laundering procedures at least equivalent to those in the British Virgin Islands: Aruba, Australia, Bahamas, Barbados, Bermuda, Belgium, Canada, Cayman Islands, Denmark, Finland, France, Germany, Gibraltar, Greece, Guernsey, Hong Kong, Iceland, Ireland, Isle of Man, Italy, Japan, Jersey, Luxembourg, Netherlands & Netherlands Antilles, New Zealand, Norway, Portugal, Singapore, Spain, Sweden, Switzerland, United Kingdom and United States of America.

An individual may be required to produce a copy of a passport or identification card certified by a notary public.  In the case of corporate applicants, they may be required to produce a certified copy of the certificate of incorporation (and change of name), memorandum and articles of association (or equivalent), and the names, occupations, dates of birth, and residential and business addresses of all directors.

The Administrator reserves the right to request such information as it deems necessary to verify the identity of an applicant and the applicant will be expected to make the representation set forth in the Subscription Agreement.  To ensure compliance with statutory and other requirements relating to anti-money laundering, the Administrator may require verification of identity from any person submitting a completed Subscription Agreement.  Pending the provision of evidence satisfactory to the Administrator as to identity, the evidence of title in respect of the Shares may be retained at the absolute discretion of

_____*Kingate Euro Fund, Ltd.* _____

the Administrator.  If within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event subscription monies will be returned without interest to the account from which such monies were originally debited, refuse to process a redemption request, or otherwise proceed in accordance with applicable laws.  Subscription monies may be rejected by the Administrator if the remitting bank or financial institution is unknown to the Administrator.

**Eligible Investors**

Investment in the Fund is not available to Restricted Persons (as defined herein), unless the Fund determines otherwise in limited cases.  The term "Restricted Person" as used in this Memorandum means any U.S. Person[*] and other persons from time to time designated as such by the Fund.  Each prospective investor is required to certify that the Shares are not being acquired directly or indirectly for the account or benefit of a Restricted Person.

Any prospective investor acting in any fiduciary capacity is required to certify the number of beneficial owners for whom Shares are being purchased.  Furthermore, it is the responsibility of each investor to verify that the purchase and payment for the Shares is in compliance with all relevant laws of the investor's jurisdiction or residence.

The Fund reserves the right to offer Shares to Restricted Persons upon compliance with applicable rules and regulations.  For example, the Fund may admit a number of U.S. tax-exempt entities such as, without limitation, employee benefit plans, charitable organizations, foundations, endowments and the like upon meeting certain eligibility standards such as being an "accredited investor" within the meaning of the U.S. Securities Act.  Such investors should request a U.S. Supplemental Disclosure Statement from the Administrator and comply with the instructions for U.S. subscribers as set forth therein.  In any event, the Fund reserves the right to reject subscriptions for Shares, in whole or in part, in its absolute discretion for any reason or for no reason.

The Fund is not a recognised collective investment scheme for the purposes of the Financial Services and Markets Act 2000 of the United Kingdom (the "Act") and the information contained in this

---

[*]  For the purposes of this Memorandum, "U.S. Person" means:  (a) any natural person resident in the United States; (b) any partnership or corporation organized or incorporated under the laws of the United States; (c) any estate of which any executor or administrator is a U.S. Person; (d) any trust of which any trustee is a U.S. Person; (e) any agency or branch of a foreign entity located in the United States; (f) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. Person; (g) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or, if an individual, resident in the United States; or (h) any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a U.S. Person principally for the purpose of investing in securities not registered under the United States Securities Act of 1933, as amended (the "Securities Act"), unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts.  "U.S. Person" does not include: (a) any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. Person by a dealer or other professional fiduciary organized, incorporated or, if an individual, resident in the United States; (b) any estate of which any professional fiduciary acting as executor or administrator is a U.S. Person if (i) an executor or administrator of the estate who is not a U.S. Person has sole or shared investment discretion with respect to the assets of the estate and (ii) the estate is governed by foreign law; (c) any trust of which any professional fiduciary acting as trustee is a U.S. Person if a trustee who is not a U.S. Person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. Person; (d) an employee benefit plan established and administered in accordance with the law of a country other than the United States and customary practices and documentation of such country; (e) any agency or branch of a U.S. Person located outside the United States if (i) the agency or branch operates for valid business reasons and (ii) the agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located; or (f) the International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations and their agencies, affiliates and pension plans.

*Kingate Euro Fund, Ltd.*

Memorandum has not been approved for the purposes of Section 21(2) of the Act by a person authorised under the Act. The promotion of the Fund and this Memorandum in the United Kingdom are therefore prohibited by law. This Memorandum is being issued in the United Kingdom by the Fund (where permitted by applicable law and regulation) to persons who are of a kind to whom the Fund may lawfully be promoted by a person authorised under the Act by virtue of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes (Exemptions) Order 2001) and Chapter 4.12 of the FSA's Conduct of Business Sourcebook or as otherwise permitted by applicable law and regulation. The Fund is not regulated by the Financial Services Authority, and investors may do not have the benefit of the Financial Services Compensation Scheme and other protections afforded by the Act or any of the rules and regulations made thereunder.

**Redemptions**

Shares are redeemable at the option of the Shareholder on the terms and conditions provided herein.

*Generally.* Shares are eligible for redemption as of the last Business Day of each calendar month (the "Redemption Date"), upon not less than thirty-five (35) days' prior written notice to the Administrator. The net redemption proceeds normally will be settled within thirty (30) days after the redemption date, without interest. In circumstances where the Fund is unable to liquidate securities positions in an orderly manner so as to fund redemptions or where the value of the assets of the Fund cannot reasonably be determined, the Fund may take longer than thirty (30) days to effect settlement of redemptions. The notice requirement may be waived by the Fund in its discretion. Redemption forms are available on request to the Administrator. A redemption request is irrevocable unless the Fund consents to its withdrawal. The Manager may elect to purchase or to procure the purchase of Shares offered for redemption at a price equal to their Net Asset Value rather than requiring the Fund to redeem them.

*Redemption Price.* The redemption price is equal to the Net Asset Value of the Shares as of the Redemption Date, plus any applicable redemption charge as described below. See "DETERMINATION OF NET ASSET VALUE".

*Settlement.* Redemptions will be generally settled in Euros, although the Fund may, in its discretion, settle redemptions in kind to the extent of such redeeming Shareholder's pro-rata share of non-illiquid, direct investments. Cash settlements will be remitted either by wire transfer to an account designated by the Shareholder or by check posted at the Shareholder's risk (as specified by the Shareholder in his written redemption notice). If Shares are held in certificate form, the redemption payment will not be remitted until the certificates have been tendered to the Administrator, and no interest will accrue on the redemption proceeds pending the settlement date. The Fund may withhold a portion of any proceeds of redemption if necessary to comply with applicable regulatory requirements.

Redemption requests may be submitted by fax to the Administrator at (+1-441) 296-8227, Attn.: Shareholder Services Unit, provided that: (i) the original Redemption Request (attached hereto) is received by the Administrator prior to the Redemption Date and (ii) the Shareholder receives written confirmation that the faxed Redemption Request has been received.

The Administrator will confirm in writing within five (5) Business Days of receipt of all faxed Redemption Request(s) which are received in good order. Shareholders failing to receive such written confirmation from the Administrator within five (5) Business Days should contact the Shareholder

_____*Kingate Euro Fund, Ltd.*_____

Services Unit at the Administrator at (+1-441) 295-9166 to obtain the same.  Failure to obtain such written confirmation will render faxed instructions void.

Requests for redemption received after 5:00 p.m. (Bermuda time) on the last day of the redemption notice will be treated as a request for redemption as of the next Redemption Date. Redemption payments will be made in Euros, unless made in kind, and will be remitted either by wire transfer to an account designated by the Shareholder at the bank from which the subscription price was paid or by check posted at the Shareholder's risk (as specified by the Shareholder in its written redemption notice).  In circumstances where the Fund is unable to liquidate securities positions in an orderly manner in order to fund redemptions, or where the value of the assets and liabilities of the Fund cannot reasonably be determined, the Fund may take longer than the time periods mentioned above to effect settlements of redemptions or may even suspend redemptions.  Under extraordinary circumstances, in the discretion of the Directors, the Fund may settle redemptions in kind and may extend the duration of the redemption notice period beyond a full quarter if the Directors deem such an extension as being in the best interest of the Fund and the non-redeeming Shareholders.  Certain risks exist with regard to redemption requests made but not yet settled.  See "CERTAIN RISK FACTORS."

*Compulsory Redemptions*.  The Fund and the Manager each, independently, have the right to require the compulsory redemption of all Shares held by a Shareholder for any reason or for no reason. Compulsory redemptions will be made at the current Net Asset Value of the Shares (plus any applicable redemption charge) as of the last Business Day of the month in which such notice of redemption is issued to the  Shareholder.

*Redemption Charge*.  Generally, no redemption charge is imposed.  However, a redemption charge not to exceed one percent (1.0%) of the proceeds (waivable in whole or in part at the sole discretion of the Manager in exceptional circumstances) may be imposed on the redemption of Shares which are held for less than twelve (12) months from the Subscription Date.

*Temporary Suspension of Dealings and Determination of Net Asset Value*.  The Fund's Directors may declare a temporary suspension of the determination of the Fund's Net Asset Value and the sale, allotment, issue or redemption of the Shares during:  (i) any period during which, in the opinion of the Board, disposal by the Fund of securities which constitute a substantial portion of the assets of the Fund is not practically feasible or as a result of which any such disposal would be materially prejudicial to Shareholders;  (ii) any period when, in the opinion of the Board, for any reason it is not possible to transfer monies involved in the acquisition or disposition or realization of securities which constitute a substantial portion of the assets of the Fund at normal rates of exchange;  (iii) any period when, in the opinion of the Board, for any reason the prices of any securities which constitute a substantial portion of the assets of the Fund cannot be reasonably, promptly or accurately ascertained;  (iv) any period (other than customary holiday or weekend closings) when any recognized exchange or market on which the Fund's securities are normally dealt in or traded is closed, or during which trading thereon is restricted or suspended; or (v) any period when proceeds of any sale or redemption of the Shares cannot be transmitted to or from the Fund's account.  The Fund may withhold payment to any person whose Shares have been tendered for redemption until after any suspension has been lifted.

## DETERMINATION OF NET ASSET VALUE

The net asset value of the Shares is equal to the market value of the Fund's total assets calculated as described below, less all accrued debts and liabilities, including (i) fees of the Manager and the Administrator earned or accrued but not yet paid, (ii) monthly amortization of organization costs, (iii) an allowance for the Fund's estimated annual audit and legal fees, (iv) any contingencies for which reserves are determined to be required, (v) any other costs attributable to the Shares (the "Net Asset Value"). Net Asset Value of the Shares is expressed in Euros, and any items denominated in other currencies are translated at prevailing exchange rates as determined by the Administrator.

The Administrator will determine the Net Asset Value of the Fund's portfolio assets attributable to the Shares as of the close of business on the last Business Day of each calendar month. See "CERTAIN RISK FACTORS." The Administrator will verify the prices attributed to the securities held by the Shares of the Fund by reference to pricing sources independent of the Investment Advisor whenever reasonably possible.

The Fund's total assets include (i) all cash and cash equivalent, including bank deposits and interest bearing obligations, (ii) all securities positions, (iii) all options positions, and (iv) all forward currency contracts.

Cash and cash equivalents, including bank deposits and interest bearing obligations, are valued at cost plus accrued interest and discount.

Securities are valued at the last sale price reported on the principal securities exchange or market on which the securities are traded. In the absence of reported sales prices on the valuation date, securities generally are valued at the last reported bid quotation.

Options positions are valued at the last sale price reported on the principal securities exchange or market on which the securities are traded. In the absence of reported sales prices on the valuation date, options generally are valued at the last reported bid quotation for "long" options and the latest reported offer quotation for "short" options.

The forward currency contracts are valued at the prevailing market forward rates as of the last day of the month.

The value of assets are recorded at their fair value as determined in good faith by the Administrator in the absence of current quotations or if the Administrator concludes that such quotations are not indicative of fair value by reason of illiquidity of a particular security or other factors. In special circumstances in which the Administrator determines that market prices or quotations do not fairly represent the value of particular assets, the Administrator is authorized to assign a value to such assets which differs from the market prices or quotations. The cost of appraisers or pricing services employed by the Fund is an expense of the Fund and as such a charge against Net Asset Value of the Shares.

Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's net assets if judgments regarding appropriate valuations made by the Administrator should prove incorrect. See "CERTAIN RISK

FACTORS." In the absence of bad faith or manifest error, the Net Asset Value calculations of the Shares made by the Administrator are conclusive and binding on all Shareholders.

The Net Asset Value per Share is equal to the Net Asset Value attributable to the Shares divided by the number of outstanding Shares on the relevant valuation date.

---

## POTENTIAL CONFLICTS OF INTEREST

---

The Manager, the Investment Advisor, the Administrator, the Consultant and their respective affiliates, which shall be deemed to include, in each case, their respective officers, directors, employees and entities owned by any of the aforementioned parties (the "Related Parties") may face certain conflicts of interests in relation to the Fund. These conflicts include, but are not limited to, the following:

The Manager and each of its directors presently and may in the future, directly or indirectly, direct, sponsor or manage other managed pools or accounts in addition to the Fund and may have financial or other incentives to favor some such pools or accounts over the Fund. The Manager's decisions with regard to the Fund may differ from those recommended for other arrangements for which the Manager exercises discretion.

The Investment Advisor is presently affiliated and manages investment programs for other investment entities with substantially the same or different objectives of the Fund. Additionally, the Investment Advisor, in its role as a market-maker, trades with the Fund as a principal and no arms' length relationship exists between the Fund and the Investment Advisor.

Some or all of the Related Parties may be involved with other entities utilizing investment strategies similar to those of the Fund and with other business in general. Execution of the strategy might not yield the same results in all cases. The Investment Advisor may cause the Fund to invest in securities in which some or all of the Related Parties have a financial interest, or to engage in transactions with brokers or others with whom some or all of the Related Parties have financial or other relationships, as by way of example, the use, in this case, of an affiliated broker dealer by the Investment Advisor. In such case, there is no assurance that the usual level of oversight or the degree of competition leading towards lower fees and commissions that might have resulted had the broker dealer been independent of the Investment Adviser would not be lost.

The Related Parties may engage for their own accounts, or for the accounts of others, in other business ventures of any nature, and the Fund has no right to participate in or benefit from such other management activities. Related Parties are not obliged to account to the Fund for any profits or benefits made or derived therefrom, nor do they have any obligation to disclose or refer any of the investment or service opportunities obtained through such activities to the Fund. Related Parties may own and sell Shares in the Fund, deal as principals with the Fund or Shareholders in the sale or purchase of investments of the Fund (or Shares) or act as brokers, whether to the Fund or to third parties, in the purchase or sale of the Fund's investments (or Shares) and entitled to retain any profits or customary commissions resulting from such dealings.

One or more directors of the Manager may also be a director of the Fund or otherwise provide services to the Fund, either directly or indirectly, in which event the likelihood of independence in dealing with issues facing the Fund is diminished. For example, Michael G. Tannenbaum, an outside Director of

the Manager, is a senior partner of the law firm that renders advice to the Fund as well as to both the Manager and the Consultant.  See "ADDITIONAL INFORMATION – Counsel"

---

## TAXATION

---

### Introduction

This summary of the principal tax consequences applicable to the Fund and its Shareholders is based upon advice received from the Fund's U.S. and British Virgin Islands legal and tax advisers.  Such advice is based upon factual representations made by the Manager, the Consultant and Administrator concerning the proposed conduct of the activities to be carried out by the Fund and by them on behalf of the Fund.  The conclusions summarized herein could be adversely affected if any of the material factual representations on which they are based should prove to be inaccurate.  Moreover, while this summary is considered to be a correct interpretation of existing laws in force on the date of this Memorandum, no assurance can be given that courts or fiscal authorities responsible for the administration of such laws will agree with such interpretations or that changes in such laws will not occur. Investors should consult their professional advisors on the possible tax consequences of their subscribing for, purchasing, holding, selling or redeeming Shares under the laws of their countries of citizenship, residence, ordinary residence or domicile.

THIS SUMMARY IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES.  THIS SUMMARY WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND ANY TAXPAYER TO WHOM THE TRANSACTIONS OR MATTERS ARE BEING PROMOTED, MARKETED OR RECOMMENDED SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### The Fund

*British Virgin Islands Taxation.* The Fund should not be subject to any taxation or other governmental charges or fees in the British Virgin Islands other than an annual license fee payable to the Registrar of Companies (currently U.S.$1,150.00) and an annual license fee payable to the Registrar of Mutual Funds (currently U.S.$350).  Under current British Virgin Island law, no income tax should be imposed on the Fund or on investors in the Fund who are not domiciled or resident in the British Virgin Islands.  There are no withholding, capital gains, estate or inheritance taxes in the British Virgin Islands.

*United States Federal Income Taxation.*  The Fund has been advised that it should not be subject to U.S. Federal income taxes on income or gains from its trading (except in respect of any dividends received in the course of such trading) provided that it does not engage in a trade or business within the U.S. to which such income or gains are effectively connected.  Pursuant to a safe harbor under the United States Internal Revenue Code of 1986, as amended, a non-U.S. corporation which trades stock or securities or commodities for its own account should not be treated as engaged in a trade or business within the U.S. provided that the non-U.S. corporation is not a dealer in stock or securities or commodities.  The Fund intends to conduct its business in a manner so as to meet the requirements of this safe harbor.  If the activities of the Fund are not covered by the foregoing safe harbor, there is a risk that the Fund (but not any investor) will be required to file a U.S. federal income tax return for such year and

pay tax at full U.S. corporate income tax rates as well as an additional thirty percent (30%) branch profits tax or other taxes on its income.

The Fund should not be subject to U.S. federal income or withholding tax on U.S. source interest income (other than in the case of certain contingent interest or interest received from a borrower ten percent (10%) or more of the equity of which is owned by the Fund, neither of which the Fund anticipates receiving) provided that the Fund is not engaged in a trade or business within the U.S. to which such interest income is effectively connected, and provided that the Fund's interest-bearing securities qualify as registered obligations and that the Fund periodically supplies an Internal Revenue Service Form W-8BEN or its equivalent.

*Other Jurisdictions.* Capital gains and other revenues received by the Fund may be subject to withholding or similar taxes imposed on foreign corporations by the country in which such gains or other revenues originate. In jurisdictions other than the U.S., non-U.S. taxes may be withheld at source on dividend and other income derived by the Fund at rates generally ranging up to thirty percent (30%). Capital gains derived by the Fund in such jurisdictions may often be exempt from non-U.S. income or withholding taxes at source, although the treatment of capital gains varies among jurisdictions.

Persons interested in purchasing the Fund's Shares should inform themselves as to any tax consequences particular to their circumstances arising in the jurisdiction in which they are resident or domiciled for tax purposes in connection with the acquisition, ownership, redemption or disposition of the Fund's Shares.

*Changes in Law.* All laws, including laws relating to taxation in the British Virgin Islands and the United States (and other jurisdictions), are subject to change without notice.

## Shareholders of the Fund

Shareholders who are not otherwise subject to BVI or United States taxes by reason of their residence, domicile or other particular circumstances should not become subject to any such taxes by reason of the ownership, transfer or redemption of the Shares.

Shareholders who are or may be subject to U.S. Federal income tax on their worldwide income should be aware of certain tax consequences of investing directly or indirectly in Shares and should be certain to consult with their own tax advisors in this regard.

U.S. tax-exempt investors should review the materials set forth below under "ERISA Considerations" as well as any supplemental materials provided to such investors.

Dividend and redemption payments made by the Fund to Shareholders who are not U.S. Persons should not be subject to U.S. Federal income tax, provided that the Shares are not held in connection with a U.S. trade or business of the Shareholder in the year of receipt. Individual Shareholders who are neither present or former U.S. citizens nor U.S. residents (as determined for U.S. estate and gift tax purposes) should not be subject to any U.S. Federal estate or gift taxes by reason of the ownership or transfer of the Shares. A Shareholder's change in status to a U.S. Person could result in adverse U.S. tax consequences in addition to resulting in a compulsory redemption of the Shares.

Any U.S. Person owning ten percent (10%) or more of the value or voting power of the shares of a foreign corporation such as the Fund will likely be required to file an information return with the U.S. Internal Revenue Service containing certain disclosure concerning the filing Shareholder, other

Shareholders and the corporation.  The Fund has not committed itself to provide the information about the Fund or its Shareholders needed to complete the return.

**Unrelated Business Taxable Income**

The term "Permitted U.S. Person" means a U.S. Person that is subject to ERISA, or is otherwise exempt from payment of U.S. Federal income tax.  Generally, a Permitted U.S. Person is exempt from Federal income tax on certain categories of income, such as dividends, interest, capital gains and similar income realized from securities investment or trading activity.  This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of a Permitted U.S. Person.  Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the Permitted U.S. Person's exempt purpose or function.  UBTI also includes (i) income derived by a Permitted U.S. Person from debt-financed property and (ii) gains derived by a Permitted U.S. Person from the disposition of debt-financed property.

A Permitted U.S. Person investing in a foreign corporation such as the Fund should not realize UBTI with respect to an unleveraged investment in Shares.  Permitted U.S. Persons are urged to consult their own tax advisers concerning the U.S. tax consequences of an investment in the Fund.

**Information Returns**

Any U.S. Person transferring cash or other property to a foreign corporation such as the Fund or owning ten percent (10%) or more of the value or voting power of the shares of a foreign corporation such as the Fund will, with certain limited exceptions, likely be required to file an information return with the U.S. Internal Revenue Service containing certain disclosure concerning the filing shareholder, other shareholders and the corporation.  The Fund has not committed itself to provide the information about the Fund or its Shareholders needed to complete the return.

**EU Savings Directive**

It should be noted that the BVI agreed in principle to implement the EU Savings Directive (2003/48/EC) ("EUSD").

According to Article 1 of the EUSD, "the ultimate aim of the EUSD is to enable savings income in the form of interest payments made in one Member State to beneficial owners, individuals, resident for tax purposes in another Member State to be made subject to effective taxation in accordance with the national laws of the latter Member State."

The EUSD applies (i) only to interest or interest-derived payments; (ii)  only to payments to EU resident individuals ("beneficial owners") and certain EU intermediary entities ("residual entities"); (iii) only when payments are made by paying agents in the EU and other defined territories (including the Caribbean Overseas Territories); and (iv) only when payments are made cross-border.

A paying agent is defined as an economic operator that is established in either the EU or certain defined territories (including the BVI) which either pays interest to, or secures the payment of interest for the immediate benefit of, the beneficial owner.  In a chain of economic operators, the last economic operator is the paying agent.

For the purposes of the EUSD, interest payments include interest paid in relation to debt claims, which include bonds and deposits, but not equities. Such payments also include interest accrued or capitalized at sale or redemption of debt claims.

Under the EUSD, there are certain exclusions to the definition of interest payments. These include the following:

(i)    Income derived from EU non-UCITS (non-retail) funds. As explained below, this is of particular significance for BVI funds by virtue of the agreed basis of implementation;

(ii)    Income realized upon the sale or redemption of shares or units of a fund (whether a EU UCITS fund or not) if less than 40% of such fund's assets are invested in debt claims. In determining the percentage of a fund's assets that are invested in debt claims, reference may be made to the investment policy stated in the fund's offering document. However, if this does not place a limit on the amount of its assets that may be invested in debt claims and it is unknown from the information available what percentage of the fund 's assets are in fact so invested, the fund will be deemed to exceed the 40% limits set out above.

Since the BVI are not directly subject to EU law, implementation of the EUSD will be by way of bilateral agreements between the BVI and each EU Member State. The BVI government has agreed a model for these bilateral agreements ("Model Agreement"), which sets out the manner in which the EUSD will be implemented in relation to the BVI. Under the Model Agreement, certain mutual funds regulated under the Mutual Funds Law (such as the Fund) will be treated as non-UCITS funds. By virtue of direct arrangements with the UK and Ireland, UK and Irish paying agents will be able to treat BVI non-UCITS funds in the same manner as EU non-UCITS funds, that is, as falling outside the scope of the EUSD. Paying agents in the BVI will be able to do likewise.

According to Swiss rules published on 1 April 2005, a Swiss-based paying agent, when attempting to determine whether a fund that is based in a dependent territory (e.g. the BVI) is within the scope of the EUSD, is entitled to look to the laws of the fund's "home country". Accordingly, if the fund would be considered to be outside of the scope of the EUSD for the purposes of the laws of the jurisdiction in which the fund is based, a Swiss-based paying agent is entitled to treat the fund as falling outside the scope of the EUSD.

The Fund has appointed the Administrator as its administrator and the Administrator is responsible for processing redemptions. Accordingly, the Fund itself would not be considered to be a paying agent for the purposes of the EUSD. The Administrator would also not be considered to be a paying agent for the purposes of the EUSD because it is located outside of the EU and the defined territories. However, if the Administrator were to make redemption payments to a professional nominee that in turn were to forward the payments to the ultimate beneficial owner, the professional nominee may be considered to be a paying agent and the redemption payments may be considered to be interest payments for the purposes of the EUSD if the professional nominee is based in an EU Member State other than the UK or Ireland or in one of the defined territories other than the BVI or Switzerland. In such circumstances, advice should be obtained from counsel in the relevant jurisdiction as to whether the legislation in that jurisdiction would treat the Fund as falling outside the scope of the EUSD and, if it would not, the manner in which such legislation would treat a redemption payment made by the Fund to a beneficial owner or residual entity.

*    *    *    *

_____ *Kingate Euro Fund, Ltd.* _____

30

The foregoing summary does not address tax considerations which may be applicable to certain Shareholders under the laws of jurisdictions other than the BVI or the U.S.  The Fund has no present plans to apply for any certifications or registrations, or to take any other actions under the laws of any jurisdictions which would afford relief to local investors therein from the normal tax regime otherwise applicable to an investment in the Shares.  It is the responsibility of all persons interested in purchasing the Shares to inform themselves as to any income or other tax consequences arising in the jurisdictions in which they are resident or domiciled for tax purposes, as well as any foreign exchange or other fiscal or legal restrictions, which are relevant to their particular circumstances in connection with the acquisition, holding or disposition of the Shares.  The value of the Fund's investments may also be affected by repatriation and exchange control regulations.

## CERTAIN ERISA CONSIDERATIONS

The United States Employee Retirement Income Security Act of 1974, as amended ("ERISA"). imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans (collectively, "ERISA Plans") and on those persons who are fiduciaries with respect to ERISA Plans.  Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the plan.  The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances, including the ERISA Plan's existing investment portfolio, and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "CERTAIN RISK FACTORS".

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts (together with ERISA Plans, "Plans")) and certain persons (referred to as "parties in interest" for purposes of ERISA and "disqualified persons" for purposes of the Code) having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction.  A party in interest or disqualified person who engages in a non-exempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code, and the transaction might have to be rescinded.

The U.S.  Department of Labor has promulgated a regulation, 29 C.F.R.  Section 2510.3-101 (as modified by Section 3(42) of ERISA) (the "Plan Asset Regulation"), describing what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA, including the fiduciary responsibility and prohibited transaction provisions of Title I of ERISA and the related prohibited transaction provisions under Section 4975 of the Code.  Under the Plan Asset Regulation, if a Plan invests in an "equity interest" of an entity that is neither a "publicly offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company", which includes for purposes of the Plan Asset Regulation a "venture capital operating company", or that equity participation in the entity by "Benefit Plan Investors" (as defined below) is not "significant".

Under the Plan Asset Regulation, equity participation in an entity by Benefit Plan Investors (as defined below) is "significant" on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25% or more of the value of any class of equity interests in the entity is held by Benefit Plan Investors.  The term " Benefit Plan Investor" is defined in the Plan Asset Regulation as: (a) any employee benefit plan (as defined in Section 3(3) of ERISA) subject to Part 4 of Subtitle B of Title I of ERISA; (b) any plan subject to Section 4975 of the Code; and (c) any entity whose underlying assets include plan assets by reason of the investment in the entity by such employee benefit plan and/or plan. For purposes of this determination, (i) the value of equity interests held by a person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the entity or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any affiliate of any such person) is disregarded, and (ii) only that portion of the equity interests of an entity described in clause (c) of the preceding sentence investing in another entity that are held by employee benefit plans or other plans described in clauses (a) or (b) of the preceding sentence are included in the testing of such other entity.

A Share in the Fund should be considered to be an "equity interest" in the Fund for purposes of the Plan Asset Regulation, and the Shares will not constitute "publicly offered securities" for purposes of the Plan Asset Regulation.  In addition, the Fund will not be registered under the Investment Company Act and it is not expected to qualify as a "venture capital operating company."

The Board intends to use commercially reasonable efforts to restrict transfers of any equity interest in the Fund so that ownership of each class of equity interests in the Fund by Benefit Plan Investors will remain below the 25% threshold contained in the Plan Asset Regulation.  Although there can be no assurance that such will be the case, the assets of the Fund should not constitute "plan assets" for purposes of ERISA and Section 4975 of the Code.

If the assets of the Fund were deemed to constitute the assets of a Plan, the fiduciary making an investment in the Fund on behalf of an ERISA Plan could be deemed to have improperly delegated its asset management responsibility, the assets of the Fund could be subject to ERISA's reporting and disclosure requirements, and transactions involving the assets of the Fund would be subject to the fiduciary responsibility and prohibited transaction provisions of ERISA and the prohibited transaction rules of Section 4975 of the Code.  Accordingly, certain transactions that the Fund might enter into, or may have entered into, in the normal course of its operations might result in non-exempt prohibited transactions and might have to be rescinded.  A party in interest or disqualified person that engaged in a non-exempt prohibited transaction may be subject to non-deductible excise taxes and other penalties and liabilities under ERISA and the Code.  In addition, such "plan asset" treatment would subject the calculation and payment of the Board's fees to applicable prohibited transaction and certain conflict of interest provisions of ERISA and the Code.  Consequently, if at any time the Board determines that assets of the Fund may be deemed to be "plan assets" subject to ERISA and Section 4975 of the Code, the Board may take certain actions it may determine to be necessary or appropriate, including requiring one or more investors to redeem or otherwise dispose of all or part of their Shares in the Fund or terminating and liquidating the Fund.

Each Plan fiduciary who is responsible for making the investment decisions whether to invest in the Fund should determine whether, under the general fiduciary standards of investment prudence and diversification and under the documents and instruments governing the Plan, an investment in the Shares is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio.  Any Plan proposing to invest in Shares should consult with its counsel to confirm that such investment will not result in a prohibited transaction and will satisfy the other requirements of ERISA and the Code.

_____*Kingate Euro Fund, Ltd.*_____

The sale of any Shares to a Benefit Plan Investor is in no respect a representation by the Board or its affiliates that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

Regardless of whether the assets of the Fund are deemed to be "plan assets", the acquisition of an Share by a Plan could, depending upon the facts and circumstances of such acquisition, be a prohibited transaction, for example, if the Board or its affiliates was a party in interest or disqualified person with respect to the Plan.  However, such a prohibited transaction may be treated as exempt under ERISA and the Code if the Shares were acquired pursuant to and in accordance with one or more "class exemptions" issued by the U.S.  Department of Labor, such as Prohibited Transaction Class Exemption ("PTCE") 84-14 (a class exemption for certain transactions determined by an independent qualified professional asset manager), PTCE 90-1 (a class exemption for certain transactions involving an insurance company pooled separate account), PTCE 91-38 (a class exemption for certain transactions involving a bank collective investment fund), PTCE 95-60 (a class exemption for certain transactions involving an insurance company general account), and PTCE 96-23 (a class exemption for certain transactions determined by an in-house asset manager).

Any insurance company proposing to invest assets of its general account in the Shares should also consider the extent to which such investment would be subject to the requirements of ERISA in light of the U.S.  Supreme Court's decision in John Hancock Mutual Life Insurance Co.  v.  Harris Trust and Savings Bank and under any subsequent legislation or other guidance that has or may become available relating to that decision, including Section 401(c) of ERISA and the regulations thereunder published by the U.S.  Department of Labor in January, 2000.

The Board will require a fiduciary of an ERISA Plan that proposes to acquire a Share to represent that it has been informed of and understands the Fund's investment objectives, policies, strategies and limitations, that the decision to acquire an Share was made in accordance with its fiduciary responsibilities under ERISA and that neither the Board nor any of its affiliates has provided investment advice with respect to such decision.  The Board will also require any investor that is, or is acting on behalf of, a Plan to represent and warrant that its acquisition and holding of a Share will not result in a non-exempt prohibited transaction under ERISA and/or Section 4975 of the Code.

Governmental plans and certain church plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to state or other federal laws that are substantially similar to the foregoing provisions of ERISA and the Code.  The Board will require similar representations and warranties with respect to the purchase of a Share by any such plan.  Fiduciaries of such plans should consult with their counsel before purchasing any Shares.

The discussion of ERISA and Section 4975 of the Code contained in this memorandum is, of necessity, general and does not purport to be complete.  Moreover, the provisions of ERISA and Section 4975 of the Code are subject to extensive and continuing administrative and judicial interpretation and review.  Therefore, the matters discussed above may be affected by future regulations, rulings and court decisions, some of which may have retroactive application and effect.

**ANY POTENTIAL INVESTOR CONSIDERING AN INVESTMENT IN THE SHARES THAT IS, OR IS ACTING ON BEHALF OF, A PLAN (OR A GOVERNMENTAL PLAN SUBJECT TO LAWS SIMILAR TO ERISA AND/OR SECTION 4975 OF THE CODE) IS STRONGLY URGED TO CONSULT ITS OWN LEGAL, TAX AND ERISA ADVISERS REGARDING THE CONSEQUENCES OF SUCH AN INVESTMENT AND THE ABILITY TO MAKE THE REPRESENTATIONS DESCRIBED ABOVE.**

_____ *Kingate Euro Fund, Ltd.* _____

---

## ADDITIONAL INFORMATION

---

### Reports to Shareholders

The Fund will furnish annual reports to its Shareholders containing financial statements examined by the Fund's independent auditors. Shareholders will be sent copies of the audited financial statements prior to the Fund's annual general meeting each year prepared in accordance with U.S. Generally Accepted Accounting Principles. In addition, Shareholders will receive from the Administrator monthly reports relating to the Fund's performance.

### Available Documents

This Memorandum is not intended to provide a complete description of the Fund's Memorandum of Association and Bye-laws or the agreements with the Manager, Administrator, Investment Advisor, and the Bank. Copies of such documents are available for inspection by Shareholders and prospective investors during normal business hours at the Administrator's office or at the office of Manager in Hamilton, Bermuda.

### Auditor's Consent

PricewaterhouseCoopers has given its written consent to the inclusion of its name, report and reference to itself in the form and context in which they appear in this Memorandum.

### Counsel

The law firms of Tannenbaum Helpern Syracuse & Hirschtritt LLP (New York) and O'Neal Webster O'Neal (BVI) serve as counsel to the Fund in connection with matters pertaining to U.S. law and BVI law, respectively, and to the Manager and, together or individually, may serve as counsel to other investment funds sponsored or managed by the Manager and its affiliates. Should a future dispute arise between the Fund and the Manager, separate counsel may be retained as circumstances and professional responsibilities then dictate. Counsel to the Fund do not represent the Shareholders. See "POTENTIAL CONFLICTS OF INTEREST."

### Inquiries and Communication with the Fund

All communications and correspondence with the Fund and inquiries concerning the Fund and the Shares, including information concerning subscription and redemption procedures and current Net Asset Value, should be directed to the Administrator at the address set forth in the "DIRECTORY" appearing elsewhere in this Memorandum.

# KINGATE EURO FUND, LTD.

### SUBSCRIPTION INSTRUCTIONS FOR NON U.S. INVESTORS ONLY

(U.S. Investors are directed to the Subscription Documents appended to the
Supplemental Disclosure Statement available on request from the Administrator)

**Subscription Applications**

Applications to subscribe for Participating Common Shares (the "Shares") of the Kingate Euro Fund, Ltd., a British Virgin Islands corporation (the "Fund"), may be made only by written application using the enclosed Subscription Agreement and certain related documentation, outlined for ease of reference as follows:

| | |
|---|---|
| Individual Investors<br>from a FATF* Jurisdiction | 1. Subscription Agreement |
| Individual Investors<br>from a non-FATF Jurisdiction | 1. Subscription Agreement<br>2. Form Letter of Reference (Exhibit C) |
| Entity Investors<br>from a FATF Jurisdiction | 1. Subscription Agreement<br>2. Form of Incumbency Certificate (Exhibit A) |
| Entity Investors<br>from a non-FATF Jurisdiction | 1. Subscription Agreement<br>2. Form of Incumbency Certificate (Exhibit A)<br>3. Form Letter of Reference (Exhibit C)<br>4. If privately held: Beneficial Ownership Information Form (Exhibit D)<br>5. If a trust: Trust Beneficiaries' Information Form (Exhibit E) |
| Funds of Funds and Other Entities<br>Investing on Behalf of Others<br>(Nominee Banks, Hedge Funds, etc.)<br>from a FATF Jurisdiction | 1. Subscription Agreement<br>2. Form of Incumbency Certificate (Exhibit A)<br>3. AML Certification (Exhibit B) |
| Funds of Funds and Other Entities<br>Investing on Behalf of Others<br>(Nominee Banks, Hedge Funds, etc.)<br>from a non-FATF Jurisdiction | 1. Subscription Agreement<br>2. Form of Incumbency Certificate (Exhibit A)<br>3. Form Letter of Reference (Exhibit C)<br>4. If privately held: Beneficial Ownership Information Form (Exhibit D)<br>5. If a trust: Trust Beneficiaries' Information Form (Exhibit E) |

All completed Subscription Agreements should be directed to the Administrator at the address shown thereon no later than three (3) Business Days (as defined in the Fund's amended and restated

---

* A FATF Jurisdiction is a country or territory which is a member of the Financial Action Task Force on Money Laundering.

*Kingate Euro Fund, Ltd.*

S-1

Information Memorandum dated 22 September, 2008, as may be further amended and restated (the "Information Memorandum")) prior to the Subscription Date (as defined in the Fund's Information Memorandum). The Fund reserves the right to reject subscriptions in whole or in part, in which event subscription payments will be refunded at the applicant's risk, without interest. The Manager of the Fund may, in its sole discretion, discontinue the offering of Shares at any time. A properly completed and signed copy of the Subscription Agreement may be submitted to the Administrator by telecopier (+ 1-441) 296-8227, Attn.: Shareholder Services Unit, in advance of submitting the original in order to expedite processing of the application. The signed original, however, must be sent to the Administrator immediately thereafter.

**Subscription Payments**

Payments in full for the amount subscribed (not less than Euro €250,000, unless otherwise agreed in advance by the Fund) are to be made in Euros by wire transfer at the latest by three (3) Business Days prior to the Subscription Date (as defined in the Fund's Information Memorandum) as follows:

(Note: Send Via SWIFT MT 100)

Wire to:

| | |
|---|---|
| Correspondent Bank: | Deutsche Bank AG Frankfurt<br>12-21, Taunusanlage<br>D-60325 Frankfurt am Main<br>Germany |
| Swift: | DEUTDEFF |
| Beneficiary Bank: | The Bank of Bermuda Limited<br>6 Front Street<br>Hamilton HM 11 Bermuda |
| Account No: | 9505926 |
| For Further Credit to | IBAN #  DE6050070010095059260 0 |
| Beneficiary: | Kingate Euro Fund, Ltd. |
| Account No: | 010-503324-511 |

Notification to the Administrator may be made via facsimile to the attention of the Shareholder Services Unit at telecopier number (+ 1-441) 296-8227.

In order to facilitate prompt and accurate crediting of subscription payments, subscribers must notify the Administrator, prior to remitting payment, of the details of the subscription payment, indicating (i) the name of the subscriber, (ii) the euro amount subscribed, (iii) the subscriber's address (including a telex or telecopier number if available), (iv) the name and address of the financial institution remitting the subscription payment and (v) the approximate date as of which the payment is being wired to the Fund's account.

**Confirmations**

Confirmations will be sent to subscribers showing the details of each transaction.  The Shares will ordinarily be issued in respect of accepted applications at the Net Asset Value (as defined in the Fund's Information Memorandum) per Share as of the last Business Day of the month following the date on which the Fund has verified the receipt of the cleared funds.

A Share certificate will be issued only if specifically requested by the subscriber.

**Local Rules**

Persons interested in subscribing for the Shares should inform themselves as to the (1) the legal requirements within their own countries for the purchase of the Shares, (2) any foreign exchange restrictions which they might encounter, (3) the income tax or other tax consequences, if any, which might be relevant to the purchase, holding or sale of the Shares, and (4) the applicable anti-money laundering rules set forth in the Memorandum and below.

As part of the Administrator's and the Fund's responsibility for protection against money laundering, the Administrator may require a detailed verification of the identity of a person or entity applying for Shares.  Depending on the circumstances of each application, a detailed verification might not be required where:

(a)      the applicant makes payment by wire transfer from an account held in the applicant's name at a recognized financial institution residing in a recognized jurisdiction, as defined by applicable laws, and the applicant's details (name and account number) appear in the confirmation of the wire transfer; or

(b)      the application is made through a recognized intermediary.

These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti-money laundering regulations.  As such, it is the current policy of the Board to accept subscription monies only from financial institutions that are licensed to conduct banking or securities business in jurisdictions designated by the Board as "qualified jurisdictions" based on the nature of the jurisdictions' regulatory regime, or the clients of such financial institutions.

A list of the jurisdictions that have been designated as "qualified jurisdictions" is available from the Fund.

The Administrator and the Fund reserve the right to request such information as they deem necessary to verify the identity of an applicant.  In the event of delay or failure by the applicant to produce any information required for verification purposes, the Administrator may refuse to accept the application and the subscription monies relating thereto or may refuse to process a redemption request until proper information has been provided.

## KINGATE EURO FUND, LTD.
## Participating Common Shares

### SUBSCRIPTION AGREEMENT
### (for non-U.S. Investors)

Kingate Euro Fund, Ltd.
c/o Citi Hedge Fund Services, Ltd.
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Fax No.: (+ 1-441) 296-8227
Attn.: Shareholder Services Unit

Dear Sirs:

The undersigned subscriber (the "Subscriber") acknowledges having received, reviewed and understood the Amended and Restated Information Memorandum dated 22 September, 2008 as may be further amended and restated (the "Information Memorandum") for the offering of Participating Common Shares (the "Shares") of Kingate Euro Fund, Ltd. (the "Fund") and hereby subscribes for as many Shares as may be purchased for the amount indicated below on the terms of the Information Memorandum and subject to the provisions of the Memorandum and Articles of Association of the Fund.

*Entity Subscriber*

**Date and Jurisdiction of Incorporation:**   _____

**Tax ID Number:**   _____

*Natural Person Subscribers*

**Date and Place of Birth:**   _____

**Social Security Number:**   _____

**Nationality:**   _____

*All Subscribers*

**Subscription Date**   _____

**Amount of Subscription:**   _____

_____ *Kingate Euro Fund, Ltd.* _____

**Name and Address of Subscriber(s):**

**Telephone Number:** _____

**Fax Number:** _____

**E-Mail:** _____

**Name and Address for Share Registration (if different):**

**Postal Address (if other than address of registration):**

**Name, Address and Account Number of Financial Institution**
**Remitting Payment for Subscriber's  Account[*]:**

---
[*]  Such account details will be used to remit proceeds on redemption of Shares unless otherwise instructed in writing of alternative instructions.

_____*Kingate Euro Fund, Ltd.* _____

S-5

**Payment Date:** _____

The Subscriber agrees that all or any funds payable to the Subscriber (including redemption proceeds) may be wire transferred to the Subscriber in accordance with the following instructions, until further written notice, signed by one or more of the following individuals authorized to act on behalf of the Subscriber, and delivered to the Administrator.

Bank Name:            _____

Bank Address:       _____

                                     _____

ABA or CHIPS No:   _____

Account Name:       _____

Account No:          _____

For Further credit:     _____

Number of beneficial owners represented by Subscriber (if Subscriber is acting in any sort of nominee or fiduciary capacity) _____

Is the Subscriber, or an affiliate of the Subscriber, a pension profit-sharing, annuity, or employee benefit plan (whether private, governmental, or charitable)?

[  ] Yes  [  ] No     *(Initial one)*

The undersigned Subscriber is *(tick one and refer to the Subscription Instructions for the documentation to enclose for different categories of investors)*:

         ☐   An Individual Investor from a FATF Jurisdiction

         ☐   An Individual Investor from a non-FATF Jurisdiction

         ☐   An Entity Investor from a FATF Jurisdiction

         ☐   An Entity Investor from a non-FATF Jurisdiction

         ☐   An Entity Investor from a non-FATF Jurisdiction – privately held

         ☐   An Entity Investor from a non-FATF Jurisdiction – trust

         ☐   A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a FATF Jurisdiction

         ☐   A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a non-FATF Jurisdiction

_____*Kingate Euro Fund, Ltd.*_____

☐     A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a non-FATF Jurisdiction – privately held

☐     A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a non-FATF Jurisdiction – trust

**Authorized Signatories:**

Set forth below are the names of persons authorized by the Subscriber to give and receive instructions between the Fund (or its Administrator) and the Subscriber, together with their respective signatures. Such persons are the only persons so authorized until further written notice to the Administrator signed by one or more of such persons.

(please attach additional pages if needed)

| Name | Signatures |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

## PROFESSIONAL INVESTOR REPRESENTATIONS AND WARRANTIES

The Subscriber represents and warrants that:

(a)    The Subscriber is subscribing for, or acquiring, Shares herein with a value of at least U.S.$250,000;

(b)    It is (i) an institution whose ordinary business or professional activity includes the buying and selling of investments, whether as principal or agent; (ii) in the case of a natural person, his/her individual net worth, or joint net worth with his/her spouse, exceeds U.S.$1 million; or (iii) an institution with a minimum amount of assets under discretionary management of U.S.$5 million; and

(c)    It (i) has the knowledge, expertise and experience in financial matters to evaluate the risks of investing in the Fund; (ii) is aware of the risks inherent in investing in the assets proposed to be acquired by the Fund and the method by which the assets of the Fund are held and/or traded; and (iii) can bear the risk of loss of its/his/her entire investment.

## SUBSCRIBER REPRESENTATIONS AND WARRANTIES

The Subscriber represents and agrees that none of the Shares (nor any interest therein) is being acquired or will at any time be held, directly or indirectly, for the account or benefit of any "Restricted Person" (as defined in the Information Memorandum), and further agrees that none of the Shares will be transferred to any person who has failed to supply a similar representation.  The Subscriber represents and warrants that:

(a)    **Reliance on Information Memorandum**.  The Subscriber acknowledges that the Fund has delivered to the Subscriber the Information Memorandum.  The Subscriber has not relied on any representations or other information purported to be given on behalf of the Fund except as set forth in the Information Memorandum or the published, financial accounts of the Fund.

(b)    **No Resale**.  The Subscriber is acquiring the Shares for its own account, or on behalf of a third party or third parties for investment and not with a view to resale, transfer or other disposition in whole or in part.

(c)    **No Need for Liquidity.** The undersigned understands that the Shares have not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or under the laws of any other jurisdiction, and that the Fund does not contemplate and is under no obligation to so register the Shares.  The undersigned understands and agrees that the Shares must be held indefinitely unless they are subsequently registered under the Securities Act and, where required, under the laws of other jurisdictions or unless an exemption from registration is available.  Even if such exemption is available, the undersigned agrees that the assignment and transferability of the Shares will be governed by the Memorandum and Articles of Association of the Fund (the "Memorandum and Articles of Association").  The Memorandum and Articles of Association require that Shares in the Fund shall not be transferred without the prior consent of the Fund.  The undersigned recognizes that there will be no established trading market for the Shares and it is extremely unlikely that any public market for the Shares will develop.  The undersigned has no need for liquidity in connection with its purchase of Shares.

(d)    **Legality and Validity of Consents**.  All consents required to be obtained and all legal requirements necessary to be complied with or observed in order for this Agreement or the issuance of the

_____***Kingate Euro Fund, Ltd.*** _____

S-8

Shares to be lawful and valid under the laws of any jurisdiction to which the Subscriber is subject have been obtained, complied with or observed.

(e)     **Anti-Money Laundering**.  The Subscriber acknowledges that due to money laundering requirements, the Fund, the Manager, the Investment Advisor and/or the Administrator may require certain identification and/or other information of the Subscriber before the application can be processed.

(f)     **Subscriber Knowledge**.  The Subscriber possesses requisite knowledge and experience in financial matters such that it is capable of evaluating the merits and risks of an investment in the Fund (including without limitation, the ability to suffer a complete loss of the investment and need to hold the Shares for an indefinite period of time).

(g)     **Transfer Request Form**.  Subscriber agrees to complete and submit to the Board of Directors the Transfer Request Form (annexed hereto) and any other documents requested by the Board of Directors in the event the Subscriber seeks to transfer its Shares, in whole or in part.  No transfer shall be effective without the express consent of the Board of Directors.

(h)     **No Performance Guarantees**.  No guarantees have been made to the Subscriber about future performance or financial results of the Fund.

(i)     **Ability to Bear Risks**.  The Subscriber is and will be able to bear the economic risks of its investment in the Shares.

(j)     **Suitability**.   The Subscriber has read carefully and understands the Information Memorandum and has consulted its own attorney, accountant or investment advisor with respect to the investment contemplated hereby and its suitability for the Subscriber and Subscriber consents to every provision therein.

(k)     **Opportunity to Verify Information**.   The Subscriber acknowledges that the representatives of the Fund, Manager, Investment Advisor, Administrator and Consultant have made available to the Subscriber, during the course of this transaction and prior to the purchase of any Shares, the opportunity to ask questions of and receive answers from them concerning the terms and conditions of the offering described in the Information Memorandum, and to obtain any additional information necessary to verify the information contained in the Information Memorandum or otherwise relevant to the suitability of the proposed investment and to the proposed activities of the Fund.

(l)     **Investment Objectives**.  The purchase of the Shares by the Subscriber is consistent with the general investment objectives of the Subscriber.

(m)     **No Borrowings**.  The Subscriber has not borrowed any portion of its contribution to the Fund, either directly or indirectly, from the Fund, the Manager, Investment Advisor, Administrator, or any affiliate of the foregoing.

(n)     **Conflicts of Interest; Fund Counsel Does Not Represent Investors**.  The Subscriber understands and acknowledges the various conflicts of interest that are set forth in the Information Memorandum.  The Subscriber understands and acknowledges that Tannenbaum Helpern Syracuse & Hirschtritt LLP and O'Neal Webster O'Neal represent only the Fund and the Manager and not the Subscriber, in connection with the offer and sale of the Shares.  The Subscriber has had the opportunity to consult with legal counsel of its own choosing.

_____*Kingate Euro Fund, Ltd.* _____

S-9

(o)      **Amendments**.    Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except with the written consent of the Fund's Board of Directors.

(p)      **Change in Information**.    The Subscriber agrees to notify the Board of Directors immediately if any of the information provided herein by the Subscriber changes or becomes inaccurate.

(q)      **Authorization**. The Subscriber acknowledges that it has the legal capacity and authority and is permitted by applicable law to execute and deliver this Agreement and is authorized to purchase Shares and to perform its obligations pursuant to the provisions hereof and pursuant to the Memorandum and Articles and of Association and such Subscriber has not been formed for the specific purpose of acquiring an interest in the Fund.

(r)      **Broker Dealer Arrangements**. The Subscriber acknowledges that the Fund and/or the Investment Advisor have the power to enter into agreements pursuant to which a registered broker-dealer affiliate of the Fund or any member of the Investment Advisor, splits commissions earned from any trades in respect of Fund assets with any other registered broker-dealer on such terms as the Fund or the Investment Advisor (as the case may be) in their sole discretion deem advisable and proper.

(s)      **Restricted Person**.    The Subscriber certifies that it is not now, and for as long as it owns the Shares, a Restricted Person, nor a custodian, nominee or trustee of such a person. The Subscriber further certifies that it is not acquiring the Shares for and will not hold the Shares on behalf of or transfer Shares to any person or entity that is a Restricted Person.  The Subscriber agrees that it will promptly notify the Fund at any time when it becomes a Restricted Person, and the Subscriber agrees that in such event the Fund shall be entitled to (but shall not be obliged to) repurchase or to require the Subscriber to redeem or sell the Shares to a person designated by the Fund at a price equal to the Net Asset Value per Share as calculated by the Administrator as at the date of the repurchase or sale or as at the date of any unauthorised transfer giving rise to such repurchase or sale.

(t)      **Legal Entity**.    Where the Subscriber is a company, trust or partnership, it agrees to produce a certified copy or copies of the certificate of incorporation (and any change of name), bye-laws (or other document evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity and any other relevant documentation as requested by the Fund.

(u)      **Subscriptions**.  The Subscriber acknowledges that the Fund reserves the right to reject in its absolute discretion this and any other subscription for Shares in whole or in part, in any order, at any time prior to a Subscription Date (as defined in the Information Memorandum), notwithstanding prior receipt by the Subscriber of notice of acceptance of the subscription. If the Shares are oversubscribed, the Fund will determine in its sole discretion which subscriptions shall be accepted.  If this subscription is rejected or if the sale of the Shares is not completed for any reason (in which event this subscription shall be deemed to be rejected), the Fund shall as soon as practicable return any funds transferred by the Subscriber (without interest) along with this Agreement and any other documents delivered by the Subscriber.

(v)      **Entire Agreement**.  This Agreement represents the entire agreement of the parties in respect of the subscription for Shares and may not be changed or terminated orally.

_____*Kingate Euro Fund, Ltd.* _____

(w)  **Waiver**.  No waiver by any party of any breach of any term of this Agreement shall be construed as a waiver of any subsequent breach of that term or any other term of the same or of a different nature.

(x)  **Legal Actions**. If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they may be entitled.

(y)  **Waiver of Statute of Limitations**.  Each investor in the Fund agrees to have waived, to the maximum extent permissible under law, the right to bring any legal claim, action or other proceeding against the Fund, its Board of Directors and other officers unless such claim, action or proceeding is commenced within six (6) months from the date of the first to occur of (i) the original occurrence allegedly giving rise to such claim, action or proceeding or (ii) the Shareholder's redemption of any Shares.

(z)  **Governing Law**.  The Subscriber agrees when entering into the Agreement to be bound by the laws of the BVI and in addition to the non-exclusive jurisdiction of the relevant courts therein subject to which laws this Agreement shall be governed and interpreted.

(aa)  **Facsimile Instructions**.    The Subscriber acknowledges that the Fund and the Administrator are entitled to act upon facsimile instructions from or purported to be from the Subscriber and that all such instructions, where accepted by the Fund or the Administrator, will be final and binding upon the Subscriber. The Subscriber agrees to indemnify the Fund or Administrator against any and all claims, demands, liabilities, costs, charges, damages and expenses that the Fund or the Administrator may incur by reason of any act or failure to act on the part of the Fund with regard to all facsimile instructions so provided by the Subscriber.

(bb)  **Survival of Representations**.    The representations, warranties, agreements and indemnification obligations of the Subscriber contained in this Agreement shall survive the execution of this Agreement and the purchase of the Shares.

(cc)  **General**.    This Agreement shall be binding upon the Subscriber and the legal representatives, successors and assigns of the Subscriber, and shall, if the Subscriber consists of more than one person, be the joint and several obligation of all such persons.  Two or more duplicate counterparts of this Agreement may be executed by the Subscriber and accepted by the Fund, each of which shall be an original, but all of which together shall constitute one and the same instrument.

### BENEFIT PLAN INVESTOR STATUS

*Please respond yes or no to the following questions:*

(1)  The Subscriber is not a, and is not using to acquire the Shares the assets of any, "benefit plan investor" as defined in 29 C.F.R. 2510.3-101(f)(2) (as modified by Section 3(42) of ERISA) (the "Plan Asset Regulation").  For purposes of illustration, "benefit plan investors" include pension plans, profit-sharing plans, or other "employee benefit plans" subject to part 4 of subtitle B of Title I of ERISA, and plans subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"). "Benefit plan investors" also include simplified employee pension plans, KEOGH plans and individual retirement accounts.   "Benefit plan investors" also include entities deemed under Department of Labor regulations to hold "plan assets" due to investments made in the entity by such employee benefit plans and other plans.

_____
*(Initial)*

If the Subscriber is an entity, the Subscriber certifies that less than 25% of the value of each class of equity interests in the Subscriber (excluding any equity interests held by an individual or entity with discretionary authority or control over the equity interests of the Subscriber) is held by "benefit plan investors".

*Or*

(2)  The Subscriber, an affiliate of the Subscriber, or the person or entity for which the Subscriber is acting is a "benefit plan investor" as defined in the Plan Asset Regulation.

_____
*(Initial)*

If the Subscriber is a "benefit plan investor," please indicate whether the Subscriber is a plan defined in Section 4975 of the Code (e.g., an individual retirement account, Coverdell account, ERISA Plans, etc.):

_____                    _____
  Yes                              No

(3) The Subscriber is a life insurance company acquiring the Shares with the assets of the Subscriber's general account.

_____
*(Initial)*

If so, the portion of such general account assets which represents "plan assets" within the meaning of the Plan Asset Regulation will not exceed the following percentage during the period the Subscriber holds the Shares:

_____%

(4)  The Subscriber is a person who has discretionary authority or control with respect to the assets of the Fund or provides investment advice to the Fund for a fee, direct or indirect, with respect to such assets or any affiliate of any such person (a "Controlling Person").

_____
*(Initial)*

(5)  The Subscriber is an entity whose underlying assets are deemed to include "plan assets" by reason of an employee benefit plan or other plan's investment in the Subscriber.  If so, the percentage of equity interests of the Subscriber held by employee benefit plans subject to part 4 of subtitle B of Title I of ERISA or plans subject to

_____
*(Initial)*

_____*Kingate Euro Fund, Ltd.* _____

S-12

Section 4975 of the Code will not exceed the following percentage during the period the Subscriber holds the Shares:

_____%

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

**The Subscriber understands and agrees that the information supplied above will be utilized to determine whether benefit plan investors own less than 25% of the value of the Shares, as determined under the Plan Asset Regulation, both upon the original issuance of Shares and upon subsequent transfer of Shares.**

## TRUSTEE, AGENT, REPRESENTATIVE, NOMINEE OR OTHER THIRD PARTIES

If the Subscriber is acting as trustee, agent, representative or nominee for an investor (a "Beneficial Owner"), the Subscriber understands and acknowledges that the representations, warranties and agreements made herein are made by the Subscriber with respect to the Subscriber *and* with respect to the Beneficial Owner. The Subscriber further represents and warrants that it has all requisite power and authority from said Beneficial Owner to execute and perform the obligations under this Subscription Agreement. The Subscriber also agrees to indemnify the Fund, the Manager, the Investment Advisor, the Consultant and the Administrator and their officers and agents for any and all costs, fees and expenses (including legal fees and disbursements) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein, or the assertion of the Subscriber's lack of proper authorization from the Beneficial Owner to enter into this Subscription Agreement or perform the obligations hereof.

If the Subscriber enters into a swap, structured note or other derivative instrument, the return from which is based in whole or in part on the return of the Fund (the "Swap") with a third party (a "Third Party"), the Subscriber represents and warrants that with respect to a Third Party entering into a Swap: (a) the Third Party is authorized under its constitutional documents (e.g., certificate of incorporation, by-laws, partnership agreement or trust agreement) and applicable law to enter into the Swap and would also be so authorized to invest directly into the Fund; (b) the Third Party has received and reviewed a copy of the Information Memorandum, the U.S. Supplement and the Subscription Agreement; (c) the Third Party acknowledges that the Fund and its affiliates are not responsible for the legality, suitability or tax consequences of the Swap and that the Subscriber is not an agent of the Fund; and (d) the Third Party is an "eligible contract participant" under the U.S. Commodity Exchange Act, as amended and, as necessary, an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended. The Subscriber also agrees to indemnify the Fund, the Manager, the Investment Advisor, the Consultant and the Administrator and their officers and agents for any and all costs, fees and expenses (including legal fees and disbursements) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein. Nothing herein constitutes an agreement or statement by the Fund as to the legality of a Swap or the suitability of a Swap for the Third Party.

## ANTI-MONEY LAUNDERING REPRESENTATIONS

(a)      The Subscriber represents that all evidence of identity provided in connection with the Subscription Agreement is true and correct and all related information furnished is genuine and accurate.

(b)      The Subscriber agrees to provide any information deemed necessary by the Fund in its sole discretion to comply with its anti-money laundering program and related responsibilities from time to time.  In the event of delay or failure by the Subscriber to produce any information requested in this Subscription Agreement or required for verification purposes, the Fund may refuse to accept the subscription.

(c)      The Subscriber represents and covenants that neither it, nor any person controlling, controlled by, or under common control with it, nor any person having a beneficial interest in it, is an individual, organization, or entity listed on the List of Specially Designated Nationals and Blocked Persons (the "OFAC Control List") maintained by the US Office of Foreign Assets Control ("OFAC"), and that it is not investing and will not invest in the Fund on behalf of or for the benefit of any individual, organization, or entity listed on the OFAC Control List.

(d)      The Subscriber represents that (i) the amounts contributed by it to the Fund were not and are not directly or indirectly derived from activities that contravene U.S. federal or state laws or regulations and international laws and regulations, including anti-money laundering laws and regulations, and (ii) the proceeds from the Subscriber's investment in the Fund will not be used to finance any illegal activities.

(e)      The Subscriber acknowledges (i) that additional subscriptions by the Subscriber may be refused and/or (ii) that requests for withdrawals may be delayed or declined if the Manager reasonably believes it does not have satisfactory evidence of the Subscriber's identity.

(f)      The Subscriber acknowledges that, if, following its subscription in the Fund, the Manager and/or the Administrator reasonably believes that the Subscriber is listed on the OFAC Control List or has otherwise breached its representations and covenants as to its identity, the Manager and/or the Administrator may be obligated to block the Subscriber's investment in accordance with applicable law, and the Subscriber shall have no claim against the Manager and/or the Administrator for any form of damages as a result of blocking the investment.

(g)      If the Subscriber is a "fund of funds" or an entity that invests on behalf of others, the Subscriber, in addition to and not by way of limiting the foregoing, represents and certifies that it is aware of the requirements of the USA PATRIOT Act of 2001, and rules and regulations promulgated thereunder and other applicable anti-money laundering measures in any jurisdiction (collectively, the "AML Rules") and that it has adopted anti-money laundering policies and procedures in place reasonably designed to verify the identity of its beneficial owners or underlying investors, as the case may be, and their respective sources of funds.  Such policies and procedures are properly enforced and are consistent with such AML Rules.  The Subscriber represents and certifies that to the best of its knowledge, the beneficial owners or investors, as the case may be, are not individuals, entities, or countries that may subject the Fund or any of its affiliates to criminal or civil violations of any AML Rules.  The Subscriber acknowledges that it is to furnish a copy of its anti-money laundering policies and procedures to the Fund when requested.  Among its other obligations hereunder, the Subscriber agrees to promptly notify the Fund if the foregoing representation and certification becomes inaccurate.

_____*Kingate Euro Fund, Ltd.* _____

(h)   Subscriber represents that:

(1)   it is <u>not</u> a Senior Foreign Political Figure[†], a member of a Senior Foreign Political Figure's Immediate Family[‡], and/or any Close Associate[§] of a Senior Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated by the US Treasury as warranting special measures due to money laundering concerns;

(2)   it is <u>not</u> a <u>former</u> Senior Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated as warranting special measures due to money laundering concerns;

(3)   it is <u>not</u> resident in, or organized or chartered under the laws of a jurisdiction that has been designated by the US Secretary of Treasury under Sections 311 and 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns;

(4)   it is <u>not</u> a Foreign Shell Bank as the term is defined in the USA PATRIOT Act; and

(5)   its subscription funds do <u>not</u> originate from, <u>nor</u> will they be routed through, an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or charted under the laws of a jurisdiction deemed to be a non-cooperative country or territory ("NCCT")[**].

## STANDING PROXY

Subscriber hereby designates and appoints Kingate Management Limited, or any successor thereof, with full powers of substitution, as Subscriber's true and lawful Proxy for the purpose of voting any Shares issued pursuant to this Agreement (or such portion thereof from time to time owned by Subscriber) as said Proxy may determine on any and all matters arising at any meeting of the Fund or any Class meeting upon which such Shares could be voted by Subscriber  (or the person in whose name the Shares hereby subscribed are registered at Subscriber's direction) if present in person at the meeting.  This proxy may be revoked by Subscriber (or his registered nominee) either personally or by presentation of a subsequently executed form of proxy at any meeting of the Fund or by written notice to Kingate Management Limited received by Kingate Management Limited prior to any such meeting provided however that such revocation may lead to the compulsory redemption of such Subscriber's Shares.

---

[†] The term "senior foreign political figure" is defined to mean  a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation.
[‡] The term "immediate family" is defined to mean the  parents, siblings, spouse, children and in-laws of a senior foreign political figure.
[§] The term close associate" is defined to mean a person who is widely and publicly known to maintain an unusually close relationship with s senior foreign political figure.
[**] The Financial Action Task Force on Money Laundering ("FATF") has designated certain countries or territories as NCCTs. The list of countries or territories deemed to be NCCTs is available at: http://www1.oecd.org/fatf.

_____***Kingate Euro Fund, Ltd.*** _____

## POWER OF ATTORNEY

The Subscriber hereby irrevocably constitutes and appoints Kingate Management Limited, with full power of substitution, as the Subscriber's true and lawful attorney-in-fact with full power and authority for the Subscriber, and in the Subscriber's name, place and stead and either personally or by attorney-in-fact, to execute, deliver, acknowledge, publish, file and record and swear to the execution, delivery, acknowledgment, filing and/or recording of:

(a)     The Information Memorandum, the Memorandum and Articles of Association and all amendments thereto required or permitted by law or the provisions of the Memorandum and Articles of Association and all instruments that the attorney-in-fact deems appropriate to reflect any change or modification of the Information Memorandum and the Memorandum and Articles of Association in accordance with the Memorandum and Articles of Association;

(b)     all such other agreements, applications, instruments, documents, certifications, certificates and reports which may from time to time be required by the laws of any jurisdiction in which the Fund shall determine to do business, or any political subdivision or agency thereof, or any regulator to effectuate, implement and continue the valid and subsisting existence of the Fund;

(c)     all conveyances and other instruments which the Board of Directors deems appropriate to reflect the dissolution and termination of the Fund; and

(d)     all certificates and other instruments deemed necessary or advisable by the Board of Directors to carry out the provisions of the Information Memorandum and the Memorandum and Articles of Association.

The Power of Attorney granted hereby is coupled with an interest and is irrevocable and shall (i) continue in full force and effect notwithstanding the subsequent death, incapacity, dissolution, termination or bankruptcy of the Subscriber or the transfer of all or any portion of the Subscriber's Shares in the Fund and (ii) extend to the Subscriber's successors, assigns and legal representatives. The Subscriber agrees to be bound by any representation made by the attorney-in-fact acting in good faith pursuant to this Power of Attorney, and hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the attorney-in-fact taken in good faith under this Power of Attorney.

In the event of any conflict between the provisions of the Memorandum and Articles of Association and any document executed or filed by the attorney-in-fact pursuant to this Power of Attorney, the Memorandum and Articles of Association shall govern.

## INDEMNIFICATION

The Subscriber acknowledges that the Subscriber understands the meaning and legal consequences of the representations and warranties contained in this Agreement and agrees to indemnify and hold harmless the Fund, the Manager, Investment Advisor, Consultant and Administrator, and their respective affiliates, employees, officers, directors and agents and each other Subscriber from and against any and all loss, damage, liability or expense, including, without limitation, legal fees, due to or arising out of a breach of any representation or warranty of the Subscriber contained in any document furnished by the Subscriber in connection with the offering and sale of the Shares, including, without limitation, this Agreement, the Information Memorandum and the Memorandum and Articles of Association, and all schedules, appendices and exhibits hereto or thereto, submitted by the Subscriber, or failure by the Subscriber to comply with any covenant or agreement by the Subscriber herein or in any other document furnished by the Subscriber to any

_____*Kingate Euro Fund, Ltd.* _____

of the foregoing in connection with this transaction. The indemnified parties shall be entitled to advances with regard to the indemnification made hereunder provided that such indemnified party deliver to the indemnifying party an undertaking pursuant to which it promises to return such advanced amount if the indemnity is ultimately found to be inapplicable.

**INDIVIDUALS**                                **ENTITIES**

_____      _____
Signature                                      Print Name of Entity

                                               By: _____
_____
Print Name                                         Authorized Signature(s)

_____      _____
Additional Investor Signature                  Print Name(s) and Title(s)

_____
Print Name

_____      _____
Date                                           Date

I/We enclose *(tick as appropriate)*:

☐      Exhibit A – Form of Incumbency Certificate

☐      Exhibit B – Anti Money Laundering ("AML") Certificate

☐      Exhibit C – Letter of Reference

☐      Exhibit D – Beneficial Ownership Information (Entities)

☐      Exhibit E – Trust Beneficiaries' Information (Trusts)

The foregoing Subscription Agreement is hereby accepted by the undersigned as of the date set forth below:

Amount Accepted              Euros_____

Kingate Euro Fund, Ltd.
By:                          _____
                             Name:
                             Title:

Date of Acceptance:          _____

_____*Kingate Euro Fund, Ltd.*_____

# EXHIBIT A

### FORM OF INCUMBENCY CERTIFICATE

The undersigned        _____
                       *Insert Name*

Being the              _____
                       *Insert Title*

Of                     _____
                       *Insert Name of Entity*

A                      _____
                       *Insert Type of Entity*

Organized under the laws of  _____
                       *Insert Jurisdiction of Entity*

(the "Company"), does hereby certify on behalf of the Company that the persons named below are directors and/or officers of the Company and that the signature at the right of said name, respectively, is the genuine signature of said person and that the persons listed below are each an authorized signatory for the Company.

|  Name  |  Title  |  Signature  |
|--------|---------|-------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

IN WITNESS WHEREOF, the undersigned has hereunto set his hand as of the _____ day of _____, 200__.

_____

Name:

Title:

The undersigned      _____
*Insert Name*

a Duly Authorized      _____of the Company
*Insert Title*

does hereby certify that    _____
*Insert Name of First Signatory*

is a duly authorized Officer of   _____
*Insert Name of Company*

and that the signature set forth above is [his][her] true and correct signature.

      IN WITNESS WHEREOF, the undersigned has executed this certificate as of the _____day of _____, 200__.

_____
Name:
Title:

# EXHIBIT B

**By Using This Form, the Undersigned Represents that it is Located in a FATF Jurisdiction**

**AML CERTIFICATION FORM FOR FUND OF FUNDS OR ENTITIES THAT INVEST ON BEHALF OF THIRD PARTIES**

The undersigned, being the    _____

*Insert Title*

of    _____

*Insert Name of Entity*

a    _____

*Insert Type of Entity*

organized under the laws of    _____

*Insert Jurisdiction of Entity*

(the "Investor"), does hereby certify that it is aware of the requirements of the USA PATRIOT Act of 2001, the regulations administered by the U.S. Department of Treasury's Office of Foreign Assets Control, and other applicable U.S. federal, state or non-U.S. anti-money laundering laws and regulations (collectively, the "anti-money laundering/OFAC laws"). As an entity regulated by _____ (*Insert Appropriate Regulatory Agency*) in the _____ (*Insert Jurisdiction*) (a FATF member jurisdiction) the Investor has/have anti-money laundering policies and procedures in place reasonably designed to verify the identity of its [beneficial holders] [underlying investors] and, to the extent required, their sources of funds. Such policies and procedures are properly enforced by the Investor.

After due inquiry, the Investor hereby represents to Kingate Euro Fund, Ltd. that, to the best of its knowledge, the Investor's [beneficial holders(s)] [underlying investor(s)] are not individuals, entities or countries that are identified on the list maintained by the U.S. Office of Foreign Assets Control[††].

Date: _____    By: _____

             Name:

             Title:

---

[1] The list may be found at http://www.ustreas.gov/ofac/t11/sdn.pdf

_____ ***Kingate Euro Fund, Ltd.*** _____

# EXHIBIT C

**FORM LETTER OF REFERENCE**

[TO BE PRINTED ON THE LETTERHEAD OF LOCAL OFFICE OF FATF
MEMBER BANKING INSTITUTION OR BROKERAGE FIRM]

Kingate Euro Fund, Ltd.
c/o Citi Hedge Fund Services, Ltd.
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Attn.: Shareholder Services Unit

To Whom It May Concern:

I, _____, the _____ of _____, do hereby
     *Name*           *Title*         *Name of Institution*

certify that _____ has maintained an account at our institution for _____
     *Name of Investor*                  *Insert Period*

years and, during this period, nothing has occurred that would give our institution cause to be

concerned regarding the integrity of _____.
                   *Name of Investor*

Do not hesitate to contact me at _____ if you have any further questions.
             *Insert Telephone Number*

                    Very truly yours,

                    _____

                    Name:

                    Title:

# EXHIBIT D

**BENEFICIAL OWNERSHIP INFORMATION**

**To Be Completed By Entity Subscribers That Are Privately Held Entities**

**Instructions:  Please complete and return this <u>Exhibit D</u> and provide the name of every person who is directly, or indirectly through intermediaries, the beneficial owner of 25% or more of any voting or non-voting class of equity interests of the Investor.   If the intermediary's shareholders or partners are not individuals, continue up the chain of ownership listing their 25% or more equity interest holders until individuals are listed.  If there are no 25% beneficial owners, please write none.**

| Full Name | If Shareholder is an Individual, Insert Name and Address of Principal Employer and Position | Citizenship (for Individuals) or Principal Place of Business (for Entities) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

# EXHIBIT E

### TRUST OWNERSHIP INFORMATION

**To Be Completed By Entity Subscribers That Are Trusts**

**Instructions:  Please complete and return this <u>Exhibit E</u> and provide the name of: i) every current beneficiary that has, directly or indirectly, an interest of 25% or more in the trust; ii) every person who contributed assets to the trust (settlors or grantors); and iii) every trustee.  If there are intermediaries that are not individuals, continue up the chain of ownership listing their 25% or more equity interest holders until individuals are listed.**

| Full Name and Address | Status (Beneficiary/Settlor/ Trustee) | Citizenship (for Individuals) or Principal Place of Business (for Entities) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

<div style="border:1px solid black">

# KINGATE EURO FUND, LTD.
## Participating Common Shares

</div>

---

### REDEMPTION REQUEST

---

Kingate Euro Fund, Ltd.
c/o Citi Hedge Fund Services, Ltd.
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Fax No.: (+ 1-441) 296-8227
Attn.:  Shareholder Services Unit

Dear Sirs:

I/We hereby requests Redemption of the number of the Participating Common Shares OR the Euro amount detailed below, subject to all the terms and conditions of the Memorandum and Articles of Association of Kingate Euro Fund, Ltd. (the "Fund"), and the Amended and Restated Information Memorandum of Kingate Euro Fund, Ltd., as may be further amended and supplemented from time to time.

Redemption shall be effective as of the last Business Day of the calendar month detailed below, provided that this Redemption Request, accompanied by a share certificate(s) (if applicable) is received by the Fund at least thirty-five (35) days prior to such effective date and that (i) the original signed Redemption Request is received by the Administrator prior to the Redemption Date and (ii) I/we receive written confirmation from the Administrator that the faxed Redemption Request has been received.

Please accept this letter as written notice of my/our intention to redeem the number of Shares indicated below or the Euro amount indicated below.

I/We (either in an individual capacity or as an authorized representative of an entity, if applicable) hereby represents and warrants to be the true, lawful and beneficial owner of the Shares to which this Redemption Request relates, with full power and authority to request redemption of such Shares. Such Shares are not subject to any pledge or otherwise encumbered in any fashion.

**Redemption Date:**        _____

**Number of Shares Being Redeemed:**

[   ]        Shares (number of shares) _____

**OR**

_____*Kingate Euro Fund, Ltd.* _____

**Amount Being Redeemed:**

[    ]    Euro (Euro amount)  _____

**Name and Address of Redeeming Shareholder(s):**

| | | | | | | | | | | | | | | | | | | | | | | |
|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|

**Telephone Number:**    _____

**Fax Number:**    _____

**E-Mail:**    _____

**Name and Address of Share Registration (if different):**

| | | | | | | | | | | | | | | | | | | | | | | |
|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|-|

**Telephone Number:**    _____

**Fax Number:**    _____

**E-Mail:**    _____

**Name and Address of Bank for the Payment of Redemption Proceeds:**

Bank Name:    _____

Bank Address:    _____

_____*Kingate Euro Fund, Ltd.* _____

_____

_____

ABA or CHIPS No:   _____

Account Name:   _____

Account No:   _____

For Further credit:   _____

Telephone Number:   _____

Fax Number:   _____

E-Mail:   _____

| INDIVIDUALS | ENTITIES |
|---|---|
| | |
| _____ | _____ |
| Signature | Print Name of Entity |
| | By: _____ |
| _____ | Authorized Signature(s) |
| Print Name | |
| _____ | _____ |
| Additional Investor Signature | Print Name(s) and Title(s) |
| _____ | |
| Print Name | |
| _____ | _____ |
| Date | Date |

_____*Kingate Euro Fund, Ltd.* _____

S-26

## KINGATE EURO FUND, LTD.
## Participating Common Shares

---

### TRANSFER REQUEST FORM

---

**Kingate Euro Fund, Ltd.**
c/o Citi Hedge Fund Services, Ltd.
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Fax No.: (+ 1-441) 296-8227
Attn.:  Shareholder Services Unit

Dear Sirs:

The undersigned (herein referred to as the "Transferor") hereby requests transfer, as defined in and subject to all the terms and conditions of the Amended and Restated Information Memorandum of the Fund, as may be further amended, restated and supplemented from time to time, to the transferee (the "Transferee") designated below, of the number of Participating Common Shares of the Fund detailed below in an amount equal to their Net Asset Value, as defined in the Information Memorandum.

Request is hereby made that effective as of _____ (insert date), Shares specified below are deemed transferred from the Transferor to the Transferee.  It is understood that the Fund's consent is required for this proposed transaction to be effective.

The Transferor (either in an individual capacity or as an authorized representative of an entity, if applicable) hereby represents and warrant to be the true, lawful and beneficial owner of the Shares to which this Transfer Request relates, with full power and authority to request transfer of such Shares. Such Shares are not subject to any pledge or otherwise encumbered in any fashion.

### TRANSFER INFORMATION

| |
|---|
| NUMBER OF SHARES<br>REQUESTED FOR TRANSFER:        SHARES………................<br>**OR**<br>US$ AMOUNT<br>BEING TRANSFERRED              US$…………………………<br><br>PLEASE INDICATE IF THE BENEFICIAL OWNER OF THE USD SHARES IN THE HANDS OF THE TRANSFEROR WILL REMAIN THE SAME:<br><br>             YES: ……NO: …… (initial applicable answer) |

EFFECTIVE TRANSFER DATE:　　…………….....................................................................

NAME AND MAILING　　……………………………………..……………………….
ADDRESS OF TRANSFEROR(S)
WISHING TO TRANSFER ……………………………………………..…………….

……………………………………………………..….

NAME AND MAILING
ADDRESS OF TRANSFEREE(S) ……………………………………..……………..…….

NAME AND ADDRESS OF …………………………………………………………………...
SHARE REGISTRATION
(IF DIFFERENT)　　……………………………………………………………..

………………………………………………………..………

NAME AND ADDRESS OF …………………………………………………………...…
FINANCIAL INSTITUTION
TO WHICH TRANSFER　　……………………..…………………………..…………
PROCEEDS ARE TO BE
TRANSFERRED FROM　　…………………………………………………………..…
(INCLUDING A BANK
ACCOUNT NUMBER AND…………………………………………………………..……
WIRING INSTRUCTIONS
IF APPROPRIATE)

DATE　　………………………………………………………….………

SIGNATURE　　………………………………………………………….………

NAME OF TRANSFEROR[*] ………………………………………………………….....

NAME AND TITLE　　………………………………………………………..…...
(IF SIGNING IN A REPRESENTATIVE CAPACITY)

---

[*] See **EXHIBIT I** attached hereto for a sample letter that must be provided to the Fund and the Administrator when anyone other than an individual makes a request to transfer Shares.

<div style="border:1px solid black; text-align:center;">

# KINGATE EURO FUND, LTD.
## Participating Common Shares

</div>

---

## SUBSCRIPTION AGREEMENT FOR ADDITIONAL SUBSCRIPTIONS BY EXISTING NON-U.S. SHAREHOLDERS

---

**Kingate Euro Fund, Ltd.**
c/o Citi Hedge Fund Services, Ltd.
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Fax No.: (+ 1-441) 296-8227
Attn.:  Shareholder Services Unit


Dear Sirs:

      1.     The undersigned, an existing Shareholder of Kingate Euro Fund, Ltd., a British Virgin Islands business company (the "Fund"), does hereby subscribe for and agrees to purchase additional shares (the "Shares") in the Fund in the amount of $_____, such subscription to be effective as of _____, _____ (the "Effective Date").

      2.     The undersigned agrees and acknowledges that in connection with its original investment in the Fund, it tendered a subscription agreement (the "Subscription Agreement") to the Fund.

      3.     The undersigned reaffirms all of the representations, warranties, covenants and agreements on the part of the undersigned which were set forth in the Subscription Agreement (which are incorporated herein by reference), except for the subscription amount and date of purchase, with the same force and effect as if set forth in full herein on the date hereof.  The undersigned also confirms to the Fund that all of the information contained in the Subscription Agreement, including, without limitation, information contained in the "SUBSCRIBER REPRESENTATIONS AND WARRANTIES" and "PROFESSIONAL INVESTOR REPRESENTATIONS AND WARRANTIES" sections, is true and correct as of the date hereof and that the effect of the execution of this instrument by the undersigned is the same as the re-execution of the Subscription Agreement on the date hereof except as above provided.

      4.     The undersigned hereby tenders wire transfer payable to "Kingate Euro Fund, Ltd." in the amount of his subscription and agrees that such wire, and this Additional Subscription Agreement are being delivered subject to the Fund's acceptance of the additional subscription contained herein and subject further to the terms and conditions of this Subscription Agreement for Additional Subscriptions, the Fund's Amended and Restated  Information Memorandum (as the same may be further amended from time to time) and the Fund's Memorandum and Articles of Association (as the same may be amended from time to time).

_____*Kingate Euro Fund, Ltd.* _____

IN WITNESS WHEREOF the undersigned agrees to be bound by this Additional Subscription Agreement as provided herein.

Dated:  _____, _____

IF THE UNDERSIGNED IS AN INDIVIDUAL, COMPLETE THE FOLLOWING:

_____  
Print name of individual

_____  
Print name of spouse if funds are to be invested in joint name

_____  
Signature of individual

_____  
Signature of spouse if funds are to be invested in joint name

IF THE UNDERSIGNED IS A CORPORATION, PARTNERSHIP, TRUST OR ANOTHER ENTITY, COMPLETE THE FOLLOWING:

_____  
Print name of corporation, partnership, trust or another entity

_____  
Print capacity of authorized representative

By:  _____  
     Signature of authorized Representative

_____  
Print name of authorized representative

_____

Accepted by:

Kingate Euro Fund, Ltd.:

_____

By:  _____  
Title:  _____

_____*Kingate Euro Fund, Ltd.*_____

S-30

**EXHIBIT I**

Sample Letter For Approved Transfers

[to be placed on letterhead of a financial institution in a recognized
jurisdiction for money laundering regulations on behalf of the Shareholder requesting a Share transfer]

**Kingate Euro Fund, Ltd.**
c/o Citi Hedge Fund Services, Ltd.
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Fax No.: (+ 1-441) 296-8227
Attn.:  Shareholder Services Unit

Re:  Transfers of Participating Common Shares in Kingate Euro Fund, Ltd. (the "Fund")

Dear Sirs:

We act as a nominee or intermediary for our customers with respect to investments in various investment funds.  We may from time to time be the recipient of shares (by way of a transfer from an existing Shareholder) in the Fund and/or in funds which are administered by the Fund's administrator, Citi Hedge Fund Services, Ltd. (the "Administrator"), or one of your subsidiary or affiliated companies.  We are providing this letter to you, the Fund, and the Administrator, in connection with your obligations under the various anti-money laundering and similar laws applicable to you.

We confirm that we are a financial institution which is subject to regulation in our jurisdiction of residence the purpose or effect of which is to prevent money laundering (the "AML Rules").

We confirm that we have in place policies and procedures which meet or exceed the requirements imposed by the AML Rules.

We confirm that prior to acting as a nominee or intermediary for our customers we verify the identity of the customer and, if not an individual, its beneficial owners.

The above information is given in strictest confidence and may only be relied upon by you and the Administrator.

Yours truly,

Signed:      _____

Full Name:      _____

Position:      _____

Address and Telephone Number of Branch Providing this Letter:

_____

_____*Kingate Euro Fund, Ltd.* _____

**EXHIBIT J**

**PRIVACY NOTICE**

Kingate Management Limited (the "Manager") recognizes the importance of protecting Shareholder privacy and have appropriate policies in place to maintain the confidentiality and security of our Shareholders' information.

**Categories Of Information We May Collect**

In the normal course of business, we may collect the following types of information:

- Information you provide in the subscription documents and other forms (including name, address, date of birth, social security or taxpayer identification number, income and other financial-related information)

- Data about your transactions with us (such as the types of investments you have made and your account status)

**How We Use Your Information That We Collect**

Any and all nonpublic personal information received by the Manager with respect to the Shareholders who are natural persons, including the information provided to the Fund by a Shareholder in the subscription documents, will not be shared with nonaffiliated third parties which are not service providers to the Fund or the Manager without prior consent from such Shareholders. In the normal course of business, we may disclose the kinds of nonpublic personal information listed above to nonaffiliated third party service providers involved in servicing and administering products and services on our behalf. Such service providers include but are not limited to the Administrator, the auditors and the legal advisors of the Fund. Additionally, the Fund and/or the Manager may disclose such nonpublic personal information as required by law (such as to respond to a subpoena or to prevent fraud). In addition, if the Fund chooses to dispose of any Shareholder's nonpublic personal information that the Fund is not legally bound to maintain, then the Fund will do so in a manner that reasonably protects such information from unauthorized access.

The same privacy policy applies to the former Shareholders.

**Confidentiality and Security**

We restrict access to nonpublic personal information about our customers to those employees and agents who need to know that information in order to provide products and services to you. We maintain physical, electronic and procedural safeguards to protect your nonpublic personal information.

For questions about this privacy policy, please contact the Manager.